## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) | Case No. 23-90005 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 3:00 p.m. (prevailing Central Time) on January 18, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on January 18, 2023, at 3:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Jones' homepage.  The meeting code is "JudgeJones".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Jones' homepage.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Party City Holdco Inc. (9758); Amscan Custom Injection Molding, LLC (4238); Amscan Inc. (1359); Amscan Purple Sage, LLC (3514); Am-Source, LLC (8427); Anagram Eden Prairie Property Holdings LLC (8309); Party City Corporation (3692); Party City Holdings Inc. (3029); Party Horizon Inc. (5812); PC Intermediate Holdings, Inc. (1229); PC Nextco Finance, Inc. (2091); PC Nextco Holdings, LLC (7285); Print Appeal, Inc. (5932); and Trisar, Inc. (0659).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

**Relief Requested**[2]

1.      The Debtors seek entry of an order substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") granting the following relief:[3]

- ***DIP Facility***:      Authorizing the Debtors to obtain postpetition financing (the "DIP Financing") pursuant to a $150 million senior secured, superpriority and priming debtor-in-possession term loan credit facility (the "DIP Facility") subject to the terms and conditions of that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement, substantially in the form attached as **Exhibit 1** to the Interim Order (the "DIP Credit Agreement"[4] and, together with the related security and ancillary documents, the "DIP Documents" and, all obligations arising thereunder, the "DIP Obligations"), of which $80 million will be available immediately upon entry of the Interim Order and the remaining $70 million to be available immediately following the entry of the Final Order;

- ***Cash Collateral***: Authorizing the Debtors to continue to use Prepetition Collateral, including Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties under the Prepetition Credit Documents, subject to the terms set forth in the DIP Documents and the Interim Order;

- ***Adequate Protection***: Authorizing the Debtors to grant adequate protection to the Prepetition Secured Parties subject to the terms set forth in the Interim Order;

- ***Superpriority Claims and DIP Liens***: Granting DIP Liens on the DIP Collateral to secure the DIP Obligations with the relative priorities set forth in the DIP Order subject to the terms set forth in the DIP Documents and the Interim Order;

- ***Automatic Stay***: Modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders subject to the terms set forth in the DIP Documents and the Interim Order; and

---

[2]      The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

[3]      The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

[4]      Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement, the Interim Order, or the First Day Declaration, as applicable.

2

- ***Final Hearing***: Scheduling a final hearing (the "<u>Final Hearing</u>") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed Final Order, as set forth in this motion and the DIP Documents filed with this Court.

2.        In support of this Motion, the Debtors submit the (a) *Declaration of David Orlofsky, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>") and (b) *Declaration of Adam B. Keil in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "<u>Keil Declaration</u>" and, together with the First Day Declaration, the "<u>Declarations</u>").  Each of the Declarations is incorporated herein by reference.

## <u>Jurisdiction and Venue</u>

3.        The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "<u>Amended Standing Order</u>").  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

4.        Venue is proper pursuant to 28 U.S.C. § 1408.

5.        The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for

the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

6.      On January 17, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## Concise Statement Pursuant to Bankruptcy Rule 4001

7.      In accordance with Bankruptcy Rules 4001(b), 4001(c) and 4001(d), the following is a concise statement and summary of the proposed material terms of the DIP Facility as provided in the DIP Documents and the DIP Orders:[5]

| | **DIP Facilities** |
|---|---|
| **DIP Facility**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*Interim Order, Preamble* | A senior secured, superpriority and priming debtor-in-possession term loan credit facility (the DIP Facility) subject to the terms and conditions set forth in the DIP Credit Agreement, consisting of new money term loans in an aggregate principal amount of $150 million, of which $75 million will be available immediately upon entry of this Interim Order (the Initial Draw), and the remainder to be available subject to and upon the date of entry of the Final Order (the Final Draw), by and among the Borrowers, the DIP Guarantors as guarantors, the several financial institutions or other entities from time to time party thereto as "Lenders" (the DIP Lenders), Ankura Trust Company, LLC, as |

---

[5]    This summary is intended only to assist the Court by reference to the DIP Credit Agreement and the DIP Orders, and is qualified in its entirety by the terms of the DIP Documents, each as may be modified by the DIP Orders. Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents or DIP Orders, as applicable.

| | **DIP Facilities** |
|---|---|
| | administrative agent and collateral agent (in such capacity, together with its successors and permitted assigns, the DIP Agent). |
| **Borrowers** <br> **(Bankruptcy Rule 4001(c)(1)(B))** <br> *DIP Credit Agreement, Preamble* | Party City Holdings Inc. and Party City Corporation. |
| **Guarantors** <br> **(Bankruptcy Rule 4001(c)(1)(B))** <br> *DIP Credit Agreement, "Guarantors"; "Subsidiary Guarantor"* <br> *Interim Order, Preamble* | All the Debtors in these chapter 11 cases other than the Borrowers and Print Appeal, Inc. |
| **DIP Lenders** <br> **(Bankruptcy Rule 4001(c)(1)(B))** <br> *DIP Credit Agreement, "Lenders"* | Those certain banks, financial institutions and other entities party to the DIP Credit Agreement from time to time as lenders. |
| **Term** <br> **Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)** <br> *DIP Credit Agreement, §2.22, "Termination Date"* | The earliest of (a) June 19, 2023 (or, in return for payment in kind of an extension premium of 3.0% of the principal amounts of Term Loans outstanding, a date that is no later than July 19, 2023) (b) the effective date of any plan for the reorganization of the Borrowers or any other Debtor under chapter 11, (c) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363, (d) the date of acceleration of the DIP Loans and the termination of unused Commitments with respect to the DIP Facility in accordance with the terms of the DIP Documents upon and during the continuance of an Event of Default and (e) the date that is thirty (30) days after the Petition Date (or such later date as may be agreed by the Required Lenders), unless the Final Order has been entered. |
| **Material Conditions to Closing and Borrowing** <br> **(Bankruptcy Rule 4001(c)(1)(B))** <br> *DIP Credit Agreement, Section 4* | The DIP Facility includes customary conditions of borrowing, the satisfaction of which are a condition precedent to the obligations of each DIP Lender to make DIP Loans. |

|  | **DIP Facilities** |
|---|---|
| **Fees and Expenses**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Credit Agreement, §§2.12, 2.27* | DIP Commitment Premium: 8.00% of the Commitments in effect on the Closing Date, payable in cash (or, if payable pursuant to an Acceptable Plan of Reorganization, either in cash or paid-in-kind as elected by the Required Lenders)<br><br>Backstop Commitment Fee: each individual Backstop Lender will receive either (i) payment of a fee equal to 10.00% of the Term Loans held by such Backstop Lender outstanding on the Termination Date in cash or (ii) in the event that an Acceptable Plan of Reorganization is pursued and consummated, conversion of all or a portion of their Term Loans into Reorganized Securities at a price equal to the rights offering price (including any fees, discounts and other economics thereto)<br><br>Delayed Draw Unused Line Fee: 0.50% per annum of the average daily unused amount of each Commitment of such Lender during the period from and including the Closing Date to but excluding the Commitment Termination Date. |
| **Interest Rate**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Credit Agreement, §2.13 "Applicable Rate," "ABR," "Floor," "Term SOFR Adjustment,"* | ABR: ABR (with a floor of 2.00%) *plus* 9.00%<br><br>SOFR: SOFR (with a floor of 1.00% and a credit spread adjustment of 0.10%) *plus* 10.00% |
| **DIP Liens**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(i))**<br><br>*DIP Credit Agreement, §2.25, 5.21*<br><br>*Interim Order ¶¶ 7, 16* | The DIP Facility will be secured by liens on substantially all assets and property of the Debtors, whether now existing or hereafter arising and wherever located.   Such liens shall be consistent with the Prepetition ABL Intercreditor Agreement (as defined in the Interim Order), *i.e.* first liens on Prepetition 1L Notes Priority Collateral and unencumbered collateral and third liens on Prepetition ABL Priority Collateral, in all cases subject to the Prepetition Permitted Senior Liens, |
| **Modification of Non-Bankruptcy Law Relating to Perfection of Liens on Estate Property** | The Interim Order contains customary provisions providing that entry of the Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted |

| | **DIP Facilities** |
|---|---|
| **(Bankruptcy Rule 4001(c)(1)(B)(vii))** *Interim Order ¶ 7(a)* | therein, including the DIP Liens and the Adequate Protection Liens, without the necessity of any filings or recordings under non-bankruptcy law. |
| **Superpriority Administrative Claims** **(Bankruptcy Rule 4001(c)(1)(B)(i))** *Interim Order ¶ 6* | The DIP Obligations shall constitute allowed superpriority administrative claims with priority over any and all administrative expenses and unsecured claims, including, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code. |
| **Borrowing Base** **(Bankruptcy Rule 4001(c)(1)(B))** *Interim Order ¶ ¶14 (i), (k), (l), (m)* | Borrowing Base Reporting: The Debtors shall deliver to the Prepetition ABL Agent, with copies to the DIP Agent and counsel to the Ad Hoc Group, a Borrowing Base Certificate, with all the information required to be provided in connection therewith, in each case in the format customarily delivered with each Borrowing Base Certificate delivered prior to the Petition Date, setting forth the Cash Collateral Borrowing Base (i) calculated as of the last day of the immediately preceding calendar week (with weeks, for purpose of the Borrowing Base Certificate, beginning on Sunday and ending on Saturday) on Thursday of each week commencing on January 26, 2023 for the week ending January 21, 2023 and each Thursday thereafter; and (ii) calculated as of the last business day of the immediately preceding fiscal month, promptly, but in no event later than January 20, 2023 with respect to the fiscal month ended December 31, 2023 and twenty calendar days (or, if such day is not a business day, the next business day) following the end of each subsequent fiscal month which monthly Borrowing Base Certificates shall reconcile all weekly inventory roll forwards, provided, however, that with respect to the weekly Borrowing Base Certificates required to be delivered under clause (i) above, only the Weekly Back-Up Information[6] shall be required to be rolled |

