# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) Case No. 23-90005 (DRJ) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

**DECLARATION OF ADAM B. KEIL
IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT
LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED
PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL
HEARING, AND (V) GRANTING RELATED RELIEF**

I, Adam B. Keil, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:[2]

1. I submit this declaration (the "Declaration") in support of the DIP Motion, which requests Court approval for the DIP Facility provided by the Ad Hoc Noteholder Group. In particular, I submit the Declaration in support of my belief that (a) the Debtors are unable to borrow

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Custom Injection Molding, LLC (4238); Amscan Inc. (1359); Amscan Purple Sage, LLC (3514); Am-Source, LLC (8427); Anagram Eden Prairie Property Holdings LLC (8309); Party City Corporation (3692); Party City Holdings Inc. (3029); Party Horizon Inc. (5812); PC Intermediate Holdings, Inc. (1229); PC Nextco Finance, Inc. (2091); PC Nextco Holdings, LLC (7285); Print Appeal, Inc. (5932); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

[2] Capitalized terms used but not defined in this declaration shall have the meanings ascribed to them in the *Declaration of David Orlofsky, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") or the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens And Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith and incorporated herein by reference.

funds on an unsecured or junior secured basis, or solely secured by the Debtors' unencumbered assets, in sufficient amounts to fund these chapter 11 cases, (b) the DIP Facility (i) is the product of an arm's-length, good faith negotiation process, and (ii) is the best currently available postpetition financing option for the Debtors, and (c) the DIP Facility contains reasonable terms and conditions under the circumstances.

2. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have obtained from the Debtors' advisors, the Debtors' management, and employees of Moelis & Company LLC ("Moelis") working directly with me and under my supervision, direction, or control. Specifically, I have overseen a Moelis team which, since March 2020, has advised the Debtors on multiple completed and contemplated transactions, and, in that capacity, I have been actively engaged advising the Debtors in the period of time leading up to the Debtors Chapter 11 filings. I am not being specifically compensated for this testimony other than through payments to be received by Moelis as a professional whose retention the Debtors are seeking to obtain this Court's approval of pursuant to an application to be filed with the Court at a later date. I am over 18 years of age and authorized to submit this declaration. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**I.      Background and Qualifications**

3. I am a Managing Director at Moelis, a global investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring transactions. Moelis is the proposed financial advisor and investment banker to the Debtors. As a Managing Director, I am responsible for the day-to-day activities of the Moelis deal team.

4. I personally have 22 years of experience as an investment banker specializing in recapitalization and restructuring transactions. Throughout my career, I have advised debtors, creditors, equity holders, and other constituents on a wide variety of restructuring transactions across a broad range of industries.

5. Prior to joining Moelis in 2008, I spent approximately eight years in the Recapitalization and Restructuring Group at Jefferies & Company, Inc. I received a B.S. in Economics with concentrations in Finance and Entrepreneurial Management from the Wharton School at the University of Pennsylvania.

6. Since I began my career, my experience includes involvement in the chapter 11 cases of major consumer product and retail companies, such as A&P, Cengage Learning, Inc., Motor Coach Industries International, Inc., Orchard Supply Hardware, Sbarro LLC, Simmons Co., Toys R Us, Inc., Vlasic Pickles, and Winn-Dixie. I have also been involved in major chapter 11 cases across a range of industries, including but not limited to ATD Corporation, C&J Energy Services Ltd., Hornbeck Offshore Services Inc., iHeartMedia, Inc., Internap Technology Solutions Inc., Knotel, Inc., MD Helicopters Inc., NewPage Corporation, SFX Entertainment Inc., Sungard Availability Services, L.P., and Talen Energy Supply, LLC.

**II.     Moelis Retention**

7. Moelis has been engaged by the Debtors to provide financial advisory and investment banking advice since early 2020 and has worked with the Debtors to identify potential solutions to address financial challenges facing the business, including its highly leveraged capital structure, sizeable debt servicing obligations including significant interest payments and near-term maturities, and ongoing liquidity tightness driven in part by the Debtors' capital structure, continuing operational challenges and macroeconomic factors. These engagements included

advising the Debtors on completed transactions, including the (i) 2020 Exchange Transaction, (ii) the Debtors' issuance of the Fixed Rate Notes in February 2021, and (iii) the August 2022 consent solicitation relating to the Anagram Entities' first and second lien notes, in each case, as described further in the First Day Declaration. Additionally, Moelis has been actively in the market evaluating a number of out-of-court transactions, including but not limited to efforts to (i) refinance the Anagram capital structure, (ii) raise incremental asset-based first-in, last-out revolving ("FILO") financing, (iii) conduct an at the market ("ATM") equity offering, (iv) raise various equity-linked capital instruments and (v) pursue other strategic alternatives. These efforts are further detailed in Section III herein.

8.   Recent efforts to address the Debtors' capital structure and identify attractive sources of incremental liquidity have been challenged due to inflation, macroeconomic headwinds, the bull-whip effect from supply chain difficulties, global helium supply challenges and the numerous other challenges facing many retailers today. These challenges led to the Debtors materially underperforming expectations since early 2022.

9.   As these financial challenges persisted through the third and fourth quarters of 2022 and Moelis worked with the Debtors to continue outreach to a range of capital providers and evaluate financing alternatives available to the Company, it became apparent that refinancing and capital raising transactions would not adequately address the Debtors' capital structure challenges, and the Debtors determined that a more holistic balance sheet restructuring would be required to create a capital structure right-sized for the Debtors' business today.

10.   Once the Debtors made the decision to pivot towards a more fulsome balance sheet restructuring, the Debtors broadened the scope of Moelis' engagement to a role that includes serving as their investment banker to explore larger-scale restructuring transactions, obtaining DIP

financing, and preparing for these chapter 11 cases, including assisting in the development of a business plan and the related cash flow forecasting that would be the basis for a restructuring transaction.

11. For several months, Moelis has been directly involved in the matters leading up to the Debtors' chapter 11 filings and the negotiations regarding debtor-in-possession financing, and throughout its engagement, Moelis has worked closely with the Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure (which is more fully set forth in the First Day Declaration), liquidity needs, and business operations.

### III. The Debtors' Efforts to Secure Financing

12. Over the past several months, including well in advance of the Debtors' decision to pursue a holistic balance sheet restructuring, the Debtors, with the assistance of Moelis, have made significant efforts to secure financing and capital needed to address the Debtors' liquidity challenges and evaluated a broad range of capital structure alternatives.

13. During 2022, Moelis evaluated the Debtors' liquidity needs and long-term capital structure while conducting outreach to identify potential providers of additional capital. Moelis and the Debtors evaluated additional areas of incremental liquidity, including (i) an ABL FILO expansion, for which the Debtors received multiple term sheets from potential lenders, (ii) an ATM equity offering, (iii) various equity-linked capital raises and (iv) other strategic alternatives that may have resulted in incremental liquidity for the Debtors. In addition to these outreach efforts, both the Debtors and Moelis received inbound inquiries from parties interested in exploring opportunities to provide the Debtors with capital. Moelis spoke with over 20 potential investors since October 2022 about DIP and out-of-court financing alternatives, which led to four parties

signing NDAs with the Debtors, conducting due diligence and broader discussions about the Debtors' financing needs.

14.     Despite the potential for certain alternatives to provide the Debtors with liquidity, the prospects for the Debtors even after receiving any potential additional capital remained challenged. The quantum of capital that parties were prepared to provide was insufficient in light of the Debtors' long-term capital needs, highly levered capital structure, and short-term liquidity needs.  Additionally, the actionable proposals in front of the Debtors would have furthered the challenges to the Debtors' capital structure by increasing leverage.  Through these conversations, many parties involved in discussions inquired about providing DIP financing in the event the Debtors decided to pursue an in-court process.  These various inquiries were followed up on later in the process and resulted in written and verbal indications of interest in providing a DIP ABL facility.

15.     Once the Debtors made the decision to pivot towards an in-court balance sheet restructuring in November 2022 Moelis and the Debtors engaged with potentially interested parties in efforts to secure postpetition financing. These parties included both new, third-party capital providers as well as existing creditors, including the Ad Hoc Noteholder Group and the ABL Secured Parties.

16.     In conjunction with outreach to a range of potential postpetition capital providers, the Debtors also considered various chapter 11 financing structures and concluded that it was highly likely that postpetition financing would have to be provided on a priming basis because, between the Prepetition 1L Notes Secured Parties and ABL Secured Parties, materially all of the Debtors' assets are encumbered and there is not enough value in the Debtors' assets that the Debtors could obtain a sufficiently large financing package to responsibly prosecute these chapter

11 cases on a junior secured or unsecured financing basis. Further, it is my understanding that any financing secured by a priming lien on either the ABL Priority Collateral or the Term/Notes Priority Collateral would require either (1) the consent of, as applicable, the Prepetition 1L Notes Secured Parties or the Prepetition ABL Secured Parties, or both, or (2) the Debtors to be able to "adequately protect" such parties. If the applicable parties did not consent to such financing, any third party proposal that sought to incur liens with priority senior to the Prepetition 1L Notes Liens or the Prepetition ABL Liens would require the Debtors to win a so-called "priming fight" in the beginning of the Debtors' chapter 11 cases. It is similarly my understanding that the ABL Secured Parties will not consent to the Debtors' incurrence of priming financing from a third party source. Based on my conversations with potential lenders outside of the Ad Hoc Noteholder Group and the four proposals the Debtors have received in recent months, no proposals that provide the Debtors with the capital required to avoid a filing are available to the Debtors. Further, I do not believe that any potential financing parties would be willing to enter into a financing agreement with the Debtors that could result in such a "priming fight." Based on these facts, among others, I believe that a postpetition financing alternative to the DIP Facility that would provide sufficient funding for the chapter 11 cases was not available under the circumstances leading to these cases on a priming, junior secured or unsecured basis.

17. The Debtors, with the assistance of Moelis, engaged with the ABL Agent and requested that the Prepetition ABL Lenders provide a DIP financing proposal. The ABL Agent provided the Debtors with indicative terms for a DIP financing proposal that contemplated the Prepetition ABL Lenders providing a DIP ABL and committed ABL exit financing. In addition, the ABL Agent was prepared to attempt to market a new money DIP term loan on a best efforts basis. The Debtors authorized the ABL Agent to solicit preliminary, targeted investor feedback,

but I have not received any positive feedback on these efforts from the ABL Agent. Based on the investor feedback as well as the ABL Agent's inability to identify a lead investor for its DIP term loan structure, its term loan proposal was not actionable.

18. Moelis also reached out to other lenders, including some who had participated in or expressed interest in participating in the Debtors' completed capital raising and refinancing transactions and ongoing market financing efforts from 2020 to present to solicit their interest in participating in or supporting a balance sheet restructuring or a postpetition financing, but those conversations did not result in actionable restructuring or financing proposals. The Debtors only received one additional proposal for postpetition financing from this outreach. However, as described below, this additional proposal was not actionable, primarily due to the fact that the proposal required financing support from the Ad Hoc Noteholder Group, which I understood would not be provided in connection of such proposal.

19. Beginning in mid-December, Moelis' outreach to potential financing sources regarding postpetition financing considered two key factors, among others. First, Moelis had worked with the Debtors to identify out of court financing alternatives. These efforts did not result in actionable capital commitments that would provide the Debtors with a sufficient amount of funding. Second, the timing for outreach to postpetition financing providers was principally driven by the Debtors' concerns regarding a potential premature and uncoordinated disclosure of a chapter 11 filing that the Debtors believed could have triggered a crisis in vendor confidence, resulting in a significant tightening of trade terms that could have precipitated a "freefall" chapter 11 filing.

20. Additionally, Moelis also discussed the opportunity to provide DIP financing with the advisors to the Ad Hoc Noteholder Group beginning in mid-December. The Ad Hoc Noteholder Group expressed interest in engagement and ultimately executed confidentiality

agreements in early January 2023 to begin to understand in detail the Debtors' liquidity situation, conduct diligence, and prepare a financing proposal. That proposal was evaluated by the Debtors and their advisors and determined to be actionable, and the Debtors and the Ad Hoc Noteholder Group began arm's length, good faith negotiations around the terms and conditions of the DIP Facility.

21. In recent weeks, the market became increasingly aware of the Debtors' interest in a DIP financing proposal, including through articles in popular financial and restructuring news sources. As a result of this increasing market awareness, Moelis received a number of inbound inquiries to explore potential opportunities to provide the Debtors with financing or explore other strategic transactions that may provide the Debtors with incremental capital. As such, I believe that any lenders interested in providing DIP financing did (or could have) reached out to Moelis to begin discussions. However, despite the Debtors' and Moelis' requests, none of these inquiries resulted in an actionable term sheet.

22. Outside of the DIP financing proposal from the Ad Hoc Noteholder Group (described below), the Debtors received two term sheets for DIP financing: one from the ABL Agent and another from a third party. Neither term sheet was actionable: the third party's proposal required funding by the Ad Hoc Noteholder Group, which made clear they were not interested in participating in the third party's transaction; and the ABL Agent's proposal, which was uncommitted, required that unidentified third parties fund a substantial portion of the DIP financing on a junior secured basis.

23. Thus, despite the efforts by Moelis and the Debtors to identify out of court and postpetition financing described above, the Debtors have not received any financing proposals that would adequately fund a chapter 11 process other than the proposal provided by the Ad Hoc

9

Noteholder Group. The Debtors, with the assistance of their advisors, extensively negotiated with the Ad Hoc Noteholder Group and its advisors around the terms of a potential restructuring. This process ultimately resulted in agreement on the terms of both a holistic restructuring transaction memorialized in the Restructuring Support Agreement and the DIP financing which is required to fund the Debtors' chapter 11 cases. Based on these facts, among others, I believe that sufficient DIP financing was not available under the circumstances leading to these cases on a junior secured or unsecured basis or secured by the Debtors' unencumbered assets.

### IV.     The DIP Facility Was Negotiated in Good Faith and Arm's Length

24.     Negotiations regarding the Debtors' proposed DIP Financing were conducted in good faith and at arm's length. During these negotiations, the Debtors were represented by experienced bankers, financial advisors, and restructuring counsel. I believe that the proposed DIP financing is the best financing proposal reasonably available under the circumstances that meets the Debtors' liquidity needs at a reasonable cost, while also providing the Debtors with a stable platform on which to reorganize and to emerge from chapter 11 as a going concern.

25.     Through the Debtors' negotiations with the Ad Hoc Noteholder Group, the economic and other terms of the DIP Facility improved to the benefit of the Debtors, including, but not limited to, lower fees and interest rates, longer milestones, improved operating covenants, less restrictive financial covenants, and a fully-committed backstop of the DIP financing. In addition, the DIP Lenders agreed to eliminate a roll up feature that had been initially proposed and provided the opportunity for all similarly situated creditors to participate in the DIP financing opportunity.

**V.      The Proposed DIP Facility**

  **A.     The DIP Facility Is the Best Available Postpetition Financing Option for the Debtors**

26.     The Debtors negotiated the DIP Facility with the Ad Hoc Noteholder Group in conjunction with the negotiation of the Restructuring Support Agreement. Entry into the DIP Facility underpins the Restructuring Support Agreement, which provides the Debtors a pathway to a prompt exit from chapter 11 with the consent of the majority of their secured lenders. If the Debtors are not authorized to enter into the DIP Facility, the future of these cases could be thrown into considerable doubt.

27.     Based on the facts above, my experience in raising DIP financing, current market conditions, the Debtors' circumstances, and my participation in, and supervision of, the negotiations around the proposed DIP Facility, I believe that (a) there are no alternative sources of financing currently available on both better and more executable terms than the DIP Facility, (b) no actionable junior or unsecured financing was available under the circumstances to the Debtors in the amount required to adequately fund these cases, (c) the terms of the DIP Facility are fair and reasonable under circumstances, and (d) therefore, the DIP Facility represents the best option available to address the Debtors' liquidity needs and create a pathway to exit from chapter 11. Absent the Debtors receiving financing through the DIP Facility, the Debtors do not have sufficient financing to fund their operations and the chapter 11 proceedings.

  **B.     The DIP Facility Contains Reasonable Terms and Conditions under the Circumstances**

28.     The Ad Hoc Noteholder Group and the other DIP Lenders have committed to provide substantial amount of capital to ensure execution of the chapter 11 plan. In light of those commitments and the circumstances of these cases, including the magnitude of the Debtors'

11

chapter 11 cases and the tangible benefit to the estates of a committed postpetition financing, I believe that the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable in amount, under the circumstances, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their business and (ii) execute a chapter 11 reorganization.

29. In consideration for their commitment to provide the DIP Facility, the Debtors have agreed, subject to Court approval, to a commitment premium of 8.0% and annual undrawn commitment fee of 50 basis points to the DIP Lenders. Additionally, as consideration for their agreement to fully backstop the DIP Facility, the members of the Ad Hoc Noteholder Group will receive, at their election, (a) in the event that a chapter 11 plan is consummated and includes a rights offering, the opportunity to convert their DIP loans into equity (or other equity-linked securities) in connection with any rights offering or (b) if such a chapter 11 plan is not consummated, payment of a cash fee equal to 10% of the outstanding loans under the DIP Facility held by such Ad Hoc Noteholder Group member, in each case, subject to the terms set forth in the Restructuring Support Agreement.

30. Based on my familiarity with the Debtors' capital structure and experience as a restructuring professional, I believe the pricing and fees have been negotiated in good faith at arm's length between the Debtors and the Ad Hoc Noteholder Group and are reasonable under the circumstances.

31. The DIP Facility also contains certain milestones that the Debtors must meet during the chapter 11 cases. The milestones were negotiated by the Ad Hoc Noteholder Group as a condition to providing the DIP Facility and should provide the Debtors with adequate time to

negotiate and implement a restructuring. Accordingly, I believe that agreeing to include these milestones in the DIP Facilities is reasonable and in the Debtors' best interests.

## VI. Conclusion

32. It is my professional opinion that the proposed DIP Facility, (a) is the best option currently available at this time to address their liquidity needs while preserving value for all stakeholders and (b) the relief requested in the DIP Motion is in the best interests of the Debtors and their estates.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

January 18, 2023

*/s/ Adam B. Keil*
Adam B. Keil
Managing Director
Moelis & Company LLC