## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) | Case No. 23-90005 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' **EMERGENCY** MOTION
## FOR ENTRY OF AN ORDER (I) AUTHORIZING
## THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
## COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE
## EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF

**Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on January 18, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on January 18, 2023 at 3:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones' home page. The meeting code is "JudgeJones." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones' home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Party City Holdco Inc. (9758); Amscan Custom Injection Molding, LLC (4238); Amscan Inc. (1359); Amscan Purple Sage, LLC (3514); Am-Source, LLC (8427); Anagram Eden Prairie Property Holdings LLC (8309); Party City Corporation (3692); Party City Holdings Inc. (3029); Party Horizon Inc. (5812); PC Intermediate Holdings, Inc. (1229); PC Nextco Finance, Inc. (2091); PC Nextco Holdings, LLC (7285); Print Appeal, Inc. (5932); and Trisar, Inc. (0659).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

## Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order").  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1408.

4.      The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.      On January 17, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and

managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

6.      A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of David Orlofsky, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[2]

### The Debtors' Workforce

7.      As of the Petition Date, the Debtors employ approximately 16,330 individuals (collectively, the "Employees"), including approximately 5,440 full-time Employees and approximately 10,890 part-time and seasonal Employees.  The Debtors also retain temporary workers who are sourced from various staffing agencies (collectively, the "Staffing Agencies") or employed directly by the Debtors to fulfill ordinary course duties on a short- or long-term basis (collectively, the "Temporary Staff").  Typically, the Debtors retain approximately 240 Temporary Staff.  However, the number of Temporary Staff fluctuates based on the Debtors' specific needs at any given time.

8.      The Employees and Temporary Staff perform a wide range of functions critical to the Debtors' operations and the administration of these chapter 11 cases.  In many instances, the

---

[2]   Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration.

Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, possess unique skills and experience, and/or have developed relationships with vendors that are essential to the Debtors' businesses. These individuals are not easily replaced. Without access to the services of the Employees and Temporary Staff, the Debtors' ability to conduct operations and the administration of their estates will be substantially impaired.

9. The vast majority of the Employees and Temporary Staff rely on their compensation and benefits to pay their daily living expenses and support their families. These workers will be subject to severe financial constraints if the Debtors are not permitted to continue paying their compensation and providing health and other benefits during the pendency of these chapter 11 cases. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate due to the facts and circumstances of these chapter 11 cases.[3]

**Compensation and Benefits**

10. To minimize the personal hardship the Employees and Temporary Staff could suffer if prepetition Employee-related obligations are not paid when due, and to maintain stability in the Debtors' workforce during the administration of these chapter 11 cases, the Debtors seek authority to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation, payroll processing services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, workers' compensation benefits, life

---

[3]   For the avoidance of doubt, the Debtors only seek authority to pay employee and temporary staff related obligations applicable to the Employees and Temporary Staff of the Debtors. The Debtors do not seek authority to pay employee and temporary staff related obligations of any non-debtor entities, including Anagram Holdings, LLC, Anagram International Inc., Anagram International Holdings Inc. and all indirect foreign subsidiaries of Party City Holdco Inc.

insurance, short- and long-term disability coverage, non-insider severance, ordinary course non-insider bonus programs, retirement and savings plans, and certain other benefits that the Debtors have historically provided in the ordinary course, all as more fully described herein (collectively, the "Compensation and Benefits"); and (b) pay all costs incidental to the Compensation and Benefits.

11.    Specifically, the Debtors seek authority, but not direction, to make the following payments related to prepetition amounts owed on account of the Compensation and Benefits:

| Relief Sought | Amount |
|---|---|
| **Compensation** | |
| Unpaid Wages | $21,313,800 |
| Unpaid Temporary Staff Compensation | $1,525,100 |
| Reimbursable Expenses | $900,000 |
| Unpaid Withholding Obligations | $6,859,400 |
| Unpaid Payroll Processing Fees | $246,300 |
| **Employee Benefits Programs** | |
| Unpaid Health Benefit Plan Amounts | $5,388,600 |
| Unremitted HSA Amounts | $2,041,000 |
| Unremitted FSA Amounts | $13,600 |
| Basic Life Insurance | $28,200 |
| Unpaid Matching Contributions | $756,100 |
| Disability Benefits Program | $149,000 |
| Time Off Policies | $2,084,000 |
| Car Allowance Program | $63,100 |
| COBRA Benefits | $87,100 |
| Outplacement Fees | $137,500 |
| **Total** | $41,592,800 |

12.    Additionally, out of an abundance of caution, the Debtors request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis during these chapter 11 cases and without the need for further Court approval, subject to the Bankruptcy Code and applicable law.

13.    For the avoidance of doubt, should the Debtors seek to pay prepetition Compensation and Benefits to any Employee in excess of the $15,150 priority wages cap imposed by section 507(a)(4) of the Bankruptcy Code, the Debtors shall seek such relief pursuant to a separate motion.

**I.    Compensation**

**A.    Unpaid Wages**

14.    In the ordinary course of business, the Debtors incur payroll obligations for wages, salaries, and other compensation owed to their Employees (the "Employee Wages").  Most of the Debtors' Employees are paid on a weekly or biweekly basis.  In 2022, the Debtors' paid approximately $347,925,000 in aggregate on account of Employee Wages, net of withholding obligations.

15.    As of the Petition Date, the Debtors estimate that they owe approximately $21,313,800 on account of unpaid Employee Wages earned by Employees within 180 days prior to the Petition Date (the "Unpaid Wages").  As described above, loss of the Unpaid Wages could cause the Employees to experience substantial financial hardship.  In light of the substantial benefit the Employees provide to the Debtors' estates, the Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of business consistent with past practice and to continue honoring Employee Wages obligations in the ordinary course of business.

**B.    Unpaid Temporary Staff Compensation**

16.    The Debtors make payments to Staffing Agencies and the Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services important to the Debtors' operations.  In the past 12 months, the Debtors have paid approximately $15,910,000 on account of Temporary Staff Compensation, including fees that the Debtors remit to Staffing Agencies in exchange for the services they provide with respect to the Temporary Staff.

The Debtors believe the authority to continue paying the Temporary Staff Compensation is critical to minimize disruption of the Debtors' business operations.  As of the Petition Date, the Debtors estimate that Temporary Staff and Staffing Agencies are owed approximately $1,525,100 on account of services rendered prior to the Petition Date, including approximately $81,100 for services rendered by independent contractors (collectively, the "Unpaid Temporary Staff Compensation").

17.     Accordingly, the Debtors seek authority to pay any Unpaid Temporary Staff Compensation in the ordinary course and consistent with past practice and to continue paying the Temporary Staff Compensation in the ordinary course of business on a postpetition basis.

**II.     Expense Reimbursement**

18.     In the ordinary course of business, the Debtors reimburse Employees for reasonable and necessary business expenses incurred in connection with the performance of authorized business (the "Reimbursable Expenses").  The Reimbursable Expenses include expenses related to business travel (e.g., airfare, in-flight Wi-Fi, luggage fees, car rentals, ground transportation, lodging, meals, laundry service), relocation costs, and other business-related expenses paid directly by Employees.  Employees request reimbursement by submitting an expense report to the Debtors directly or through iExpense, a third-party expense reporting application.  Once the Debtors have verified that an Employee's request relates to allowable Reimbursable Expenses, they reimburse the Employee for the submitted expenses.

19.     In the past 12 months, the Debtors paid Employees approximately $500,000 per month on account of Reimbursable Expenses.  As of the Petition Date, the Debtors estimate that they owe approximately $900,000 on account of Reimbursable Expenses.  The Debtors' inability to reimburse Employees for Reimbursable Expenses could impose hardship on Employees who have incurred obligations for the Debtors' benefit.  To avoid harming such Employees and to

protect against the risk that these Employees may become personally liable for such expenses, the Debtors request authority to pay outstanding Reimbursable Expenses and to continue to pay the Reimbursable Expenses in the ordinary course of business on a postpetition basis.[4]

### III.    Payroll Withholding and Processing

#### A.    Withholding Obligations and Payroll Taxes

20.    During each payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions as required by law.  The Debtors also deduct other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, contributions under voluntary benefit programs, 401(k) retirement plan contributions, legally ordered deductions, and other miscellaneous deductions (collectively, the "Deductions").  The Debtors forward the Deductions to the appropriate third-party recipients.

21.    In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes" and, the Payroll

---

[4]    The Debtors also operate the Debtors' corporate card program, under which the Debtors provide credit cards to certain employees to make business-related purchases on the Debtors' behalf.  The Debtors are seeking relief to pay any amounts due on account of, and to continue in the ordinary course of business, their corporate card program in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* filed substantially contemporaneously herewith.

Taxes together with the Deductions, the "Withholding Obligations").  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

22.    In the past 12 months, the Debtors paid approximately $12,013,000 per month on account of Withholding Obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $6,859,400 on account of the Withholding Obligations (the "Unpaid Withholding Obligations").   Accordingly,  the  Debtors  seek  authority  to  pay  any  Unpaid  Withholding Obligations in the ordinary course of business and consistent with past practice, and to continue to pay Withholding Obligations in the ordinary course of business on a postpetition basis.

### B.    Payroll Processing

23.    The Debtors contract with Automatic Data Processing, Paychex Flex, and Sentrix (collectively, the "Payroll Processors") to process and administer the Debtors' payroll.  For each payroll period, the Payroll Processors may process direct deposit transfers or administer payroll checks to Employees from disbursement accounts funded by the Debtors.  In addition, the Payroll Processors may serve as the Debtors' federal W-2 tax form processing vendor and/or administer certain of the Debtors' federal, state, and local payroll tax filings.  The Payroll Processors are integral  to  the  Debtors'  payroll  process  and  facilitate  the  Debtors'  accurate  payment  of compensation based on time worked, performance, and incentives earned.

24.    In 2022, the Debtors paid approximately $2,653,500 in the aggregate on account of payroll  processing  services,  time  and  attendance  systems,  benefits  administration,  recruiting services  and  related  tools.   As  of  the  Petition  Date,  the  Debtors  estimate  that  they  owe approximately $246,300 to the Payroll Processors for payroll processing services (the "Unpaid Payroll Processing Fees").  The Debtors seek authority to pay any Unpaid Payroll Processing Fees

in the ordinary course of business and to continue paying for payroll processing services in the ordinary course of business on a postpetition basis.

## IV.    **Employee Incentive Programs**[5]

25.    The Debtors maintain various incentive programs to drive performance among certain of their Employees, including corporate Employees, Employees on the Debtors' "PODs" teams, and Employees with important roles related to the Debtors' supply chain, retail business segment, and consumer products division (the "<u>Employee Incentive Programs</u>").  Payments to Employees under the Employee Incentive Programs are made after actual results on performance measures for the previous performance period have been finalized and approved, which typically occurs on or about March 15.  To qualify for the Employee Incentive Programs, Employees must be actively employed on the date of payment under an applicable Employee Incentive Program. The Debtors seek authority to continue the Employee Incentive Programs, at their discretion, and in a manner consistent with prepetition practice to preserve Employee morale and ensure the Debtors maintain a motivated workforce at this critical juncture.

### A.    **Cash-Based Incentive Programs**

26.    *Supply Chain Incentive Programs*.  The Debtors maintain incentive programs pursuant to which bonuses are awarded to certain eligible non-insider Employees with leadership roles at the Debtors' manufacturing facilities and distribution centers (the "<u>Supply Chain Incentive Programs</u>").  Under the Supply Chain Incentive Programs, the Debtors offer annual bonuses to eligible non-insider Employees based on achievement of (i) the Debtors' annual financial performance objectives and (ii) annual operational performance objectives for one or more of the

---

[5]    The relief sought under this motion with respect to Employee Incentive Programs does not include the payment of any obligation to any "Insider" (as the term is defined in section 101(31) of the Bankruptcy Code).  The Debtors may seek separate authority with respect to any "insider," to the extent necessary, and reserve all rights with respect to the "insider" status of any Employee.

Debtors' manufacturing facilities or distribution centers at which the Supply Chain Incentive Programs participant has responsibilities. Facility-specific objectives historically have included production targets, in the case of the Debtors' manufacturing facilities, and per-unit efficiency metrics, in the case of the Debtors' distribution centers. As of the Petition Date, approximately 31 non-insider Employees participate in the Supply Chain Incentive Programs. The Debtors estimate that a maximum amount of approximately $558,029 will be payable to eligible non-insider Employees under the Supply Chain Incentive Programs in March 2023.

27.    *PODs Incentive Program*. The Debtors maintain an incentive program under which bonuses are awarded to eligible non-insider Employees with a Manager-level or more senior title in the Debtors' merchants, inventory optimization, design, product development, and sourcing functions (the "PODs Incentive Program"). Under the PODs Incentive Program, the Debtors offer annual bonuses to eligible non-insider Employees based on certain financial performance objectives that are approved by members of the Debtors' senior management team and board of directors. In 2022, performance metrics under the PODs Incentive Program were tied to the Debtors' adjusted EBITDA and the retail business segment's net sales and gross profit. As of the Petition Date, approximately 103 non-insider Employees participate in the PODs Incentive Program. The Debtors do not believe that any amounts will be payable under the PODs Incentive Program in 2023.

28.    *Retail Incentive Programs*. To incentivize Employee performance in the Debtors' retail segment, the Debtors maintain incentive programs for eligible Employees involved in the operations and management of the Debtors' specialty retail party supply stores and temporary Halloween stores (the "Retail Incentive Programs"). Under the Retail Incentive Programs, retail field management, district team leaders, and store team leaders (including store team leaders at the

Debtors' seasonal Halloween City locations) have the opportunity to receive annual or semiannual bonuses based on achievement of performance objectives approved by members of the Debtors' senior management team.  Depending on the participating Employee's position, payouts have historically been based on district- or region-specific sales, store profitability, customer experience, and/or the Debtors' adjusted EBITDA.  As of the Petition Date, approximately 1,010 non-insider Employees participate in the Retail Incentive Programs.  The Debtors estimate that a maximum amount of approximately $1,914,051 will be payable to eligible non-insider Employees under the Retail Incentive Programs in March 2023.

29.    *Consumer Products Sales Incentive Programs*.  The Debtors also maintain incentive programs for eligible Employees in the Debtors' consumer products division (the "Consumer Products Sales Incentive Programs").  Under the Consumer Products Sales Incentive Programs, sales leaders and sales managers historically have had the opportunity to receive annual bonuses based on achievement of individual sales targets, revenue targets for the Debtors' consumer products division, and the Debtors' target adjusted EBITDA, in each case, as approved by members of the Debtors' senior management team.  As of the Petition Date, approximately 22 non-insider Employees participate in the Consumer Products Sales Incentive Programs.  The Debtors estimate that a maximum amount of approximately $522,363 will be payable to eligible non-insider Employees under the Consumer Products Sales Incentive Programs in March 2023.

30.    *Corporate Annual Incentive Program*.  In the ordinary course, the Debtors offer bonuses to eligible corporate Employees, including Employees who serve on the Debtors' executive leadership team, based on the Debtors' achievement of certain financial performance objectives that are set for the Debtors, in line with their annual budget and forecast, and approved by the Debtors' board of directors (the "Corporate AIP").  Amounts under the Corporate AIP are

paid annually and historically have been based on the Debtors' achievement of target adjusted EBITDA and net sales metrics.  As of the Petition Date, approximately 307 Employees are eligible to participate in the Corporate AIP.  The Debtors do not believe that any amounts will be payable under the Corporate AIP in 2023.[6]

31.    *Employee Referral Program*.  In the ordinary course of business, the Debtors provide various incentive awards to eligible Employees who refer job applicants who are subsequently hired and remain employed with the Debtors (the "Employee Referral Program"). Referral bonus amounts range from $100 to $1,000 per successful referral.  In the 12 months prior to the Petition Date, the Debtors paid approximately $500,000 in incentive awards under the Employee Referral Program.

32.    Although the Debtors anticipate that certain amounts will be payable under the cash-based incentive programs in 2023, as of the Petition Date, the Debtors are not aware of any accrued but unpaid obligations under the Supply Chain Incentive Programs, the PODs Incentive Program, the Retail Incentive Programs, the Consumer Products Sales Incentive Programs, the Corporate AIP, or the Employee Referral Program (collectively, the "Cash-Based Incentive Programs").

33.    The Debtors believe that honoring their obligations under the Cash-Based Incentive Programs with respect to non-insiders constitutes ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, does not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to honor

---

[6]    Under the Supply Chain Retention Program (as defined herein), the Debtors guaranteed the annual bonus at target of 8 non-Insider Employees who participate in the Corporate AIP.  Subject to their continued employment, approximately $190,508 in the aggregate will be payable to these non-insider Employees in March 2023.

any outstanding obligations under the Cash-Based Incentive Programs in the ordinary course and continue the Cash-Based Incentive Programs in the ordinary course on a postpetition basis with respect to non-insider Employees.  Honoring and maintaining the Cash-Based Incentive Programs is integral to maintaining Employee morale and ensuring the Debtors maintain a motivated workforce at this critical juncture.

### B.    Equity-Based Incentive Programs

34.    In the ordinary course of business, the Debtors offer certain Employees and non-employee directors stock-based awards that vest over specified periods of time in amounts tied to the Debtors' performance, as measured by the Debtors' stock price on the applicable grant and vesting dates in accordance with the terms of applicable agreements (the "Equity Based Incentives").  The Debtors are not, by the motion, seeking authority to grant any additional Equity Based Incentives to Employees or non-employee directors.

### V.    Employee Retention Programs[7]

35.    *Supply Chain Retention Program*.  In July 2022, the Debtors granted cash-based retention awards to non-insider Employees with important responsibilities related to the Debtors' supply chain in recognition of the increased efforts of these Employees (the "Supply Chain Retention Program").  Pursuant to the Supply Chain Retention Program, the Debtors (a) awarded special year-end retention bonuses to 13 non-insider Employees and (b) guaranteed the annual bonus at target of 17 non-insider Employees who participate in either the Corporate AIP or the Supply Chain Incentive Programs.  Subject to their continued employment, approximately $440,373 will be payable to participating non-insider Employees under the Supply Chain Retention Program in March 2023 (inclusive of bonus guarantees).  For avoidance of doubt, the

---

[7]    The relief sought under this motion with respect to Employee Retention Plans does not include the payment of any obligation to any "Insider" (as the term is defined in section 101(31) of the Bankruptcy Code).

Debtors are seeking authority to pay amounts under the Supply Chain Retention Program solely with respect to non-insider Employees.

36.     The Debtors believe they are authorized to honor their obligations under the Supply Chain Retention Program in the ordinary course of business under section 363(c)(1) of the Bankruptcy Code.  Nonetheless, out of an abundance of caution, the Debtors seek express authority to honor obligations under the Supply Chain Retention Program.  The Debtors submit that honoring such obligations will improve the morale of critical personnel and mitigate disruption of the Debtors' operations during these chapter 11 cases.

37.     *January 2023 Retention Programs*.  In January 2023, the Debtors granted cash-based retention awards pursuant to two retention programs developed in coordination with the Debtors' executive compensation consulting firm in light of the immediate and ongoing need to retain key members of the Debtors' workforce (the "January 2023 Retention Programs").  These retention awards replaced all outstanding retention awards for January 2023 Retention Program participants who had been eligible to receive an award under one of the Debtors' existing retention programs.[8] All awards granted to eligible Employees under the January 2023 Retention Programs are subject to clawback and/or forfeiture in the event an Employee is terminated for cause or resigns without good reason before August 31, 2023.

38.     The Debtors developed the first of the January 2023 Retention Programs to retain approximately 59 non-insider Employees with key roles in critical functions of the Debtors' businesses (the "Non-Executive Retention Program").  Approximately 28 VP-level and above non-

---

[8]     In August 2022, the Debtors implemented a cash-based retention plan (the "August 2022 Retention Plan") to recognize the outstanding contributions of, and provide retentive value to, approximately 13 Employees.  Because each participant in the August 2022 Retention Plan became eligible to receive an award under the January 2023 Retention Programs, the August 2022 Retention Plan was effectively superseded by the January 2023 Retention Programs and is no longer in effect.

insider Employees received aggregate retention awards that generally approximate three months of their respective base salaries.  The remaining approximately 31 non-insider Employee participants, who have titles below the VP-level, received aggregate retention awards that approximate two months of their respective base salaries.  Prior to the Petition Date, the Debtors paid participants in the Non-Executive Retention Program approximately $1.64 million in aggregate and, subject to the non-insider Employees' continued employment with the Debtors, approximately $1.64 million will be payable under the Non-Executive Retention Program upon the earlier of August 31, 2023 and 30 days after the effective date of a chapter 11 plan.

39.     The second of the January 2023 Retention Programs was designed to mitigate retention risk with respect to certain Employees who serve on the Debtors' executive leadership team (the "ELT Retention Program").[9]  Retention awards granted under the ELT Retention Program were generally sized to partially replace the long-term incentive component of participants' total annual compensation opportunity.  Prior to the Petition Date, the Debtors paid the 8 participants in the ELT Retention Program approximately $1.34 million in aggregate and, subject to their continued employment with the Debtors, approximately $1.34 million will be payable to these Employees under the ELT Retention Program within 30 days of the effective date of a chapter 11 plan.

40.     Given the expected timeline of these chapter 11 cases, the Debtors do not anticipate that they will need to seek court approval to make payments under the January 2023 Retention Programs.  Nonetheless, the Debtors have described the January 2023 Retention Programs in this

---

[9]     The Debtors' Chief Executive Officer, Brad Weston, voluntarily declined to participate in the ELT Retention Program.

motion to provide a comprehensive picture of the Debtors' programs and policies for the benefit of the Court and parties in interest.[10]

## VI.     Employee Benefits Programs

41.     The Debtors offer their Employees the ability to participate in several health and welfare insurance and benefits programs (including, among other programs, medical and dental plans, vision, flexible benefits plans, life insurance, disability plans) and retirement plans (collectively, the "Employee Benefits Programs").

42.     The Employee Benefits Programs confer substantial benefits to eligible Employees who rely on the Employee Benefits Programs for their physical and financial well-being.  Failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship.  In light of the substantial benefit the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such hardship.  Accordingly, the Debtors seek authority to:  (a) pay any unpaid amounts due with respect to the Employee Benefits Programs; and (b) continue the Employee Benefits Programs in the ordinary course of business on a postpetition basis.  As of the Petition Date, the Debtors estimate that they owe approximately $5,480,200 on account of the Employee Benefits Programs.

### A.     Health Benefit Plans

43.     The Debtors offer their Employees the opportunity to participate in various health benefit plans, including medical and dental plans (collectively, the "Health Benefit Plans"). Specifically, the Debtors provide:

- Healthcare Plans:  The Debtors' healthcare plans (the "Healthcare Plans") are fully funded and self-funded medical and prescription drug plans administered by several healthcare management

---

[10]   For avoidance of doubt, the Debtors do not seek to pay any amounts under the January 2023 Retention Programs pursuant to this motion.  However, the Debtors reserve the right to request authority to make payments under the January 2023 Retention Programs (or seek approval of new retention and/or incentive programs) at a later date.

companies, including Lucent Health, Aetna, Kaiser Permanente in California, Quantum, United HealthCare, and CVS Caremark. The Healthcare Plans provide coverage for, among other things, physician and ancillary care, inpatient or outpatient care, preventative care, and prescription drug services. On average, the Debtors pay approximately 75% of the Healthcare Plan premiums and Employees pay the remaining approximately 25%. Spouses, children, and other specified dependents are eligible dependents under the Healthcare Plans. Approximately 2,945 Employees enroll in the Healthcare Plans. The annual cost to the Debtors of the Healthcare Plans is approximately $56,664,000.

- Dental Plans: The Debtors offer their Employees the option of participating in dental plans (the "Dental Plans") administered by Aetna. The Debtors and Employees each pay for approximately 50% of Dental Plan premiums. The annual cost to the Debtors of the Dental Plans is approximately $926,050. As of the Petition Date, the Debtors estimate that they owe approximately $84,900 on account of the Dental Plans.

- Vision Plans: The Debtors offer Employees the option of participating in vision plans (the "Vision Plans") administered by United HealthCare. Employees are responsible for the entire amount of Vision Plan premiums and pay approximately $14,050 in aggregate on account of Vision Plan premiums per month.

44.     In the aggregate, the Debtors estimate that they owe approximately $5,388,600 on account of the Health Benefit Plans (the "Unpaid Health Benefit Plan Amounts"), including claim reimbursement payments and administrative fees owed to Lucent Health, Quantum, CVS Caremark, Aetna, and United HealthCare. The Debtors seek authority to honor prepetition obligations on account of the Unpaid Health Benefit Plan Amounts and to continue the Health Benefit Plans on a postpetition basis in the ordinary course of business.

**B.     Health Savings Accounts**

45.     The Debtors provide certain Employees enrolled in high-deductible Healthcare Plans access to a health savings account ("HSA") administered by HSA Bank. Participating Employees can choose to make pre-tax contributions to their individual HSA through payroll deductions up to the maximum amount permitted by the Internal Revenue Service. Amounts in

HSAs can be used to pay for qualifying medical expenses.  The Debtors contribute up to $1,400 to each Employee's HSA, depending on the Employee's Healthcare Plan and completion of annual wellness exams or screenings, in an aggregate amount of approximately $505,200 per year.  As of the Petition Date, the Debtors estimate that approximately $2,041,000 of Employee and Debtor contributions to HSAs has accrued but has not yet been remitted to Employee HSAs (the "Unremitted HSA Amounts").  Accordingly, the Debtors seek authority to remit the Unremitted HSA Amounts and continue the HSAs in the ordinary course of business on a postpetition basis.

### C.  Flexible Spending Accounts

46.     The Debtors provide Employees with access to three flexible spending accounts that allow Employees to contribute pre-tax dollars to cover eligible expenses for (a) health care, (b) dependent care, and (c) commuting (each, an "FSA").  The Debtors do not contribute to Employees' FSAs and believe the FSA amounts are generally held in trust by the Debtors and are therefore not property of the Debtors' estates.  The FSAs are administered by Benefits Resource Inc. ("BRI").  The Debtors pay BRI approximately $1,900 in administrative fees in aggregate per month on account of the FSAs (the "FSA Fees").  As of the Petition Date, the Debtors estimate that there is approximately $13,600 in unremitted FSA Employee contributions (the "Unremitted FSA Amounts").  The Debtors seek authority to pay any outstanding FSA Fees, remit the Unremitted FSA Amounts, and continue the FSAs in the ordinary course of business on a postpetition basis.

### D.  Workers' Compensation Program

47.     The Debtors maintain workers' compensation insurance for Employees in the states and foreign jurisdictions in which the Debtors operate at the statutorily required levels for claims arising from or related to their employment with the Debtors (collectively, the "Workers'

Compensation Program," and the Debtors' obligations related thereto, the "<u>Workers'
Compensation Obligations</u>").[11]

48.    In most states, the Debtors maintain workers' compensation policies through
Travelers Property Casualty Company of America ("<u>Travelers</u>").  The Debtors pay monthly
premiums directly to Travelers based on the Debtors' estimated gross payroll for the applicable
policy year.  In Ohio, North Dakota, and Washington, where the sale of workers' compensation
insurance by private insurers is prohibited, the Debtors purchase workers' compensation coverage
from government-operated insurance funds.

49.    As of the Petition Date, the Debtors estimate that the total amount of reserves under
the Workers' Compensation program is approximately $13.5 million to $15 million.  The Debtors
must continue the claims assessment, determination, adjudication, and payment process pursuant
to the Workers' Compensation Program, without regard to whether such liabilities were
outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers'
compensation laws and requirements during the pendency of these chapter 11 cases.  Their
businesses' inability to do so may result in adverse legal consequences that could potentially
disrupt their chapter 11 process.  Accordingly, the Debtors seek authority to pay prepetition
amounts owed with respect to the Workers' Compensation Obligations, and to continue the
Workers' Compensation Program in the ordinary course on a postpetition basis.

E.    Life Insurance

50.    The Debtors provide life and accidental death and dismemberment insurance
(the "<u>Basic Life Insurance</u>") to eligible full-time Employees through The Standard

---

[11]    The  Workers' Compensation Program may change postpetition in the ordinary course of their businesses due to
changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this
motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including
the authority to make any changes to current policy and practice, as necessary.

("The Standard").  The Debtors pay for all expenses on account of the Basic Life Insurance, which historically has cost approximately $28,200 in aggregate per month.  As of the Petition Date, the Debtors estimate that they owe approximately $28,200 on account of the Basic Life Insurance.  Employees also have the option to purchase supplemental life insurance and accidental death or dismemberment insurance (the "Supplemental Life and AD&D Insurance") through The Standard.  The Supplemental Life and AD&D Insurance is paid by the Debtors' Employees, and the Debtors do not have any outstanding obligations on account of the Supplemental Life and AD&D Insurance program.  By this motion, the Debtors seek authority to pay any prepetition obligations on account of the Basic Life Insurance and to continue providing Basic Life Insurance and Supplemental Life and AD&D Insurance in the ordinary course of business on a postpetition basis.

**F.     401(k) Plan**

51.     The Debtors currently maintain a retirement savings plan (the "401(k) Plan"), which is administered by Fidelity Investments Operations Company, Inc. ("Fidelity") for the benefit of (a) full-time Employees who are at least 18 years old, who become eligible to participate on the first day of the month on or after 30 days of employment with the Debtors, and (b) part-time and temporary Employees who are at least 21 years old, who become eligible to participate on the first day of the month on or after the completion of a 1,000-hour year of service.  Approximately 3,821 Employees participate in the 401(k) Plan.   The Debtors withhold approximately $15,825,210 per year from Employees' compensation on account of Employees' 401(k) contributions to the 401(k) Plan.  The Debtors pay Fidelity approximately $165,000 in administrative fees per year for administering the 401(k) Plan. As of the Petition Date, the Debtors owe Fidelity approximately $15,600 in administrative fees related to the 401(k) Plan (the "Unpaid 401(k) Fees").

52.     The Debtors also provide certain matching contributions for the 401(k) Plan (the "401(k) Matching Contributions").  The Debtors match 100% of Employees' contributions up to 3% of eligible compensation and 50% of Employees' contributions between 3% and 5% of an eligible compensation.  All 401(k) Matching Contributions become fully vested immediately.  In the 12 months leading up to the Petition Date, the Debtors paid approximately $8,248,300 in 401(k) Matching Contributions.   As of the Petition Date, the Debtors estimate that they owe approximately $756,100 in accrued and unpaid 401(k) Matching Contributions (the "Unpaid Matching Contributions").   The Debtors request authority to (a) pay all Unpaid 401(k) Fees, (b) remit all Unpaid Matching Contributions, (c) remit all amounts contributed by Employees on account of the 401(k) Plan, and (d) continue honoring their obligations on account of the 401(k) Matching Contributions and 401(k) Plan on a postpetition basis in the ordinary course of business.

### G.     Disability Benefits Program

53.     The Debtors provide basic short- and long-term disability benefits to eligible full-time Employees through The Standard (the "Disability Benefits Program").   Under the Disability Benefits Program, eligible Employees are entitled to 60% of their base weekly earnings up to $750 per week for 180 days following a qualified non-work related illness or injury.  After 180 days, eligible Employees are entitled to continue receiving 60% of base weekly earnings up to $10,000 per month.  As of the Petition Date, the Debtors estimate that they owe The Standard approximately $149,000 on account of the Disability Benefits Program.   By this motion, the Debtors seek authority to pay any prepetition obligations on account of the Disability Benefits Program and to continue offering the Disability Benefits Program to eligible Employees in the ordinary course of business on a postpetition basis.

### H.     Time Off Policies

54.     The Debtors provide paid time off to all eligible Employees in the form of vacation time, sick time, and company holidays.  The Debtors also permit their Employees to take paid and unpaid time off for other specified reasons, certain of which are required by law (collectively, the "Time Off Policies").

55.     For most non-retail Employees, the Debtors have a general PTO Policy (the "General PTO Policy") under which eligible Employees—generally those working full-time or part-time, regular status in corporate, manufacturing or distribution—are granted two (2) to six (6) weeks of annual paid vacation depending on the Employee's position and tenure.  Under the General PTO Policy, accrued but unused vacation time may not be carried over from one calendar year to the next (except as required by state law).  Employees who resign or are terminated are not eligible to receive payment for accrued but unused vacation time (unless required by law in the state in which the Employee works).

56.     For eligible Employees at the Director level and above, the Debtors have an unlimited paid time off policy ("Unlimited PTO Policy") under which eligible Employees are afforded the flexibility to take planned time off for vacation, sickness, or personal reason to the extent the Employee's supervisors or managers have approved such leave.  Under the Unlimited PTO Policy, there is no accrual of unused paid time off with respect to Employees and thus Employees do not receive compensation for "unused" paid time off upon leaving the Debtors' employ.

57.     The Debtors have a separate paid time off policy for full-time retail store Employees (the "Retail PTO Policy").  Under the Retail PTO Policy, paid time off is earned based on the number of hours worked by an Employee over each pay period during the calendar year. The accrual rate of each eligible Employee is determined by tenure and position with maximum

annual accruals that range from one to four weeks.  Up to five (5) days of paid time off may be carried over into subsequent calendar years; provided, that paid time off that is carried over must be used by May 1 (unless otherwise dictated by state law).  Similar to the General PTO Policy and the Unlimited PTO Policy, under the Retail PTO Policy, Employees do not receive compensation for "unused" paid time off upon leaving the Debtors' employ (unless required under state law).

58.     All eligible, full-time Employees generally receive the equivalent of five (5) days of sick time at the beginning of each calendar year (or an alternate amount of time as directed by state law) to care for their own health, or the health of a relative, child, or other person of significance (the "Sick Time Policy").  The Debtors' part-time Employees may be eligible to receive sick time based on the state in which they work.  Sick time does not carry over from one year to the next (unless mandated by state law), and Employees do not receive compensation for "unused" sick time upon leaving the Debtors' employ.[12]

59.     The Debtors provide Employees with certain other forms of paid and unpaid time off, including:

- 11 paid holidays per year during which full-time Employees (excluding full-time retail Employees, who receive nine (9) paid holidays per year)[13] are not required to work and are paid their base rate of pay;

- unpaid leave under the Family and Medical Leave Act for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs; and

- other paid leaves of absence, many of which are required by law, including for bereavement, jury or court attendance, time spent voting, and military service, and unpaid leaves of absence, including medical leaves, domestic abuse leaves, and other personal leaves.

---

[12]   Certain states require the Debtors to restore "unused" sick time to former Employees who have been rehired by the Debtors.

[13]   Full-time retail store Employees who work on a paid holiday may take the paid holiday on any other day of the calendar month.

These other forms of paid and unpaid time off do not involve incremental cash outlays beyond standard payroll obligations.

60.     The Debtors estimate that, as of the Petition Date, total accrued but unpaid liability on account of the Time Off Policies is approximately $2,084,000.  The Debtors believe that continuing the Time Off Policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases.  Further, the policies are broad-based programs upon which all Employees have come to depend.  The Debtors anticipate that their Employees will use paid and unpaid time off in the ordinary course of business, which will not create any material cash flow obligations beyond the Debtors' normal payroll obligations.  The Debtors seek authority to allow eligible Employees to use their paid and unpaid time off under the Time Off Policies in the ordinary course of business consistent with past practice.

**I.     Car Allowance Program**

61.     In the ordinary course of business, the Debtors provide a monthly car allowance to approximately 110 qualifying Employees (the "Car Allowance Program").  In 2022, the Debtors paid approximately $688,200 in aggregate on account of the Car Allowance Program.  The Debtors intend to continue the Car Allowance Program in the ordinary course during the pendency of these chapter 11 cases.  As of the Petition Date, the Debtors estimate that they owe approximately $63,100 on account of the Car Allowance Program.

**J.     Non-Insider Sign-on Bonuses**

62.     In the ordinary course of business, the Debtors offer sign-on bonuses to certain non-insider Employees (the "Sign-on Bonus Program").  Under the Sign-on Bonus Program, on an ad hoc basis, the Debtors offer potential new hires sign-on incentives that may be subject to clawback if a new hire does not remain employed with the Debtors for a minimum length of time.  As of the

Petition Date, the Debtors estimate that approximately $105,000 will be payable to 4 non-insider Employees in March 2023 under the Sign-on Bonus Program.

### K.      Non-Insider Severance Program

63.      The Debtors maintain a discretionary severance program in the ordinary course of business for the benefit of certain non-insider Employees in connection with reductions in force or other terminations (the "Non-Insider Severance Program").   Under the Non-Insider Severance Program, upon termination and at the Debtors' discretion, eligible non-insider Employees may receive a lump sum payment or salary continuation depending on the Employee's length of employment and position (collectively, the "Severance Obligations").  Payments on account of the Severance Obligations are typically provided in exchange for entry into release and confidentiality agreements, pursuant to which Employees typically release any and all claims against the Debtors and agree to not disclose confidential information.[14]

64.      As of the Petition Date, the Debtors do not believe that they owe any amounts to non-insider former Employees on account of Severance Obligations.  The Debtors believe that honoring the Severance Obligations is critical to maintaining Employee morale and loyalty. Accordingly, in the event that Severance Obligations arise after the Petition Date, the Debtors seek authority, but not direction, to make payments pursuant to the Non-Insider Severance Program in the ordinary course consistent with the Debtors' historical practice.  For avoidance of doubt, any

---

[14]     Prior to the Petition Date, the Debtors paid all salary continuation payments owed to 25 recently terminated non-insider former Employees in an aggregate amount of approximately $1.26 million.  On the same date, the Debtors also paid approximately two months of salary continuation to one former member of the Debtors' senior management in an aggregate amount of approximately $120,000.

payment of severance obligations to any "insider," as that term is defined in section 101(31) of the Bankruptcy Code, would be subject to the limitations of section 503(c)(2) of the Bankruptcy Code.

**L.      COBRA Benefits Program**

65.      Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former employees of the Debtors (the "COBRA Participants") may, in certain cases, continue insurance coverage under the Health Benefit Plans following the termination of their employment with the Debtors (the "COBRA Benefits").  COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to 18 months and, in certain cases, up to 36 months, following termination of employment.  The COBRA Participants bear the cost of their insurance coverage subsequent to termination unless otherwise subsidized by the Debtors.  The Debtors use the services of HealthEquity to assist in the administration of the COBRA Benefits.

66.      As of the Petition Date, the Debtors estimate that they owe approximately $87,100 on account of the COBRA Benefits.  The Debtors request authorization to pay the COBRA Benefits, honor any obligations related to the COBRA Benefits that may be outstanding as of the Petition Date, and continue administering COBRA Benefits for all eligible former employees on a postpetition basis.

**M.      Outplacement Program**

67.      The Debtors provide outplacement services to certain terminated Employees to assist them with obtaining new employment (the "Outplacement Program").  The Debtors pay third-party service providers directly for their outplacement services.  As of the Petition Date, the Debtors estimate that they owe approximately $137,500 to third-party service providers on account of the Outplacement Program (the "Outplacement Fees").  The Debtors request authority to pay

any outstanding Outplacement Fees and to continue the Outplacement Program in the ordinary course of business on a postpetition basis.

**Basis for Relief**

**I.     Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations**

**A.     Certain of the Compensation and Benefits Are Entitled to Priority Treatment**

68.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* U.S.C. § 1129(a)(9)(B).  To the extent that an Employee receives no more than the statutory prescribed limit of $15,150 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors.  Indeed, the Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all stakeholders.  Finding, attracting, and training new qualified talent would be extremely difficult and would likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B.     Payment of Certain Compensation and Benefits Is Required by Law**

69.     The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages.  Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf.  *See* 11 U.S.C. § 541(b)(1).  Further, federal and state laws require the Debtors to withhold certain

tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

70.    Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.   Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II.    Payment of the Compensation and Benefits and the Relief Sought Herein Is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates

71.    Courts have acknowledged that it is often appropriate to authorize the payment of prepetition obligations where it advances Code-related objectives such as protecting and preserving the estate.  *See, e.g.*, *Czywewski* v. *Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting the approval of first-day wages orders authorizing the payment of employees' prepetition wages).  In authorizing payments of prepetition obligations, courts have relied on several legal theories rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

72.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the

benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

73.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Inst. Creditors of Cont'l Air Lines, Inc.* v. *Cont'l Air Lines, Inc.* (*In re Cont'l Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted).

74.     Section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Courts apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly

authorized by the Bankruptcy Code and which further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. at 497 (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation).

75.     Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("The payment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

76.     Here, the requested relief amply satisfies the foregoing standards. Along with their customers and vendors, the Employees are the Debtors' most important asset. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, the Debtors must do their utmost to retain their

workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Compensation and Benefits.

77.     The majority of Employees rely exclusively on the Compensation and Benefits to satisfy their daily living expenses.  Many of the Debtors' Employees expect and require their wages to arrive on a timely basis.  Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their Compensation and Benefits obligations expeditiously. Failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.  Furthermore, if this Court does not authorize the Debtors to honor their various obligations under the Health Benefit Plans described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

78.     Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Compensation and Benefits and to continue the Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**III.    The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims**

79.     Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or

> to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

80.     The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their claims under the Workers' Compensation Program (the "Workers' Compensation Claims") in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the Workers' Compensation Claims could have a detrimental effect on Employee financial well-being and morale and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

**The Court Should Authorize the Debtors' Financial Institutions
to Honor and Process the Debtors' Payments**

81.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated access to cash collateral, and proceeds of the DIP Facility.  Additionally, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

33

## **Emergency Consideration**

82.     Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

83.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

84.     Nothing contained herein is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection

of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

85.     The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) JPMorgan Chase Bank, N.A., as Prepetition ABL Agent, and counsel thereto, Simpson Thacher & Bartlett LLP, 425 Lexington Ave., New York, NY 10017; (d) counsel to the Ad Hoc Noteholder Group, Davis Polk & Wardwell LLP, 450 Lexington Ave., New York, NY 10017; (e) Ankura Trust Company, LLC, as First Lien Notes Trustee, 140 Sherman St., 4th Fl., Fairfield, CT 06824; (f) Wilmington Trust, National Association, as Unsecured Notes Trustee, 246 Goose Ln., Ste. 105, Guilford, CT 06437; (g) counsel to the Ad Hoc Group of Anagram Noteholders, Milbank LLP, 55 Hudson Yards, New York, NY 10001; (h) Ankura Trust Company, LLC, as agent under the DIP Facility, 140 Sherman St., 4th Fl., Fairfield, CT 06824, and counsel thereto, Chapman and Cutler LLP, 1270 Avenue of the Americas, New York, NY 10020; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct

business; (m) other regulatory agencies having a regulatory or statutory interest in these cases; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[<em>Remainder of page intentionally left blank</em>]

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

January 18, 2023

Respectfully submitted,

By: */s/ John Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (pending *pro hac vice*)
Kenneth S. Ziman (pending *pro hac vice*)
Michael M. Turkel (pending *pro hac vice*)
Grace C. Hotz (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
kziman@paulweiss.com
mturkel@paulweiss.com
ghotz@paulweiss.com

*Proposed Counsel to the Debtors and the Debtors in Possession*

## **Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ John F. Higgins*
John F. Higgins


## **Certificate of Service**

I certify that on January 18, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins