IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re:<br><br>PARTY CITY HOLDCO INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-90005 (DRJ)<br><br>(Jointly Administered) |

**DECLARATION OF ADAM B. KEIL IN SUPPORT OF DEBTORS'
BACKSTOP MOTION AND REVISED RIGHTS OFFERING MATERIALS**

I, Adam B. Keil, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I submit this declaration (the "Declaration") in support of the (a) *Debtors' Motion for Entry of an Order (I) Authorizing the (A) Debtors' Entry Into, and Performance Under, the Backstop Commitment Agreement, and (B) Payment of Related Fees, Premiums, Indemnities, and Expenses, (II) Approving the Equity Rights Offering Procedures and Related Forms, and (III) Granting Related Relief* [Docket No. 896] (the "Backstop Motion") and (b) *Notice of Revised Rights Offering Materials* [Docket No. 1466] (the "Notice of Revised Rights Offering Materials").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Custom Injection Molding, LLC (4238); Amscan Inc. (1359); Amscan Purple Sage, LLC (3514); Am-Source, LLC (8427); Anagram Eden Prairie Property Holdings LLC (8309); Party City Corporation (3692); Party City Holdings Inc. (3029); Party Horizon Inc. (5812); PC Intermediate Holdings, Inc. (1229); PC Nextco Finance, Inc. (2091); PC Nextco Holdings, LLC (7285); Print Appeal, Inc. (5932); and Trisar, Inc. (0659). The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco Inc. and Its Debtor Affiliates*, filed substantially contemporaneously herewith, the Backstop Motion, or the Backstop Commitment Agreement (substantially in the form attached as Exhibit D to the Notice of Revised Rights Offering Materials), as applicable.

2. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have obtained from the Debtors' advisors, the Debtors' management, and employees of Moelis & Company LLC ("Moelis") working directly with me and under my supervision, direction, or control. Specifically, I have overseen a Moelis team which, since March 2020, has advised the Debtors on multiple completed and contemplated transactions, and, in that capacity, I have been actively engaged advising the Debtors in the period of time leading up to and following the Debtors' chapter 11 filings. I am not being specifically compensated for this testimony other than through payments to be received by Moelis as a retained professional. I am over 18 years of age and authorized to submit this Declaration. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

I.  **Background and Qualifications**

3. I am a Managing Director at Moelis, a global investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring transactions. Moelis is the investment banker and financial advisor to the Debtors retained in these chapter 11 cases, as described below. As a Managing Director, I am responsible for the day-to-day activities of the Moelis deal team.

4. I personally have 23 years of experience as an investment banker specializing in recapitalization and restructuring transactions. Throughout my career, I have advised debtors, creditors, equity holders, and other constituents on a wide variety of restructuring transactions across a broad range of industries.

5. Prior to joining Moelis in 2008, I spent approximately eight years in the Recapitalization and Restructuring Group at Jefferies & Company, Inc. I received a B.S. in Economics with concentrations in Finance and Entrepreneurial Management from the Wharton School at the University of Pennsylvania.

6. Since I began my career, my experience includes involvement in the chapter 11 cases of major consumer product and retail companies, such as A&P, Cengage Learning, Inc., Motor Coach Industries International, Inc., Orchard Supply Hardware, Sbarro LLC, Simmons Co., Toys R Us, Inc., Vlasic Pickles, and Winn-Dixie.  I have also been involved in major chapter 11 cases across a range of industries, including but not limited to ATD Corporation, C&J Energy Services Ltd., Hornbeck Offshore Services Inc., iHeartMedia, Inc., Internap Technology Solutions Inc., Knotel, Inc., MD Helicopters Inc., NewPage Corporation, SFX Entertainment Inc., Sungard Availability Services, L.P., and Talen Energy Supply, LLC.

## II. Moelis Retention

7. Moelis has been engaged by the Debtors to provide financial advisory and investment banking services since early 2020 and has worked with the Debtors to identify potential solutions to address financial challenges facing the business, including its highly leveraged capital structure, sizeable debt servicing obligations including significant interest payments and near-term maturities, and ongoing liquidity tightness driven in part by the Debtors' capital structure, continuing operational challenges, and macroeconomic factors.  These engagements included advising the Debtors and their affiliates on completed transactions, including (i) a 2020 exchange transaction involving the Debtors' Unsecured Notes, (ii) the Debtors' issuance of the Fixed Rate Notes in February 2021, and (iii) the August 2022 consent solicitation relating to the Anagram Wholly-Owned Subsidiaries' first and second lien notes, in each case, as described further in the First Day Declaration.[3]  Additionally, Moelis has been directly involved in the matters leading up to and following the Debtors' chapter 11 filings and the negotiations regarding debtor-in-

---

[3] As used herein, the term "First Day Declaration" shall refer to the *Declaration of David Orlofsky, Chief Restructuring Officer of Party City Holdco Inc., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 11].

3

possession financing, the Restructuring Support Agreement, the Plan, a new money rights offering, and exit financing.

8. On January 24, 2023, the Debtors applied to retain Moelis as their investment banker and financial advisor in their chapter 11 cases pursuant to the *Debtors' Application for Entry of an Order (I) Authorizing the Employment and Retention of Moelis & Company LLC as Investment Banker and Financial Advisor for the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 233]. On February 21, 2023, the Court entered its *Order (I) Authorizing the Employment and Retention of Moelis & Company LLC as Investment Banker and Financial Advisor for the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 524].

9. Moelis has worked closely with the Debtors' management, creditors, and other professionals and advisors in assisting in the Debtors' restructuring efforts. As a result of its extensive experience with the Debtors, Moelis has acquired significant knowledge of the Debtors and their businesses and is intimately familiar with the Debtors' financial affairs, capital structure, business operations, key stakeholders, capital needs, potential financing structures, and related matters.

### III. The Backstop Commitment Agreement and Backstop Commitment Agreement Obligations

10. As discussed in greater detail in the First Day Declaration, in November 2022, the Debtors, with the assistance of their advisors, commenced comprehensive restructuring negotiations with the Ad Hoc Noteholder Group consisting of holders of a supermajority of the Debtors' outstanding first lien secured notes (the "Secured Notes"). After good-faith, arm's-length negotiations, on January 17, 2023, the parties reached agreement over the terms of an in-court restructuring, and the Debtors entered into a restructuring support agreement with holders of over

70%[4] of the Debtors' Secured Notes at the time (the "Restructuring Support Agreement"). Among other things, the Restructuring Support Agreement contemplates that the Debtors will raise significant new capital pursuant to a new money rights offering. Currently, the members of the Ad Hoc Noteholder Group hold approximately 89% (or approximately $810 million)[5] of the principal amount of the Secured Notes and 100% (or approximately $150 million) of the outstanding principal amount of DIP Loans. Under the Restructuring Support Agreement, the holders of over 89%[6] of the principal amount of the Secured Notes agreed to support the Debtors' restructuring, including by voting in favor of the Debtors' Plan.

11. Since the Petition Date, the Debtors and the Ad Hoc Noteholder Group have engaged in continued, arm's-length negotiations over the specific terms of a rights offering. Initially, the Debtors' Plan contemplated a $75 million new-money Rights Offering consisting of subscription rights to purchase New Common Stock.

12. After the filing of the Debtors' initial Plan, the Debtors determined to update their financial projections and valuation analysis prepared in connection with solicitation on the initial Plan. As a result of these updated financials, the Debtors and the Ad Hoc Noteholder Group entered into negotiations on, and ultimately agreed to, certain modifications to the Plan and Rights Offering to account for the Debtors' revised financial outlook. Under the modified Plan and Rights Offering, the subscription rights are now structured to allow participants to purchase their pro rata share of an Investment Package with an aggregate purchase price of $75 million, consisting of

---

[4] *See Disclosure Statement For The First Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco Inc. and Its Debtor Affiliates* [Docket No. 838], at p. 10.

[5] *See Joint Verified Statement of Davis Polk & Wardwell LLP and Haynes and Boone, LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 150], at pp. 7-8.

[6] *See Supplement to Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco Inc. and Its Debtor Affiliates* [Docket No. 1462] (the "Disclosure Statement Supplement"), at p. iii.

approximately $75 million of New Second Lien Notes and 27.18% of the New Common Stock (subject to dilution by the MIP). The Rights Offering remains fully backstopped by the Ad Hoc Noteholder Group to ensure the Debtors receive the capital contemplated by the Rights Offering. In connection with these modifications, the Debtors and the Ad Hoc Noteholder Group also agreed to certain modifications to the Backstop Commitment Agreement and related Rights Offering materials, as disclosed in the Notice of Revised Rights Offering Materials.

13. Pursuant to the Backstop Commitment Agreement, the Commitment Parties agreed to, among other things, provide the Funding Commitments in consideration for, among other things, the Debtors' agreement to provide certain Indemnification Obligations and to pay the Expense Reimbursement (each as defined below) and, a backstop fee of 10% of the Aggregate Rights Offering Amount (the "Backstop Commitment Premium"), payable in (a) additional shares of New Common Stock equal to the aggregate Backstop Commitment Premium Share Amount and (b) additional Original Principal Amount of New Second Lien Notes equal to the aggregate Backstop Commitment Premium Notes Amount, subject to the terms and conditions contained in the Backstop Commitment Agreement.

14. Pursuant to the Backstop Commitment Agreement, if the Rights Offering is not consummated, the Debtors will be obligated, under certain circumstances, to pay $7.5 million in cash to the Commitment Parties.

15. As additional consideration for the Commitment Parties' entry into the Backstop Commitment Agreement, the Backstop Commitment Agreement provides for an expense reimbursement (the "Expense Reimbursement"), which requires the Debtors to pay, to the extent not otherwise already paid, all reasonable and documented fees and expenses of the Commitment Parties and the Initial Commitment Parties Advisors incurred in connection with the Backstop

Commitment Agreement, the Restructuring Support Agreement, and the chapter 11 cases. The Debtors also agreed to provide certain indemnification obligations, including the payment of contribution and reimbursement claims for certain losses, claims, damages, liabilities, costs, and expenses arising out of or in connection with the Backstop Commitment Agreement and the transactions contemplated thereby (the "Indemnification Obligations" and, together with the Backstop Commitment Premium and Expense Reimbursement, the "Backstop Commitment Agreement Obligations").

### IV. Entry into the Backstop Commitment Agreement Is Necessary to Ensure Adequate Funding to Emerge from Bankruptcy

16. I believe that the Debtors' entry into, and approval of, the Backstop Commitment Agreement is necessary to provide the capital required for the Debtors to emerge from bankruptcy.

17. The Debtors' management and board of directors, in consultation with their financial and legal advisors, engaged in extensive arm's-length, good-faith negotiations with the Ad Hoc Noteholder Group. The Debtors ultimately determined that entry into the Backstop Commitment Agreement is necessary to complete the Rights Offering and provide sufficient capital to make distributions under the Plan and sustain the business post-emergence.

18. The Backstop Commitment Agreement is essential for the Debtors to emerge from these chapter 11 cases. First, together with the Restructuring Support Agreement, the Backstop Commitment Agreement reflects the terms and the conditions required to ensure robust creditor support for the Plan. Second, the Backstop Commitment Agreement protects against the contingency that the Rights Offering will generate insufficient funds by securing for the Debtors enough liquidity to consummate the Plan and operate their business post-reorganization. Third, it ensures that the Debtors will have the means to substantially reduce their debt obligations through the Plan through the full equitization of their Secured Notes on a consensual basis under the Plan.

Fourth, the Backstop Commitment Agreement signals to the Debtors' customers, vendors, employees, and other key stakeholders that the Debtors are a stable enterprise on a path to successfully exit chapter 11. Finally, as the Backstop Commitment Agreement Obligations are essential components of the Backstop Commitment Agreement, the Commitment Parties were not willing to provide the Funding Commitments absent this consideration.

19. Despite several months passing since the Debtors disclosed the terms of the Rights Offering, the Debtors have not received any superior alternatives to the Rights Offering that would provide the funding necessary to allow the Debtors to emerge from chapter 11.[7] Furthermore, I do not believe that the Debtors could obtain alternative financing on more favorable terms due to, among other things: (a) the current and forecasted performance of the Debtors' businesses; (b) the resignation of the Debtors' previous auditor and the current lack of audited 2022 financial statements on which investors could rely; and (c) the Debtors' inability to refinance the Prepetition ABL Facility on acceptable terms necessitating the revised Plan treatment for classes 3A and 3B (as further described in the Disclosure Statement Supplement).

20. The terms of the Rights Offering were negotiated in good faith between the Debtors and the Ad Hoc Noteholder Group. The Debtors and the Ad Hoc Noteholder Group had discussions and reached ultimate agreement over (a) the size of the Second Lien Notes offering; (b) the interest rate on the Second Lien Notes; (c) the term of the Second Lien Notes; (d) the equity

---

[7] On April 25, 2023, Mudrick Capital Management L.P. ("Mudrick"), a Holder of the Debtors' Secured Notes, presented the Debtors with an alternative equity rights offering proposal. *See Objection of Mudrick Capital Management L.P. to Confirmation of Second Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco Inc. and Its Debtor Affiliates*, at Exhibit A [Docket No. 1039]. After thorough consideration, the Debtors determined it was not in their best interests and rejected the proposal. Mudrick later withdrew that proposal, and its objections to the Backstop Motion and confirmation of the Plan were later resolved, as described in the Confirmation Order and the *Debtors' (I) Memorandum of Law in Support of (A) Final Approval of the Debtors' Disclosure Statement and the Disclosure Statement Supplement and (B) Confirmation of the Debtors' Plan and (II) Omnibus Reply to Objections Thereto*, filed substantially contemporaneously herewith.

allocation included in the Investment Package; and (e) the Backstop Commitment Agreement Obligations.  The terms are the best currently available to the Debtors, the capital is necessary for the Debtors to emerge from chapter 11, and the terms are otherwise reasonable under the circumstances.

21. Accordingly, I believe that the decision to enter into the Backstop Commitment Agreement and to incur the obligations thereunder, including the Backstop Commitment Agreement Obligations, is reasonable and appropriate.

## V. The Fees, Premiums, Indemnities, and Expenses Are the Best Available to the Debtors Under the Circumstances, Required to Consummate the Plan, Appropriate under the Circumstances, and in the Best Interests of the Debtors' Estates

22. Approval of the Backstop Commitment Agreement Obligations at this stage of the chapter 11 cases is reasonable and appropriate.  The Funding Commitments are a key component of a restructuring transaction that will provide the Debtors with $75 million of new capital.  The Commitment Parties were not willing to provide the Funding Commitments absent the Backstop Commitment Agreement Obligations, which compensate the Commitment Parties for undertaking financial risk to aid the Debtors in their restructuring efforts.

23. Moreover, approving the Backstop Commitment Agreement Obligations and thereby securing the Funding Commitments will benefit all parties in interest by providing increased certainty that the Debtors will have sufficient liquidity to fund distributions under their plan of reorganization, emerge from chapter 11, and operate the reorganized Debtors' go-forward business.

24. For these reasons, approval of the Backstop Commitment Agreement Obligations at this time is necessary to ensure the Debtors preserve the Funding Commitments, comply with the heavily negotiated deadlines and milestones negotiated with the vast majority of their funded debtholders, and continue toward emergence from chapter 11.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

August 31, 2023

/s/ *Adam B. Keil*
Adam B. Keil
Managing Director
Moelis & Company LLC