---

[6] The "Weekly Back-Up Information" means the following Borrowing Base components (in each case, consistent with the Debtors' past practice under the Prepetition ABL Credit Agreement) trade receivables, foreign receivables, eligible credit card receivables, perpetual inventory, inventory FCPO, unbilled and received

| | **DIP Facilities** |
|---|---|
| | forward on a weekly basis, and each other component that does not constitute Weekly Back Up-Information may be rolled forward on a monthly basis; provided further, that the Debtors shall use commercially reasonable efforts to roll forward each input on a weekly basis to the extent practicable. <br><br> Borrowing Base: the definition of "Borrowing Base" used in the determination of any Availability Event or Borrowing Base Shortfall (as defined below) shall be the "Borrowing Base" as defined in, and determined in accordance with, the Prepetition ABL Credit Agreement and set forth in the most recent Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement) delivered prior to the Petition Date but modified as provided below herein (the "Cash Collateral Borrowing Base"), which, for the avoidance of doubt, shall give effect to the applicable Net Recovery Percentage (as defined in the Prepetition ABL Credit Agreement) set forth in the appraisal prepared by B. Riley Advisory & Valuation Services, LLC for the Prepetition ABL Agent effective as of September 3, 2022 and as adjusted pursuant to a Permitted Re-Appraisal (defined below); provided, further, that notwithstanding anything to the contrary in the ABL Credit Agreement, (x) the Cash Collateral Borrowing Base shall not otherwise reflect any new reserves except for the Store Closing Reserve (as defined below) or any modifications of eligibility criteria (except those eligibility criteria that automatically change pursuant to the terms of the Prepetition ABL Credit Agreement as in effect on the Petition Date) set forth in the Prepetition ABL Credit Agreement  (y) the Cash Collateral Borrowing Base will be calculated using any updated Borrowing Base Certificates (as defined in the ABL Credit Agreement) as and when required to be delivered pursuant to the adequate protection ABL Borrowing Base Reporting below, and (z) the Cash Collateral Borrowing Base shall be increased (on a dollar-for-dollar basis) by the |

---

inventory, loss reserve (shrinkage), in-transit inventory, aged in-transit inventory, in-transit inventory more than 75 days OTW, the in-transit inventory reserve, eligible in-transit inventory limit, and the landed cost reserve.

| | **DIP Facilities** |
|---|---|
| | amount of cash then held in the Adequate Protection Account.<br><br>Store Closing Reserve: Commencing in the week following the week in which the Company has commenced "store closing sales" in one-hundred (100) or more stores (each a "Closing Store") in the aggregate since the Petition Date, and continuing each week thereafter, the Prepetition ABL Agent may institute a Store Closing Reserve in its Permitted Discretion, which shall be a reserve against the Cash Collateral Borrowing Base. A "Store Closing Reserve" means a reserve in an amount equal to the difference between the Net Recovery Percentage (as defined in the Prepetition ABL Credit Agreement) and the Net Recovery Percentage reduced by 1000 basis points each week, in each case multiplied by 92.5% or 90% (in the case of the ABL Borrowing Base (as defined in the Prepetition ABL Credit Agreement)) or 2.5% or 5% (in the case of the FILO Borrowing Base (as defined in the Prepetition ABL Credit Agreement)) (as required under the definition of "inventory component" in the Prepetition ABL Credit Agreement) multiplied by the Cost (as defined in the Prepetition ABL Credit Agreement) of all Eligible Inventory (as defined in the Prepetition ABL Credit Agreement) at the Closing Stores.<br><br>Appraisals: Notwithstanding anything to the contrary in the Prepetition ABL Credit Agreement, the Prepetition ABL Agent will not be entitled to request access for and/or request any new inspections, appraisals and field examinations (including, without limitation, with respect to Prepetition ABL Priority Collateral). Notwithstanding the foregoing, the Prepetition ABL Agent shall be permitted to request access for and/or request any new inspections, appraisals, and field examinations from time to time, at the Prepetition ABL Agent's own expense, for valuation purposes only, which (i) do not impact the calculation of the Cash Collateral Borrowing Base and (ii) do not unreasonably interfere with the ordinary course activities and operations of the Debtors as in effect at such time, provided that, on or after June 30, |

| | **DIP Facilities** |
|---|---|
| | 2023, if the Borrower has not emerged from chapter 11, the Prepetition ABL Agent may conduct one appraisal, inspection, and field examination consistent with past practice, and may adjust the valuations used to calculate the Borrowing Base in accordance with the terms of the Prepetition ABL Credit Agreement based on such appraisal, inspection, or field examination (a "Permitted Re-Appraisal"). |
| **Adequate Protection for Prepetition ABL Secured Parties**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(ii), (b)(1)(B)(iv))**<br><br>*Interim Order ¶ ¶14(c), (d), (f), (g), (h), (j), (n)* | Adequate Protection Liens: The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral, in the case of the Prepetition ABL Priority Collateral, senior to all other liens but in the case of DIP 1L Notes Priority Collateral subject and subordinate to, in the case of DIP 1L Notes Priority Collateral, (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the Prepetition 1L Notes Liens, and (v) the 1L Notes Adequate Protection Liens.<br><br>Adequate Protection Claims: The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted an allowed superpriority administrative expense claim on account of such Prepetition ABL Secured Parties' Adequate Protection Claims as provided for in section 507(b) of the Bankruptcy Code which Prepetition ABL 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds). With respect to the Prepetition ABL Priority Collateral, the Prepetition ABL 507(b) Claim shall be senior to all other claims of any kind and with respect to the DIP 1L Notes Priority Collateral, the Prepetition ABL 507(b) Claim shall be subject and subordinate only to the Carve-Out, the DIP Superiority Claims, the Prepetition 1L Notes 507(b) Claim, the Prepetition |

| | **DIP Facilities** |
|---|---|
| | Permitted Senior Liens, and the prepetition claims of the Prepetition 1L Notes Secured Parties.<br><br>Fees and Expenses: As further adequate protection, , the DIP Loan Parties shall provide the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Prepetition ABL Agent under the Prepetition ABL Credit Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Simpson Thacher & Bartlett LLP (solely in its capacity as counsel to the Prepetition ABL Agent), and one local counsel the Prepetition ABL Agent, and Berkeley Research Group, LLC as financial advisor, subject to the review procedures set forth in the  Interim Order.<br><br>Information Rights: The Debtors shall provide to the Prepetition ABL Agent at the same time as such reporting is provided to the DIP Lenders and/or the DIP Agent all reporting required to be provided to the DIP Lenders or DIP Agent under the DIP Documents. The Debtors shall provide the Prepetition ABL Agent with all other reporting required under the Prepetition ABL Credit Agreement when due in accordance with its terms.<br><br>ABR Rollover: Notwithstanding anything to the contrary herein or in the Prepetition ABL Credit Agreement, upon the termination of any applicable Interest Period (as defined in the Prepetition ABL Credit Agreement), each Term SOFR Borrowing (as defined in the Prepetition ABL Credit Agreement) shall automatically convert to and be deemed to be an ABR Borrowing (as defined in the Prepetition ABL Credit Agreement) for all purposes under the Prepetition ABL Credit Agreement; provided that no break funding payments shall be payable in connection therewith.<br><br>Adequate Protection Account: If the Borrower delivers a weekly Borrowing Base Certificate to the Prepetition ABL Agent that provides a Borrowing Base that is less |

| | **DIP Facilities** |
|---|---|
| | than the sum of (a) the Prepetition ABL Obligations plus (b) the greater of $46,000,000 and 10.0% of the Total Line Cap (as defined in the Prepetition ABL Credit Agreement) (an "Availability Event," and the amount of such shortfall, the "Borrowing Base Shortfall"), the Borrower shall, by the end of the second business day thereafter, deposit cash in an amount equal to the Borrowing Base Shortfall into a controlled segregated reserve account maintained by the Prepetition ABL Agent (the "Adequate Protection Account"), with all funds held in the Adequate Protection Account deemed Prepetition ABL Priority Collateral and deemed not DIP Collateral, provided that the Borrowing Base shall be adjusted on a dollar-for-dollar basis by the amount of cash then held in the Adequate Protection Account and shall be reflected in Borrowing Base Certificates, provided further that, for the avoidance of doubt that the DIP Liens shall extend to the Debtors' reversionary interest in the Adequate Protection Account. The Borrower may withdraw cash from the Adequate Protection Account at any time so long as such withdrawal, delivery of the most recent Borrowing Base Certificate would not have resulted in an Availability Event. |
| **Adequate Protection for Prepetition 1L Notes Secured Parties** <br><br> **(Bankruptcy Rule 4001(c)(1)(B)(ii), (b)(1)(B)(iv))** <br><br> *Interim Order ¶¶14(a), (b), (e)* | **Adequate Protection Liens:** Each Prepetition 1L Notes Trustee, for itself and for the benefit of the other applicable Prepetition 1L Notes Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral, subject and subordinate to (i) Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens and (iv) and in the case of Prepetition ABL Priority Collateral, (x) the Prepetition ABL Liens and (y) the ABL Adequate Protection Liens. <br><br> **Adequate Protection Claims:** Each Prepetition 1L Notes Trustee, for itself and for the benefit of the other applicable Prepetition 1L Notes Secured Parties, is hereby granted, subject to the Carve-Out, an allowed |

| | **DIP Facilities** |
|---|---|
| | superiority administrative expense claim on account of such Prepetition 1L Notes Secured Parties' Adequate Protection Claims as provided for in section 507(b) of the Bankruptcy Code, which Prepetition 1L Notes 507(b) Claim shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds). The Prepetition 1L Notes 507(b) Claims shall be subject and subordinate only to (1) the Carve-Out, (2) the DIP Superpriority Claims, and (3) solely with respect to the Prepetition ABL Priority Collateral, the Prepetition ABL Debt and the Prepetition ABL 507(b) Claim. <br><br> <u>Fees and Expenses</u>: the DIP Loan Parties shall provide the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Prepetition ABL Agent under the Prepetition ABL Credit Documents, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Simpson Thacher & Bartlett LLP (solely in its capacity as counsel to the Prepetition ABL Agent), and one local counsel the Prepetition ABL Agent, and Berkeley Research Group, LLC as financial advisor, subject to the review procedures set forth in the Interim Order. |
| **Limitations on the DIP Lenders' Obligations to Fund Activities of the Debtors** <br><br> **(Bankruptcy Rule 4001(c)(1)(B))** <br><br> *Interim Order ¶ 21* | Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the DIP |

| | **DIP Facilities** |
|---|---|
| | Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $100,000), (b) attempts to prevent, hinder, or otherwise delay or interfere with each Prepetition 1L Notes Trustee's, the Prepetition ABL Agent's, the Prepetition Secured Parties', the DIP Agent's, or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Credit Documents and this Interim Order; (c) attempts to seek to modify any of the rights and remedies granted to each Prepetition 1L Notes Trustee, the Prepetition ABL Agent, the Prepetition Secured Parties, the DIP Agent, or the DIP Secured Parties under this Interim Order, the Prepetition Credit Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to |

| | **DIP Facilities** |
|---|---|
| | approve superpriority claims or grant liens (other than the liens and claims granted hereunder or permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Secured Parties, each Prepetition 1L Notes Trustee, Prepetition ABL Agent and Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Secured Parties. For the avoidance of doubt, this paragraph [21] shall not limit the Debtors' right to use DIP Collateral to contest that an Event of Default has occurred hereunder pursuant to and consistent with paragraph [8] of this Interim Order. |
| **Events of Default**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Credit Agreement § 7.1* | Usual and customary events of defaults for facilities of this type and purpose, including, among others:<br>• Breaches of the budget and variance covenants<br>• failure to comply with milestones,<br>• nonpayment of obligations,<br>• defaults under covenants,<br>• breaches of representations and warranties,<br>• the occurrence of any number of adverse actions or consequences in any of the chapter 11 cases. |
| **Covenants**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Credit Agreement, Articles V and VI* | Affirmative Covenants: Usual and customary for financings of this type, including, without limitation, (a) reporting requirements, (b) delivery of certain compliance certificates, notices, reports and filings, (c) preservation of existence, (d) compliance with applicable laws, (e) payment of post-petition |

| | **DIP Facilities** |
|---|---|
| | obligations, (f) maintenance of property and insurance, (g) keeping of books and records, (h) use of proceeds, (i) further assurances regarding collateral and guarantors, (j) compliance with milestones, (k) weekly management conference calls and (l) delivery of the DIP Budget and variance reporting. |
| | <u>Negative Covenants</u>: Usual and customary for financings of this type, including, without limitation, restrictions on: (a) indebtedness, (b) liens and guaranties, (c) investments, (d) disposition of assets, (e) restricted payments and payments in respect of other indebtedness, (f) transactions with affiliates, (g) use of proceeds, (h) post-petition claims, (i) activities of PC Intermediate and the Holding Companies, (j) compliance with the DIP Budget (subject to permitted variances and exclusions), (k) compliance with minimum Liquidity, (l) Intra-Company Agreement and (m) payments to foreign vendors, critical vendors and administrative expense claims under section 503(b)(9) of the Bankruptcy Code. |
| **Reporting** <br><br> **(Bankruptcy Rule 4001(c)(1)(B))** <br><br> *DIP Credit Agreement § 5.01.* | The DIP Facility requires compliance with certain periodic reporting covenants, including monthly, quarterly and annual financial statements, Liquidity certificates, Weekly Payment Matrixes of Specified First Day Payments, the DIP Budget and variance reports. |
| **Provisions Providing for the Reaffirmation of Prepetition Debt** <br><br> **(Bankruptcy Rule 4001(c)(1)(B)(iii), (viii))** <br><br> *Interim Order ¶¶ G, 20* | The Interim Order provides stipulations by the Debtor reaffirming the Prepetition 1L Fixed Notes, Prepetition 1L Floating Rate Notes, and Prepetition ABL Facility, and a waiver of any right to challenge the foregoing. <br><br> The Debtors' stipulations are binding on the Debtors as of the entry of the Interim Order, and shall only be binding on third parties if no proceeding has been commenced by the earlier of (a) with respect to any party in interest other than the Creditors' Committee, 75 days after entry of the Interim Order, and (b) with respect to the Creditors' Committee, no later than 60 days after its appointment, with typical exceptions for trustees appointed prior to the conclusion of the Challenge Period |

| | **DIP Facilities** |
|---|---|
| **Use of Proceeds and Cash Collateral**<br><br>**(Bankruptcy Rule 4001(c)(1)(B), (b)(1)(B)(ii))**<br><br>*DIP Credit Agreement § 3.21* | Subject to any additional restrictions in the Interim Order or the Final Order, the proceeds of the DIP Facility shall be used in accordance with and as provided in the Approved Budget (subject to permitted variances), including, without limitation: (a) to pay the administrative costs of the Cases and (b) for general corporate purposes. |
| **Entities with Interest in Cash Collateral**<br><br>**(Bankruptcy Rule 4001(c)(1)(B), (b)(1)(B)(i))**<br><br>*Interim Order ¶ F* | The Prepetition Secured Parties. |
| **Milestones**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(vi))**<br><br>*DIP Credit Agreement §5.18* | • no later than January 17, 2023, the Petition Date shall have occurred;<br>• No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br>• no later than twenty-one (21) days after the Petition Date, the Debtors shall have (i) delivered to counsel to the Ad Hoc Noteholder Group a business plan that is acceptable to the Required Lenders and (ii) populated a data room with marketing materials that are acceptable to the Required Lenders and delivered to counsel to the Ad Hoc Group outreach target lists, teaser materials, and other marketing materials reasonably requested by the Ad Hoc Group Advisors related to a process to market and sell substantially all of the Debtors' assets;<br>• no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;<br>• no later than sixty (60) days after the Petition Date, the Debtors shall have filed the Acceptable Plan of Reorganization and Acceptable Disclosure Statement with the Bankruptcy Court;<br>• no later than one hundred and five (105) days after the Petition Date, the Bankruptcy Court |

|  | **DIP Facilities** |
|---|---|
|  | shall have entered the Confirmation Order; and<br>• no later than one hundred and twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred.<br><br>Upon the occurrence of a Toggle Event, the Milestones set forth above that occur after such Toggle Event shall be replaced in their entirety by the following milestone (which, to the extent such date (including any extension thereof), does not consist of a date certain, shall be calculated under Bankruptcy Rule 9006) unless extended in writing by the Required Lenders:<br><br>• By no later than the date that is fifty-five (55) days following the date of an occurrence of a Toggle Event, the Bankruptcy Court shall have entered the Sale |
| **Indemnification**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(ix))**<br><br>*DIP Credit Agreement § 9.03*<br><br>*Interim Order ¶22* | The debtors shall indemnify and hold harmless the Prepetition Secured Parties and DIP Secured Parties (including Chapman and Cutler LLP, as counsel to the Administrative Agent and the Ad Hoc Group Advisors (plus one firm of local counsel per material jurisdiction to the Ad Hoc Group)) in accordance with the DIP Documents and Prepetition Credit Documents, subject to customary exceptions including (i) the gross negligence, bad faith or willful misconduct of an indemnitee or (ii) a material breach of the DIP Documents. |
| **Waiver/Modification of the Automatic Stay**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(iv))**<br><br>*Interim Order ¶8* | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Documents |
| **Section 506(c) and 552(b) Waiver**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(x))** | Subject to the entry of the Final Order, the Prepetition Secured Parties and DIP Secured Parties are to a waiver of (a) any "equities of the case" exception under |

| | **DIP Facilities** |
|---|---|
| *Interim Order ¶9* | section 552(b) of the bankruptcy code and (b) section 506(c) of the Bankruptcy Code. |
| **Liens on Avoidance Proceeds** <br><br> **(Bankruptcy Rule 4001(c)(1)(B)(xi))** <br><br> *Interim Order ¶¶7(a), 14(a), (c)* | Subject to the entry of the Final Order, the Avoidance Proceeds (but not the Avoidance Actions) shall be subject to liens in favor of the DIP Loans, ABL Adequate Protection Claims, and the Prepetition 1L Notes Secured Parties' Adequate Protection Claims. |

### Significant Provisions under the Complex Case Procedures

8.      The Interim Order, and the Final Order, as applicable, contain certain of the provisions (the "Significant Provisions") identified in paragraph 8 of the Complex Case Procedures as set forth below.  In addition to the Debtors' specific justifications for the Significant Procedures, provided in the table below, the Debtors believe that each Significant Procedure is justifiable because the DIP Lenders would not have provided the DIP Facility without such provision and the DIP Facility, taken as a whole, is fair and reasonable to the Debtors (particularly in the context of these chapter 11  and the best financing option available.

| **Provision** | **Status** |
|---|---|
| **Cross-Collateralization.** | The Interim Order and Final Order do not contemplate cross-collateralization. |
| **Roll-Up** | The Interim Order and Final Order do not contemplate a roll-up. |
| **Non-Consensual Priming Liens** | The Interim Order and Final Order do not contemplate a Non-Consensual Priming Liens. |
| **Provisions Limiting the Ability of Estate Fiduciaries to Fulfill Their Duties** | The Interim Order and Final Order do not include provisions limiting the abilities of estate fiduciaries to fulfill their duties. |
| **Plan Confirmation Milestones** | Provision: <br><br> The DIP Credit Agreement requires the Debtors to comply with the following milestones: |

| Provision | Status |
|---|---|
| | • No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br>• no later than 21 days after the Petition Date, the Debtors shall have (i) delivered to counsel to the Ad Hoc Noteholder Group a business plan that is acceptable to the Required Consenting Noteholders and (ii) populated a data room with marketing materials that are acceptable to the Required Consenting Noteholders and delivered to counsel to the Ad Hoc Noteholder Group outreach target lists, teaser materials, and other marketing materials reasonably requested by the Ad Hoc Group Advisors related to a process to market and sell substantially all of the Debtors' assets;<br>• no later than 35 days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;<br>• no later than 60 days after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement with the Bankruptcy Court;<br>• no later than 105 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and<br>• no later than 120 days after the Petition Date, the Plan Effective Date shall have occurred.<br><br>Justification:<br><br>The Debtors believe that these milestones are achievable and will allow them to complete a value-maximizing restructuring, and believe that the milestones balance the DIP Lenders' justifiable concerns about process costs with the time required for the Debtors to successfully complete their chapter 11 cases. |
| **Liens on Proceeds of Avoidance Actions** | Provisions:<br><br>*Interim Order,* ¶7(a)<br><br>Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully- |

| Provision | Status |
|---|---|
| | perfected first priority senior security interest (subject only to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with any of the DIP Secured Parties or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, in each case other than the Avoidance Actions and any Excluded Collateral (as defined in the DIP Documents) and the Carve-Out Account and any amounts held therein (but, for the avoidance of doubt, subject to entry of the Final Order, "Unencumbered Property" shall include Avoidance Proceeds).<br><br>*Interim Order*, ¶14(a)<br><br>Each Prepetition 1L Notes Trustee, for itself and for the benefit of the other applicable Prepetition 1L Notes Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, |

| Provision | Status |
|-----------|--------|
|  | financing statements or other agreements) on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral, subject and subordinate to (i) Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens and (iv) and in the case of Prepetition ABL Priority Collateral, (x) the Prepetition ABL Liens and (y) the ABL Adequate Protection Liens (as defined below).<br><br>*Interim Order*, ¶14(c)<br><br>The Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of its Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral, in the case of the Prepetition ABL Priority Collateral, senior to all other liens but in the case of DIP 1L Notes Priority Collateral subject and subordinate to, in the case of DIP 1L Notes Priority Collateral, (i) the Prepetition Permitted Senior Liens, (ii) the Carve-Out, (iii) the DIP Liens, (iv) the Prepetition 1L Notes Liens, and (v) the 1L Notes Adequate Protection Liens.<br><br><u>Justification</u>:<br><br>The Debtors believe that providing liens on proceeds of Avoidance Actions, but not the Avoidance Actions themselves, is justifiable because (a) the Debtors' will control the Avoidance Actions themselves, ensuring that the DIP Lenders and Prepetition Secured Parties do not control the Avoidance Actions, (b) the Debtors had minimal unencumbered property to provide as collateral for the DIP Facility, and (c) liens on Avoidance Actions are subject to the Final Order, allowing other parties in interest to object. |
| **Limitations on the Use of Cash Collateral to Pay Fees and Expenses of Advisors to Official Committees or Future Trustees** | <u>Provision</u><br><br>*Interim Order* ¶21<br><br>Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP |

| Provision | Status |
|---|---|
| | Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $100,000), (b) attempts to prevent, hinder, or otherwise delay or interfere with each Prepetition 1L Notes Trustee's, the Prepetition ABL Agent's, the Prepetition Secured Parties', the DIP Agent's, or the DIP Secured Parties', as applicable, |

| Provision | Status |
|---|---|
| | enforcement or realization on the Prepetition Secured Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Credit Documents and this Interim Order; (c) attempts to seek to modify any of the rights and remedies granted to each Prepetition 1L Notes Trustee, the Prepetition ABL Agent, the Prepetition Secured Parties, the DIP Agent, or the DIP Secured Parties under this Interim Order, the Prepetition Credit Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims granted hereunder or permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Secured Parties, each Prepetition 1L Notes Trustee, Prepetition ABL Agent and Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Secured Parties. For the avoidance of doubt, this paragraph 21 shall not limit the Debtors' right to use DIP Collateral to contest that an Event of Default has occurred hereunder pursuant to and consistent with paragraph 8 of this Interim Order.<br><br>Justification: |

| Provision | Status |
|---|---|
|  | The Debtors believe that it is reasonable for the DIP Lenders to limit the amount of the new money that they provide that is being used to fund litigation against them. Limits on investigation fees and costs are common practice, and the limit in the Interim Order is consistent with similar cases in this district. |
| **Default Provisions Potentially Terminating the Automatic Stay Without Further Order** | Provisions: |

<br>

For the "Default Provisions" row, Status column continues:

Provisions:

*Interim Order* ¶14(e)

Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Required Lenders and following delivery of written notice (a "Termination Notice") (including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, the "DIP Agent Remedies Notice Period") to lead restructuring counsel to the Debtors, lead restructuring counsel to the Prepetition ABL Agent, lead restructuring counsel to the Prepetition 1L Notes Trustees, lead counsel to the Creditors' Committee, and the U.S. Trustee, (the "Remedies Notice Parties"), the DIP Agent may (and any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to, unless the Court orders otherwise (provided that during the DIP Agent Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the DIP Agent consenting to such emergency hearing) with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral, and provided further that if a request for such hearing is made prior to the end of the DIP Agent Remedies Notice Period, then the DIP Agent Remedies Notice Period shall be continued until the Court hears and rules with respect thereto): (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Loan Documents to use any Cash Collateral (subject to the Carve-Out and

| Provision | Status |
| --- | --- |
| | related provisions), (b) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the DIP Loan Documents.  Upon delivery of such Termination Notice by the DIP Agent, without further notice or order of the Court, the DIP Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional DIP Obligations hereunder will, subject to the expiration of the DIP Agent Remedies Notice Period and unless the Court orders otherwise, automatically terminate and the DIP Secured Parties will have no obligation to provide any DIP Loans or other financial accommodations. <br><br> *Interim Order* ¶14(f) <br><br> Following an Event of Default and the delivery of the Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in paragraph 8(e)), the DIP Secured Parties shall be required to file a motion with the Court seeking emergency relief (the "Stay Relief Motion") on not less than five (5) business days' notice to the Remedies Notice Parties (which may run concurrently with the DIP Agent Remedies Notice Period) for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Secured Parties to, subject to the Prepetition ABL Intercreditor Agreement and the Carve-Out and related provisions: (a) freeze monies or balances in the Debtors' accounts (unless such monies constitute Prepetition ABL Priority Collateral); (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Secured Parties against the DIP Obligations (unless such amounts constitute Prepetition ABL Priority Collateral), (c) enforce any and all rights against the DIP Collateral (other than Prepetition ABL Priority Collateral), including, without limitation, foreclosure on all or any portion of the DIP Collateral (other than Prepetition ABL Priority Collateral), |

| Provision | Status |
|---|---|
| | occupying the Debtors' premises, sale or disposition of the DIP Collateral (other than Prepetition ABL Priority Collateral); and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law (other than with respect to Prepetition ABL Priority Collateral).  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral (other than Prepetition ABL Priority Collateral) following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral (other than Prepetition ABL Priority Collateral), and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of Event of Default or Cash Collateral to fund operations in accordance with the Approved Budget and the terms of the DIP Documents. <br><br> *Interim Order* ¶14(h) <br><br> (h)        Upon the occurrence of any of the below events (a "Cash Collateral Termination Event"), the ABL Secured Parties, on not less than five (5) business days' notice to the Remedies Notice Parties (such five (5) business day period, the "ABL Remedies Notice Period"), and unless the Court orders otherwise (provided that during the ABL Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing (with the Prepetition ABL Agent consenting to such emergency hearing) with the Court for the purpose of contesting whether, in fact, an Cash Collateral Termination Event has occurred and is continuing or to obtain non-consensual use of Cash Collateral, and provided further that if a request for such hearing is made prior to the end of the ABL Remedies Notice Period,  the ABL Remedies Notice Period shall be continued until the Court hears and rules with respect thereto), the ABL Secured |

| Provision | Status |
|-----------|--------|
| | Parties may terminate their consent to the Debtors' use of Cash Collateral constituting Prepetition ABL Priority Collateral: |
| | •     The occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) that has not been waived by the Required Lenders pursuant to the DIP Documents or cured for a period of five (5) business days; |
| | •     An Event of Default (as defined in the DIP Credit Agreement or Restructuring Support Agreement, as applicable) by the Debtors under section 5.18 of the DIP Credit Agreement or Section 4.01 of the Restructuring Support Agreement, as either section may be amended or default may be waived by the Required Lenders or Required Consenting Noteholders (as defined in the Restructuring Support Agreement); |
| | •     The termination of all commitments under the DIP Facility, other than in accordance with the DIP Documents; |
| | •     The failure of the DIP Lenders to fund any requested draw under the DIP Facility which failure has not been remedied within three (3) business days after such request; |
| | •     The exercise of remedies by the DIP Agent including, but not limited to, the termination of the consensual use of cash collateral or the delivery of a Carve Out Trigger Notice; |
| | •     The failure to make any payment pursuant to paragraph 14(g) hereof within three (3) business days after such payment becomes due; |
| | •     The failure to fund the Adequate Protection Account (as defined herein) in accordance with the terms of the Interim Order within two (2) business days of an Availability Event (as defined herein); |
| | •     The filing of any motion or pleading by the Debtors to stay, vacate, reverse, amend or modify the Interim Order or Final Order in a manner materially adverse to the ABL Lenders; |

28

| Provision | Status |
|---|---|
| | • The entry of an order appointing a trustee, receiver or examiner with expanded powers with respect to any of the Debtors; <br><br> • The Debtors shall attempt to invalidate, reduce or otherwise impair the Prepetition ABL Obligations; <br><br> • The dismissal of any of the Chapter 11 Cases; <br><br> • The effective date of any plan of reorganization <br><br> • The conversion of any of the Chapter 11 Cases to a case under chapter 7; <br><br> • The failure to deliver any Borrowing Base Certificate (as defined herein) when required, the failure to make any payment pursuant to paragraph 14(f) hereof after such payment becomes due under the relevant prepetition engagement letters, or any other failure to provide any other adequate protection payments required to be made under the Interim Order or Final Order to the ABL Secured Parties, in each case after three (3) business days' notice and an opportunity to cure; <br><br> • The failure to fund the Carve-Out Account pursuant to the paragraph 5 of the Interim Order or Final Order, which failure has not been remedied within three (3) business days; <br><br> • The stay, reversal, vacatur, rescission or other modification of the Interim Order or Final Order in a manner materially adverse to the Prepetition ABL Secured Parties without the consent of the Prepetition ABL Secured Parties. <br><br> Justification: <br><br> The Debtors believe that the provisions limiting the automatic stay in the Interim Order are justifiable because in no case can the stay be lifted without a hearing before this Court, should the Debtors or another party in interest timely seek such hearing. |
| **Releases of Claims** | Provision <br><br> *Interim Order* ¶G(xiv) <br><br> Effective as of the date of entry of this Interim Order, each of the Debtors and (subject to the Challenge Period in paragraph 20) the Debtors' estates, on its own |

| Provision | Status |
|---|---|
| | behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives in such capacity (as defined herein) (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "Released Claims"), in each case arising out of or related to (as applicable) the Prepetition Credit Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order; *provided* that the releases set forth in this section shall not release any claims against a Released Party or liabilities that a court of competent jurisdiction determines results from the bad faith, fraud, gross negligence or willful misconduct of such Released Party. For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their Obligations under the DIP Documents.<br><br>Justification:<br><br>The Debtors believe that the releases of claims in the Interim Order are appropriate, because (among other reasons), they comply with the Complex Case |

| **Provision** | **Status** |
| --- | --- |
| | Procedures because they are subject to a Challenge Period with a length consistent with the Complex Case procedures.   Additionally, the Debtors have been provided significant consideration in the form of the DIP Facility and use of their cash Collateral by the DIP Lenders and Prepetition Secured Parties, respectively, such that the releases of claims are a fair exchange. |

9.      The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating the restructuring transactions contemplated by the Restructuring Support Agreement. In light of the foregoing, the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases, and the Significant Provisions in the DIP Orders should be approved.

**I.      The Debtors' Prepetition Capital Structure**

10.     Of the Debtors' wholly-owned subsidiaries, ten entities are obligated on portions of the Debtors' prepetition funded debt.  As of the Petition Date, the Debtors have approximately $1.4 billion in total funded debt obligations, consisting of approximately $407.2 million under their senior secured asset-based revolving credit facility, $17.1 million under their first-in, last-out facility, $911.7 million in aggregate principal amount of first lien notes, and $115.2 million in aggregate principal amount of unsecured notes.  The funded debt obligations of the Anagram Entities are not included in these amounts as the Anagram Entities are not debtors in these chapter 11 cases.

11.     The following table depicts the Debtors' prepetition capital structure:

31

| Funded Debt | Maturity | Approximate Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| **Secured Debt** | | |
| ABL Facility | February 2026 | $407,282,560 |
| FILO Facility | February 2026 | $17,100,500 |
| Floating Rate Notes | July 2025 | $161,700,000 |
| Fixed Rate Notes | February 2026 | $750,000,000 |
| | **Total Secured Debt** | **$1,336,083,060** |
| **Unsecured Debt** | | |
| Unsecured 2023 Notes | August 2023 | $22,900,000 |
| Unsecured 2026 Notes | August 2026 | $92,300,000 |
| | **Total Funded Debt** | **$1,451,283,060** |

A.      **Secured Debt Obligations**

a.   **ABL/FILO Facilities**

12.      Party City Holdings Inc. and Party City Corporation, as borrowers, PC Intermediate Holdings, Inc., as holdings, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "ABL Agent"), are parties to an ABL Credit Agreement, dated as of August 19, 2015 (as amended pursuant to the First Amendment thereto dated as of August 2, 2018, the Second Amendment thereto dated as of March 4, 2019, the Third Amendment thereto dated as of April 8, 2019, the Fourth Amendment thereto dated as of June 28, 2019, the Fifth Amendment thereto dated as of February 19, 2021, the Sixth Amendment thereto dated as of March 18, 2022, the Seventh Amendment thereto dated as of July 19, 2022, and as at any time further amended, restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"). The ABL Credit Agreement provides for a revolving credit facility in an amount up to $545 million, including $40 million in swingline loans and $50 million in letters of credit.  In addition, on July 19, 2022, the borrowers under the ABL Credit Agreement incurred an asset-based revolving credit facility providing for an additional $17.1 million of revolving commitments on a first-in, last-out basis (the "FILO Facility" and, together with the ABL Facility, the "ABL/FILO

Facilities"; the lenders under the ABL/FILO Facilities, the "Prepetition ABL Lenders").  Each of

the other Debtors guarantees the ABL/FILO Facilities, with the exception of the Non-Guarantor

Debtors.

13.     The maturity date on the ABL/FILO Facilities is February 19, 2026, and the

obligations thereunder are secured by first liens on the Debtors' (other than the Non-Guarantor

Debtors') accounts receivable, inventory, bank accounts, related property, and certain cash (which

also form the borrowing base for the ABL/FILO Facilities), and second liens on substantially all

other property of the Debtors (other than the Non-Guarantor Debtors).  As of the Petition Date,

approximately $407.2 million in principal amount was outstanding under the ABL Facility and,

additionally, approximately $17.1 million in principal amount was outstanding under the FILO

Facility.

### b.  First Lien Notes

14.     In connection with the 2020 Exchange Transaction, on July 30, 2020, Party City

Holdings Inc. issued approximately $162 million in aggregate principal amount of senior secured

first lien floating rate notes due 2025 (the "Floating Rate Notes") under an Indenture, dated as of

July 30, 2020 (as amended, restated, supplemented, or otherwise modified from time to time), with

certain of the Debtors, as guarantors, and Ankura Trust Company, LLC, as trustee (solely in such

capacity, the "Floating Rate Notes Trustee").  Party City Holdings Inc. issued the Floating Rate

Notes in exchange for certain of the then-existing Unsecured 2023 Notes and Unsecured 2026

Notes (each as defined below).  Each of the other Debtors, except the Non-Guarantor Debtors and

PC Intermediate Holdings, Inc., guarantees the Floating Rate Notes.  The maturity date of the

Floating Rate Notes is July 15, 2025.  The Floating Rate Notes are secured by a first priority lien

on substantially all assets of Party City Holdings Inc. and the other guarantor-Debtors, except for

the collateral that secures the ABL/FILO Facilities on a first lien basis, with respect to which the Floating Rate Notes and related guarantees are secured by a second priority lien (the "First Lien Notes Collateral").  As of the Petition Date, approximately $161.7 million in aggregate principal amount of Floating Rate Notes was outstanding.

15.    On February 19, 2021, Party City Holdings Inc. issued $750 million in aggregate principal amount of 8.750% senior secured first lien notes due 2026 (the "Fixed Rate Notes" and, together with the Floating Rate Notes, the "First Lien Notes") under an Indenture, dated as of February 19, 2021 (as amended, restated, supplemented, or otherwise modified from time to time), with PC Intermediate Holdings, Inc., certain of the Debtors, as guarantors, and the Ankura Trust Company, LLC, as trustee (solely in such capacity, the "Fixed Rate Notes Trustee").  The net proceeds were used to repay the Company's then-existing debt under a term loan facility maturing in 2022 and to pay related fees and expenses for general corporate purposes.  Each of the Debtors, except the Non-Guarantor Debtors and PC Intermediate Holdings, Inc., guarantees the Fixed Rate Notes.  The maturity date of the Fixed Rate Notes is February 15, 2026.  The Fixed Rate Notes are secured by the First Lien Notes Collateral with the same lien priority as the Floating Rate Notes, subject to the Pari Notes Intercreditor Agreement (as defined below).  As of the Petition Date, approximately $750 million in aggregate principal amount of Fixed Rate Notes was outstanding.

### c.  Intercreditor Agreements

16.    The ABL Agent and Floating Rate Notes Trustee, together with Party City Holdings Inc., Party City Corporation, and PC Intermediate Holdings, Inc., entered into an Amended and Restated Intercreditor Agreement, dated as of July 30, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL/Notes Intercreditor Agreement").  On February 19, 2021, when the Fixed Rate Notes were issued, the Fixed Rate

Notes Trustee and the other parties to the ABL/Notes Intercreditor Agreement executed the Intercreditor Agreement Joinder to bind the Fixed Rate Notes Trustee thereto. The ABL/Notes Intercreditor Agreement sets forth the agreements between the ABL Agent, the Floating Rate Notes Trustee, and the Fixed Rate Notes Trustee with respect to the priority of liens in the collateral securing the ABL/FILO Facilities and each of the First Lien Notes, and the respective rights and remedies of the various lenders, among other things.

17.     The Floating Rate Notes Trustee, together with Party City Holdings Inc., Party City Corporation, and PC Intermediate Holdings, Inc., entered into a Pari Passu Intercreditor Agreement, dated as of July 30, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Pari Notes Intercreditor Agreement"). On February 19, 2021, when the Fixed Rate Notes were issued, the Fixed Rates Notes Trustee entered into a Joinder No. 1 to the Pari Notes Intercreditor Agreement to bind the Fixed Rate Notes Trustee thereto. The Pari Notes Intercreditor Agreement sets forth the agreements between the Fixed Rate Notes Trustee and the Floating Rate Notes Trustee with respect to the priority of liens in the collateral securing each of the First Lien Notes, and the respective rights and remedies of the various lenders, among other things.

**B.      Unsecured Debt Obligations**

18.     On August 19, 2015, Party City Holdings Inc. issued $350 million in aggregate principal amount of 6.125% senior notes due 2023 (the "Unsecured 2023 Notes") under an Indenture, dated as of August 19, 2015 (as amended, restated, supplemented, or otherwise modified from time to time), with Wilmington Trust, National Association, as trustee. In July 2020, approximately 93.5% of the then-existing holders of Unsecured 2023 Notes by amount participated in the 2020 Exchange Transaction and, pursuant to the terms thereof, exchanged their Unsecured 2023 Notes for their pro rata share of first and second lien notes issued by certain of

the Anagram Entities, the Floating Rate Notes, and certain common stock of PC Holdco.  The Unsecured 2023 Notes mature on August 15, 2023.  As of the Petition Date, the aggregate principal amount of the Unsecured 2023 Notes was approximately $22.9 million, which represents the Unsecured 2023 Notes of noteholders who did not participate in the 2020 Exchange Transaction.

19.     On August 2, 2018, Party City Holdings Inc. issued $500 million in aggregate principal amount of 6.625% senior notes due 2026 (the "Unsecured 2026 Notes") under an Indenture, dated as of August 2, 2018 (as amended, restated, supplemented, or otherwise modified from time to time), with Wilmington Trust, National Association, as trustee.  In July 2020, approximately 78.6% of the then-existing holders of Unsecured 2026 Notes by amount participated in the 2020 Exchange Transaction and, pursuant to the terms thereof, exchanged their Unsecured 2026 Notes for their pro rata share of first and second lien notes issued by certain of the Anagram Entities, the Floating Rate Notes, and certain common stock of PC Holdco.  The Unsecured 2026 Notes mature on August 1, 2026.  As of the Petition Date, the aggregate principal amount of the Unsecured 2026 Notes was approximately $92.3 million, which represents the Unsecured 2026 Notes of noteholders who did not participate in the 2020 Exchange Transaction.

**The Debtors' Need for the DIP Facility and Development of the DIP Budget**

20.     To continue operating in the ordinary course, and to effectuate an efficient and expeditious restructuring, the Debtors need immediate access to liquidity.  As described in greater detail in the First Day Declaration, the Debtors, with the assistance of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to stabilize the Debtors' operations and fund the administration of these chapter 11 cases.  In undertaking this analysis, the Debtors and their advisors considered the Debtors' near-term projected financial performance, including demand for the Debtors' products and the cost of supplying such products, along with their current liquidity position.  *See* First Day Decl. ¶¶ 78–79.

21.     As part of the Debtors' financial review and analysis, the Debtors, with the assistance of their financial advisor, AlixPartners, developed an initial 13-week budget, a copy of which is attached as **Schedule 1** to the Interim Order (the "Initial Budget").  The Initial Budget incorporates a number of factors and reasonable assumptions, including the Company's substantial working capital requirements, the effect of filing for chapter 11 on the Debtors' operations, material cash disbursements, vendor relationships and required payments, cash flows from the Debtors' ongoing operations, and the cost of necessary goods and materials.  Furthermore, the Initial Budget includes all of the expenditures that the Debtors seek authority to pay under various "first day" pleadings, if approved by the Court.

22.     With the consent of the Prepetition Secured Parties, the Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes. Cash Collateral, however, is insufficient to fund the costs associated with the Debtors' operations and restructuring.  Therefore, the Debtors, with the assistance of their advisors, have determined that the additional postpetition financing provided by the DIP Facility is immediately necessary to allow the Debtors to pay for costs of these chapter 11 cases while continuing to operate their businesses in the ordinary course, fund adequate protection payments, and demonstrate to their counterparties that they are well-capitalized.  Accordingly, the Debtors believe the DIP Facility is fundamental to the preservation and maintenance of the Debtors' going-concern value during these chapter 11 cases and critical for the Debtors' successful reorganization.

23.     Unless the Debtors can demonstrate that they have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, vendors and suppliers may refuse to do business with the Debtors.  Moreover, absent access to the funds available under the DIP Facility and access to Cash Collateral, the Debtors will promptly

lack sufficient liquidity to continue their operations in the ordinary course to the material detriment of the Debtors' customers, creditors, employees, and other parties in interest. Therefore, the Debtors have an immediate need to access the DIP Facility on an interim basis and throughout the pendency of these chapter 11 cases.

<u>**Alternative Sources of Financing Are Not Available on Better Terms**</u>

24.    As explained in the Keil Declaration, despite the efforts by Moelis & Company, LLC ("<u>Moelis</u>") and the Debtors to identify out of court and postpetition financing over the past several months, the Debtors have not received any financing proposals that would adequately fund a chapter 11 process other than the proposal provided by the Ad Hoc Noteholder Group.

25.    Since October 2022, Moelis has spoken with over 20 potential investors about DIP and out-of-court financing alternatives. Keil Decl. ¶ 13. Despite the potential for certain out-of-court alternatives to provide the Debtors with liquidity, the quantum of capital that parties have been prepared to provide has been insufficient in light of the Debtors' long-term capital needs, highly levered capital structure, and short-term liquidity needs. *Id.* ¶ 14. When the Debtors made the decision to pivot towards an in-court balance sheet restructuring, Moelis and the Debtors engaged with both (i) new, third-party capital providers and (ii) existing creditors, including the Ad Hoc Noteholder Group and the ABL Secured Parties. *Id.* In conjunction with outreach to a range of potential postpetition capital providers, the Debtors concluded that postpetition financing likely would have to be provided on a priming basis because the Debtors have insufficient unencumbered assets to obtain sufficient postpetition financing to responsibly prosecute these chapter 11 cases on a junior secured or unsecured financing basis. Keil Decl. ¶ 16. And because no potential financing parties were willing to enter into a financing agreement with the Debtors that could result in a "priming fight," the Debtors have not received third-party postpetition financing on a priming basis. *See id.*

26.     Outside of the DIP financing proposal from the Ad Hoc Noteholder Group, the Debtors did receive two term sheets for DIP financing: one from the ABL Agent and another from a third party.  *Id.* ¶ 22.  However, neither term sheet was actionable.  *Id.*  Thus, despite the Debtors' and Moelis' efforts, the Debtors have not received any actionable financing proposals that would adequately fund a chapter 11 process other than the proposal provided by the Ad Hoc Noteholder Group.  *Id.* ¶ 23.  Accordingly, the DIP Facility represents the best option available to address the Debtors' liquidity needs and create a pathway to exit from chapter 11.

## Use of Cash Collateral

27.     The DIP Facility contemplates that the Debtors will have immediate access to Cash Collateral on a consensual basis, subject to the terms and conditions of the DIP Documents and the DIP Orders. Coupled with the liquidity provided under the DIP Facility, immediate access to the Cash Collateral will (a) ensure that the Debtors have sufficient working capital to, among other things, continue their business operations in the ordinary course by paying their employees, vendors, landlords, and service providers, (b) enable the Debtors to honor their prepetition obligations under and in accordance with the proposed "first-day" relief if approved by the Court, and (c) satisfy administrative expenses of these chapter 11 cases.  By providing the Debtors with the immediate ability to use Cash Collateral, the DIP Facility also ensures that the Debtors avoid unnecessary business disruptions that would otherwise be costly and potentially damaging to their businesses.

## Forms of Adequate Protection

28.     After arms' length, and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of the Prepetition Collateral, including Cash Collateral, subject to the provision by the Debtors of adequate protection. Among other things, the adequate protection contemplated by the DIP Orders is designed to protect the Prepetition Secured Parties'

interests in the Debtors' property from any diminution in value caused by, among other reasons, imposition of the automatic stay, the Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of these chapter 11 cases and, solely with respect to the holders of Prepetition 1L Notes, the priming of their liens by the DIP Liens. Specifically, the Debtors have agreed to provide the following forms of adequate protection:

- **Adequate Protection Liens:** As further set forth in the Interim Order, the Debtors will grant each Prepetition 1L Notes Trustee and the Prepetition ABL Agent, for the benefit of the applicable Prepetition Secured Parties, a security interest in and lien on the DIP Collateral, with the priorities set forth in the Interim Order.

- **Adequate Protection 507(b) Claims**: As further described in the Interim Order, each of the Prepetition 1L Notes Trustee and the Prepetition ABL Agent, on behalf of the applicable Prepetition Secured Parties, will be granted adequate protection super-priority claims as provided in sections 503(b) and 507(b) of the Bankruptcy Code, with the priorities set forth in the Interim Order.

- **Adequate Protection Payments**: The Debtors will pay certain reasonable fees and expenses of certain Prepetition Secured Parties.

- **Prepetition ABL Interest Payment**: As (a) adequate protection and (b) consideration for their agreement to consent to the Debtors use of their Cash Collateral, the Prepetition ABL Agent, on behalf of the Prepetition ABL Secured Parties will receive payments equal to the interest payable in cash (including, as to the first such payment, amounts accrued prior to the Petition Date) at the non-default interest rate applicable to the ABL Obligations.

- **Adequate Protection Account**: As (a) adequate protection and (b) consideration for their agreement to consent to the Debtors' use of their Cash Collateral, the Debtors shall fund a segregated controlled account for the benefit of the ABL Secured Parties in an amount equal to the amount, if any, that borrowings under the ABL Facility exceed the borrowing base.

29.     The Adequate Protection Liens, Adequate Protection Superiority Claims, Adequate Protection Payments, Prepetition ABL Interest Payment, and Adequate Protection Account are each conferred separately to each of the Prepetition 1L Notes Trustees and the Prepetition ABL Agent for the benefit of the applicable Prepetition Secured Parties.

## The DIP Facility is Necessary to Preserve the Debtors' Estates

30.     Given the Debtors' current projections and the absence of sufficient unencumbered assets, immediate access to the DIP Facility and use of cash collateral is necessary for continued operations, including to fund wages, salaries, and benefits of the Debtors' employees, procure necessary goods and services, maintain trade terms with the Debtors' vendors, pay the Debtors' landlords, finance the costs of these chapter 11 cases, and meet other working capital needs of the Debtors.  First Day Decl. ¶ 76.  Without immediate access to the DIP Facility on the terms requested in the DIP Motion, the Debtors will suffer immediate and irreparable harm.  *Id.* ¶ 79. Consequently, the DIP Facility is necessary to preserve the value of the Debtors' estates.

## Basis for Relief

## II.     The Debtors Should Be Authorized To Obtain Post-Petition Financing on a Senior Secured and Superpriority Basis

31.     The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code

provides that the court may approve financing, "with priority over any or all administrative expenses. . .." 11 U.S.C. § 364(c). Further, section 364(d) of the Bankruptcy Code provides that priming liens may be incurred to support postpetition financing if the debtor is "unable to obtain such credit otherwise" and the primed lienholders are adequately protected. 11 U.S.C. § 364(d).

32.     Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant considerable deference to a debtor's exercise of its business judgment when evaluating their requests to incur postpetition credit. *See, e.g., In re N Bay Gen. Hosp., Inc*., No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Latam Airlines Grp. S.A*., 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (deferring to a debtor's "reasonable business judgment. . . so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in interest").

33.     In determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Facility, this Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed post-petition facility. For example, in *In re ION Media Networks, Inc*., 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York explained that "noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization" may be properly considered by debtors when selecting post-petition

financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms" due to the importance of those terms. *Id.*

34.     Here, given all the facts and circumstances present in these chapter 11 cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Facility. The Debtors exercised proper business judgment in securing the DIP Facility on terms that are fair and reasonable and the best available to them under the circumstances and in the current market. Moreover, given the circumstances described above, the Debtors could not obtain credit on junior secured or unsecured basis or without the limited priming contemplated by the Interim Order. *See* Keil Decl. ¶ 16.  For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Facility pursuant to sections 364(c) and (d) of the Bankruptcy Code.

> **A.     The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter the DIP Facility**

35.     Based on the facts and circumstances of these chapter 11 cases, the DIP Facility represents a proper exercise of the Debtors' business judgment.  As noted above, bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including decisions about whether and how to borrow money.  *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity") (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *In re Garrett Motion Inc.*, No. 20-12212 (Bankr. S.D.N.Y. October 23, 2020) (approving postpetition financing as "a sound and prudent exercise of the Debtors' business judgment"); *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) (noting "decisions in [the Southern District of New York] emphasizing that [bankruptcy courts] should

43

not substitute [their] business judgment for that of the Debtors'") (citations omitted), *aff'd* 421

B.R. 620 (S.D.N.Y. 2009); *In re Ames Dep't Stores, Inc*., 115 B.R. at 40 ("More exacting scrutiny

would slow the administration of the debtor's estate and increase its cost, interfere with the

Bankruptcy Code's provision for private control of administration of the estate, and threaten the

court's ability to control a case impartially."); *Richmond Leasing Co.* v. *Capital Bank N.A*., 762

F.2d 1303, 1311 (5th Cir. 1985).

36.    Specifically, when evaluating whether a debtor's decision to obtain postpetition

financing was an exercise of sound business judgment, courts need only "examine whether a

reasonable business person would make a similar decision under similar circumstances." *In re*

*Dura Auto. Sys., Inc*., 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re*

*Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006)).    When evaluating whether a debtor's

decision to enter into postpetition financing was an exercise of sound business judgment,

bankruptcy courts consider the terms of the financing in light of the debtor's circumstances and

the market for financing more generally.    *See In re Farmland Indus., Inc*., 294 B.R. 855, 886

(Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l*

*Bank & Trust Co*. (*In re Ellingsen McLean Oil Co., Inc*.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986)

(recognizing a debtor may have to enter into "hard bargains" to acquire funds for its

reorganization).

37.    Prevailing market conditions are also highly relevant to a court's evaluation of a

debtor's business judgment regarding their DIP financing.    *See* Hr'g Tr. at 734 35:24, *In re*

*Lyondell Chem. Co*., Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms

that are now available for DIP Financing in the current economic environment aren't as desirable"

as in the past).    Accordingly, the Debtors submit that the proposed DIP Facility should be approved

as a sound exercise of their business judgment.  Businesses generally, and retailers in particular, are facing various challenges related to inflation, macroeconomic headwinds, and the bull-whip effect from supply chain difficulties.  *See* Keil Decl. ¶ 8.  Despite this economic environment, the Debtors have successfully negotiated financing that provides ample liquidity, attractive pricing, flexible budget covenants, and a path to reorganization.  Indeed, the DIP Facility is the first step in a process by which the Debtors intend to reorganize and, among other things, preserve jobs for thousands of employees.  The proposed DIP Financing also resulted from vigorous negotiation with the Ad Hoc Noteholder Group supported by experienced, professional advisors and, as set forth in the Keil Declaration, is on terms that are fair and reasonable. On this record, the relief requested here is a sound exercise of the Debtors' business judgment and should be approved.

### B.    The Debtors Meet the Conditions Necessary Under Section 364(c) and (d) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

38.    The Debtors propose to obtain financing under the DIP Facility by providing superpriority claims and liens pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code. The Debtors propose to provide the DIP Secured Parties with liens on and security interests in all of the DIP Collateral, including priming liens on Prepetition 1L Notes First Priority Collateral and junior liens on Prepetition ABL Priority Collateral.  The DIP Collateral includes the Prepetition Collateral, any other assets of the Debtors that were not subject to any validly perfected liens or security interest as of the Petition Date, and, subject to entry of the Final Order to the extent granted therein, the proceeds of avoidance actions (in each case subject to the Carve-Out).

39.    In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts act in their "informed discretion." *In re Ames Dep't Stores*, 115 B.R. at 37. Courts perform a qualitative analysis and consider factors including whether (a) the debtor made a reasonable effort to find financing with better terms, (b) the financing is necessary

to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate. *In re Republic Airways Holdings Inc*., 2016 WL 2616717, at \*11 (Bankr. S.D.N.Y. May 4, 2016).

40.     Additionally, section 364(d)(1)(B) of the Bankruptcy Code requires that lenders primed by superpriority DIP liens must be provided adequate protection.  The only lenders primed by the DIP Facility are the Prepetition 1L Notes Secured Parties.  As discussed below, the adequate protection package provided to the Prepetition 1L Notes Secured Parties provides sufficient adequate protection to allow the DIP Facility.  However, the Prepetition 1L Notes Secured Parties have consented to the DIP Facility, rendering such an analysis unnecessary and establishing that the DIP Facility can be authorized pursuant to section 364(d)(1)(B).

### C.     The Debtors Are Unable to Obtain Financing on More Favorable Terms Than the DIP Facility

41.     Debtors need to demonstrate that they made a reasonable effort to find alternative financing before a bankruptcy court will order superpriority liens.  *In re Latam Airlines Grp. S.A*., 2020 WL 5506407, at \*26 (Bankr. S.D.N.Y. Sept. 10, 2020).  But, the Bankruptcy Code "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.* (citing *Bray* v. *Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co*.), 789 F.2d 1085, 1088 (4th Cir. 1986)); *In re Pearl-Phil GMT (Far East) Ltd*. v. *Caldor Corp.*, 266 B.R. 575, 584−85 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc*., 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain superior terms after discussing possible postpetition financing with four lenders); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

42.     Moreover, when only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB* v. *Sky Valley, Inc*., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

43.     Here, the Debtors do not believe that comparable alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital.  Although the Debtors solicited financing proposals from potential new, third-party capital providers, the Debtors ultimately conducted arm's-length negotiations with the Debtors' existing stakeholders regarding the terms of the DIP Facility.  Keil Decl. ¶¶ 24-25.  Through these negotiations, the Debtors improved the economic and other terms of the DIP Facility, which is the best financing proposal reasonably available under the circumstances.  *Id.* 24.  In sum, the DIP Facility represents the Debtors' best available postpetition financing option.

### D.     The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates

44.     The Debtors have a fiduciary duty to protect and maximize their estates' assets.  *See In re Mushroom Transp. Co*., 382 F.3d 325, 339 (3d Cir. 2004). The Debtors seek access to the DIP Facility consistent with that duty.  Without access to the DIP Facility, the Debtors would be unable to fund critical payments that are essential to the Debtors' operational viability.  First Day Decl. ¶¶ 76–77.

### E.     The Terms of the DIP Facility Are Fair, Reasonable, and Adequate under the Circumstances

45.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc*., 294 B.R. at 886; *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. at 365.  The appropriateness of a proposed financing facility should also be considered

in light of current market conditions. *See In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of the DIP] reasonable here and now."). Here, the terms of the DIP Facility are fair, appropriate, reasonable, adequate under the circumstances, and in the best interests of the Debtors, their estates, and their creditors.

46.      As noted above, the terms of the DIP Facility were actively negotiated by the Debtors' advisors.  Under the current circumstances, the pricing, fees, and other economics provided for in the DIP Facility, taken as a whole, are reasonable and in the Debtors' best interests, particularly in light of the absence of any more favorable alternatives. *See* Keil Decl. ¶ 30.  The DIP Lenders also negotiated for milestones that provide the Debtors with adequate time to negotiate and implement a value-maximizing restructuring such that agreeing to include these milestones as a condition to entering into the DIP Facility was reasonable and in the Debtors' best interests. *See id.* ¶ 31.

### F.      DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)

47.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. 11 U.S.C. § 364(e).

48.     Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. As described in the Keil Declaration, the negotiations of the terms of the DIP Facility with the DIP Lenders were conducted at arms' length. Under the circumstances, the terms and conditions of the DIP Documents are reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the DIP Budget.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

## III.     The Prepetition Secured Parties Are Adequately Protected

49.     Section 363(c)(2) of the Bankruptcy Code provides that, absent consent, a debtor may use cash collateral where "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(A)–(B). Absent consent, section 363(e) of the Bankruptcy Code further conditions the use of collateral upon the debtor providing "adequate protection" of a secured creditor's interest in the property proposed to be used.  11 U.S.C. § 363(e); 3-363 Collier on Bankruptcy ¶ 363.05 (16th ed. 2010).

50.     Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Mosello*, 195 B.R. at 289  ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. Mar. 4, 1986) (the application of

49

adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

51.     After extensive arm's length and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of their Prepetition Collateral, including Cash Collateral, subject to the provision by the Debtors of adequate protection as set forth in the Interim Order. Among other things, the Adequate Protection Liens contemplated by the DIP Facility are designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any diminution in value caused by the Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of these chapter 11 cases.  The proposed DIP Facility, which is consensually priming only the Prepetition 1L Notes Secured Parties, provides adequate protection for all parties by allowing the Debtors to continue operating their businesses as a going concern.  Bankruptcy courts have found lenders are adequately protected when priming debt is used to improve the value of their collateral or the Debtors' estates.  *See, e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *see also In re Hubbard Power and Light*, 202, B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  For a court to find that a secured creditor is adequately protected under similar facts, it looks to see if "projections grounded on a firm evidentiary basis" support the claim that nonconsensually priming debt improves the primed creditors' position.  *In re Mosello*, 195 B.R. at 292.  Accordingly, the value created by virtue of allowing the Debtors to continue to operate is enough to adequately protected the Prepetition Secured Parties.

52.     In addition, the Debtors will continue to pay cash interest on the amount outstanding under the ABL Facility. Moreover, the Debtors have agreed to stay in formula under their borrowing base, and to maintain deposit cash in a controlled segregated cash reserve account

for the benefit of the ABL Secured Parties to the extent the amount outstanding under the ABL Facility exceeds the borrowing base, which will serve to further adequately protect the value of the ABL Secured Parties.  The considerable adequate protection provided to the ABL Secured Parties in the Interim Order – which goes beyond their prepetition entitlements – protects the ABL Secured Parties from any potential diminution of the value of their collateral.  Based on the generous adequate protection package the Debtors provided in the Interim Order, the ABL Secured Parties have agreed that they are adequately protected.

**IV.    The Use of Cash Collateral Is Warranted and Should Be Approved**

53.    The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that if the debtor is authorized to continuing operating its business during its chapter 11 case, the debtor "may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).

54.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See*, *e.g.*, *In re Swedeland*

*Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis").

55.     Here, the DIP Secured Parties and the Prepetition Secured Parties consent to or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.  Further, as set forth above, the proposed adequate protection is appropriate, fair, and customary for debtor-in-possession financings of this type.

**V.      The Scope of the Carve-Out is Appropriate**

56.     The Interim Order subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out.  Such Carve-Outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee appointed can reimburse their professionals in certain circumstances following an event of default under the terms of the debtor's postpetition financing.  *See Ames Dep't Stores*, 115 B.R. at 40.  Neither the Interim Order nor the DIP Facility directly or indirectly deprives the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *See id.* at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of the U.S. Trustee's fees and professional fees of the Debtors and any statutory committee notwithstanding the grant of priming liens, superpriority claims, and adequate protection liens and claims.

**VI.    The Debtors Should Be Authorized to Pay the Fees and Premiums Required by the DIP Agents and the DIP Lenders Under the DIP Documents**

57.    In consideration for their commitment to provide the DIP Facility, the Debtors have agreed, subject to Court approval, to a commitment premium of 8% and annual undrawn commitment fee of 0.5% to the DIP Lenders.  Additionally, as consideration for their agreement to fully backstop the DIP Facility, the members of the Ad Hoc Noteholder Group will receive, at their election, (a) in the event that a chapter 11 plan is consummated and includes a rights offering, the opportunity to convert their DIP loans into equity (or other equity-linked securities) in connection with any rights offering or (b) if such a chapter 11 plan is not consummated, payment of a cash fee equal to 10% of the outstanding loans under the DIP Facility held by such Ad Hoc Noteholder Group member, in each case, subject to the terms set forth in the Restructuring Support Agreement.

58.    In light of the substantial amount of capital that the DIP Lenders have committed to provide to ensure an efficient and value-maximizing chapter 11 process, the Debtors, in consultation with their advisors, believe that the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable under the circumstances and necessary to obtain the DIP Facility.  Accordingly, the Court should authorize the Debtors to pay the fees and premiums provided under the DIP Documents in connection with entering into those agreements.

**VII.    The Automatic Stay Should Be Modified on a Limited Basis**

59.    The Interim Order contemplates modification of the automatic stay to (a) permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order and the DIP Documents and (b) permit the DIP Secured Parties to exercise rights and remedies under certain circumstances.

The Debtors believe that these provisions were required for the Debtors' to obtain the DIP Financing and use Cash Collateral as provided in the Interim Order.  Notably, the exercise of remedies is subject to five calendar days' notice to allow the Debtors to cure or seek other relief. Moreover, following the delivery of such notice, the DIP Agent may file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of Event of Default) or Cash Collateral to fund operations in accordance with the Approved Budget.

60.     In the Debtors' business judgment, the stay modifications are reasonable and fair under the circumstances of these chapter 11 cases.

## VIII.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm

61.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rules 4001(b)(2) and 4001(c)(2) & Complex Case Procedures ¶ 5.  Furthermore, section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3).

62.     As set forth in the First Day Declaration, the Debtors would be unable to continue as a going concern if they do not obtain approval of the DIP Facility and access to Cash Collateral,

which would cause immediate and irreparable harm to the Debtors and their stakeholders by dramatically diminishing the value of the Debtors' estates.   First Day Decl. ¶¶ 74–76. Furthermore, the Debtors require access to additional liquidity provided under the DIP Facility to stabilize their operations, meet working capital and business operating needs, fund the administration of these chapter 11 cases, and implement the relief requested in the Debtors' other "first day" motions.  *Id.* ¶ 76.

63.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code, Bankruptcy Rule 4001(b), and paragraph 5 of the Complex Case Procedures, the Debtors request that the Court conduct an expedited hearing on this DIP Motion, and enter the Interim Order authorizing the Debtors to obtain credit under the DIP Facility, including the use Cash Collateral, all on an interim basis, pending approval on a final basis after the Final Hearing (if necessary).

## Emergency Consideration

64.     Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

65.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

66.     The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) JPMorgan Chase Bank, N.A., as Prepetition ABL Agent, and counsel thereto, Simpson Thacher & Bartlett LLP, 425 Lexington Ave., New York, NY 10017; (d) counsel to the Ad Hoc Noteholder Group, Davis Polk & Wardwell LLP, 450 Lexington Ave., New York, NY 10017; (e) Ankura Trust Company, LLC, as First Lien Notes Trustee, 140 Sherman St., 4th Fl., Fairfield, CT 06824; (f) Wilmington Trust, National Association, as Unsecured Notes Trustee, 246 Goose Ln., Ste. 105, Guilford, CT 06437; (g) counsel to the Ad Hoc Group of Anagram Noteholders, Milbank LLP, 55 Hudson Yards, New York, NY 10001; (h) Ankura Trust Company, LLC, as agent under the DIP Facility, and counsel thereto, Chapman and Cutler LLP, 1270 Avenue of the Americas, New York, NY 10020; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; (m) other regulatory agencies having a regulatory or statutory interest in these cases; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

January 18, 2023

Respectfully submitted,

By: */s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (pending *pro hac vice*)
Kenneth S. Ziman (pending *pro hac vice*)
Michael M. Turkel (pending *pro hac vice*)
Grace C. Hotz (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
kziman@paulweiss.com
mturkel@paulweiss.com
ghotz@paulweiss.com

*Proposed Counsel to the Debtors and the Debtors in Possession*

**<u>Certificate of Accuracy</u>**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ John F. Higgins*
John F. Higgins

**<u>Certificate of Service</u>**

I certify that on January 18, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins