## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PARTY CITY HOLDCO INC., *et al.*,[1] | ) | Case No. 23-90005 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

---

### DECLARATION OF DAVID ORLOFSKY, CHIEF RESTRUCTURING OFFICER OF PARTY CITY HOLDCO INC., IN SUPPORT OF CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PARTY CITY HOLDCO INC. AND ITS DEBTOR AFFILIATES

---

I, David Orlofsky, make this declaration pursuant to 28 U.S.C. § 1746:

1.      I am a Managing Director of AlixPartners, LLP ("AlixPartners") and have served as the Chief Restructuring Officer of Party City Holdco Inc. (together with the other above-captioned debtors and debtors in possession, the "Debtors") since January 16, 2023. AlixPartners has served as financial advisor to the Debtors related to the chapter 11 cases since October 2022.[2]  I have more than 23 years of restructuring experience in providing both interim management and advisory services to clients, including by serving as the Chief Restructuring Officer of RCS Capital Corporation, Preferred Sands, and Mark IV Industries and the interim Chief Operating Officer and Chief Financial Officer of Malden Mills.  I hold a bachelor's degree in business administration from Montclair State University.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Party City Holdco Inc. (9758); Amscan Custom Injection Molding, LLC (4238); Amscan Inc. (1359); Amscan Purple Sage, LLC (3514); Am-Source, LLC (8427); Anagram Eden Prairie Property Holdings LLC (8309); Party City Corporation (3692); Party City Holdings Inc. (3029); Party Horizon Inc. (5812); PC Intermediate Holdings, Inc. (1229); PC Nextco Finance, Inc. (2091); PC Nextco Holdings, LLC (7285); Print Appeal, Inc. (5932); and Trisar, Inc. (0659).  The location of the Debtors' service address for purposes of these chapter 11 cases is: 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

[2]     In addition to the current engagement, the Debtors have previously retained AlixPartners in connection with prior strategic transactions dating back to 2020.

2.      I submit this declaration (this "Declaration") in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco Inc. and Its Debtor Affiliates*, dated August 31, 2023 (as may be amended, modified, or supplemented in accordance with the terms thereof, the "Plan"), and the *Debtors' (I) Memorandum of Law in Support of (A) Final Approval of the Debtors' Disclosure Statement and Disclosure Statement Supplement and (B) Confirmation of the Debtors' Plan and (II) Omnibus Reply to Objections Thereto* (the "Confirmation Brief"),[3] each filed substantially contemporaneously herewith.

3.      Through my role as an advisor to, and officer of, the Debtors, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am also familiar with the terms of the Debtors' Plan, Disclosure Statement, and Disclosure Statement Supplement.  Except as otherwise indicated, all facts in this Declaration are based upon (a) my personal knowledge, (b) my discussions with the Debtors' management team and advisors, (c) my review of relevant documents (including the Plan, Disclosure Statement, and Disclosure Statement Supplement) and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, (d) information provided to me by AlixPartners employees working under my supervision, or (e) my opinions based upon my experience and knowledge.

4.      I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

---

[3]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Confirmation Brief, as applicable.

## **Background and Plan Summary**

5.      I believe that the Debtors, after months of arm's-length, good faith negotiations, have proposed a restructuring in the Plan that maximizes stakeholder recoveries and positions the Debtors for success upon their emergence from chapter 11.  The Plan has the support of, or is otherwise consensual as among, the Ad Hoc Noteholder Group, the Prepetition ABL Agent, the Creditors' Committee, and Mudrick Capital Management, L.P. (together with its managed funds, "Mudrick").  Such consensus was memorialized in five related agreements disclosed throughout the Chapter 11 Cases:

   a. the Restructuring Support Agreement among the Debtors and the Consenting Noteholders, pursuant to which the Consenting Noteholders agreed to support and vote in favor of the Plan on the terms and conditions set forth therein;

   b. the Backstop Agreement, pursuant to which the Commitment Parties agreed to backstop up to $75 million of the investment package comprising New Second Lien Notes and New Common Stock offered pursuant to the Rights Offering, each of which will be issued by Party City Holdco Inc. on the Effective Date;

   c. a settlement between the Debtors, the Ad Hoc Noteholder Group, and the Creditors' Committee, the terms of which are summarized in the *Notice of GUC Cash Allocation* [Docket No. 921] and incorporated into the Plan, and pursuant to which the GUC Trust will be established on the Effective Date and the Creditors' Committee agreed to support the Plan, among other things;

   d. an agreement with the Prepetition ABL Agent over treatment of the Prepetition ABL Claims, the terms of which are incorporated into the Plan and the ABL Term Sheet filed with the Plan Supplement; and

   e. a settlement between the Debtors, the Ad Hoc Noteholder Group, and Mudrick, the terms of which are incorporated in the Confirmation Brief and Confirmation Order, pursuant to which the Debtors will pay $2 million in cash and issue an unsecured $1.5 million promissory note to Mudrick on the Effective Date, the parties will exchange mutual releases (including of potential claims and causes of action against the Ad Hoc Noteholder Group and trustees under the Secured Notes Indentures), and Mudrick's objections to the Plan and related transactions will be deemed withdrawn, among other things.

6.      The restructuring embodied in the Plan: (a) provides for the equitization of approximately $911.7 million of Secured Notes Claims; (b) effectuates the DIP Non-Cash Takeout Option pursuant to which approximately $150 million of DIP Claims will be converted into approximately $150 million of New Second Lien Notes and 27.18% of the New Common Stock (subject to dilution by the MIP); (c) reduces annual Cash interest expense by approximately $90 million and provides for no secured debt maturities until 2028; (d) capitalizes the Debtors through the ABL Exit Facility and a fully backstopped new money investment through the Rights Offering; (e) allows for unsecured creditors to receive meaningful distributions, notwithstanding that such creditors would not be entitled to receive any distribution on a pure waterfall, absolute priority rule basis; (f) right-sizes the Debtors' retail operations through the disposition and renegotiation of leases; and (g) has the support of the requisite majority of Holders of the Debtors' Secured Notes (their largest creditor constituency), 100% of the Prepetition ABL Lenders, and the Creditors' Committee, and resolves the Confirmation and other objections asserted by Mudrick.

7.      Given the foregoing, I believe that confirmation of the Plan will afford the Debtors a "fresh start," and the broad consensus for the Plan attests to its fairness and value to the Debtors' Estates and stakeholders.  I also believe that the Plan, including the Creditors' Committee Settlement, the Mudrick Settlement, and other settlements and compromises of Claims, Interests, and controversies embodied therein, is in the best interests of the Debtors, the Estates, represents the Debtors' best available pathway to emergence, and provides for a value-maximizing transaction at a critical time in the retail industry.

A.      **The Creditors' Committee Settlement and Origin's Objection**

8.      A key component of the Debtors' restructuring is the Creditors' Committee Settlement, under which the Debtors will transfer $3.54 million in Cash and the Interchange

Litigation Claims to a GUC Trust to be established on the Effective Date. In exchange, the Creditors' Committee agreed to support the Plan, recommended that general unsecured creditors vote to accept the Plan, and withdrew pending discovery requests from the Debtors, their advisors, and the Ad Hoc Noteholder Group. As part of the settlement, the Creditors' Committee requested that the Debtors contribute the Interchange Litigation Claims to the GUC Trust for the benefit of all general unsecured creditors, with the trust assuming responsibility for the administration and monetization of those claims. The Creditors' Committee also requested that the Debtors reject the Service Agreement among the Debtors and Origin (a third-party claims administrator with respect to the Interchange Litigation Claims) so that the commission otherwise payable to Origin would be shared by all general unsecured creditors under the Plan. The Debtors agreed to these terms in their business judgment because the benefits of the Creditors' Committee Settlement far outweighed any potential recovery that the Reorganized Debtors may have received on account of such claims absent the settlement and transfer of claims. Moreover, upon rejection of the Service Agreement, Origin's resulting General Unsecured Claim for any rejection damages would be satisfied solely from the GUC Trust Assets that the Debtors had already agreed to contribute under the terms of the settlement.

9.    I understand that Origin objected to the rejection of the Service Agreement, primarily arguing that the Debtors assigned a portion of their recovery on account of the Interchange Litigation Claims to Origin under the Service Agreement, that the Service Agreement is not executory and therefore cannot be rejected, and that the Debtors did not reasonably exercise their business judgment in rejecting the Service Agreement. I disagree for several reasons.

10.     First, I do not believe that the Debtors assigned any portion of the Interchange Litigation Claims to Origin under the Service Agreement.  The Service Agreement does not contemplate any payment structure or transfer of property beyond the commission scale set forth therein.   Second, I believe that both the Debtors and Origin have material outstanding performance obligations under the Service Agreement, demonstrating that it is properly characterized as executory.  Under the agreement, Origin acts as the Debtors' agent and attorney-in-fact and has the powers and rights to submit and obtain a recovery on the Interchange Litigation Claims.  The Debtors have a continuing obligation to provide information regarding their claims to Origin.  Based on discussions with the Debtors' management and employees and my review of Origin's objections, I understand that the claims administration process with respect to the Interchange Litigation Claims has not yet begun, and will be complex and require substantial negotiation with the claims administrator over a period of one and a half to two years. During that time, the Debtors expect an ongoing need to share information with Origin and that Origin will need to complete substantial work verifying the accuracy and completeness of the claims benefits tendered to the Debtors.

11.     Finally, the Debtors exercised reasonable business judgment in determining to reject the Service Agreement.  As discussed above, rejection of the Service Agreement was central to the Debtors' ability to reach agreement over the Plan terms with the Creditors' Committee and avoid otherwise costly and time-consuming discovery and litigation.  The GUC Trust stands ready to administer the Interchange Litigation Claims in an effort to maximize recoveries for general unsecured creditors under the Plan.  On the contrary, assumption of the Service Agreement would result in up to $1.25 million of commission fees owed to Origin on account of prepetition unsecured claims and jeopardize the Creditors' Committee Settlement

(and potentially confirmation of the Plan).  Thus, the Debtors determined to reject the Service Agreement to avoid the substantial risk and expense that would result from litigating confirmation with the Creditors' Committee.  For the foregoing reasons, I believe that Origin's objections should be overruled.

**B.     The Mudrick Settlement**

12.     The settlement the Debtors (in consultation with the Ad Hoc Noteholder Group) reached with Mudrick is also integral to the Debtors' restructuring and, together with the Creditors' Committee Settlement, allows the Debtors to seek Confirmation of the Plan on a nearly entirely consensual basis.  The Mudrick Settlement resolves (a) the objections Mudrick filed to the Debtors' Plan and Backstop Motion, (b) potential claims or causes of action Mudrick may have against the Ad Hoc Noteholder Group and/or trustees under the Secured Notes Indentures (including with respect to alleged non-pro rata payments, breaches of good faith and fair dealing, and receipt of non-pro rata distributions under the Secured Notes Indentures), and (c) supplemental objections to the Plan and other pleadings that Mudrick advised the Debtors it was prepared to file, which the Debtors believed could interfere with and/or delay confirmation and consummation of the Plan.

13.     The terms of the Mudrick Settlement are incorporated in the Confirmation Brief and Confirmation Order and include the following terms:

a.     on the Effective Date, the Debtors will pay Mudrick $2 million in cash;

b.     on the Effective Date, the Debtors will issue a $1.5 million promissory note to Mudrick, which shall (a) bear interest at 10% per year, compounded quarterly and payable in kind, (b) mature on the date that is one year following the Effective Date, and (c) contain terms allowing the Reorganized Debtors  to prepay the note at any time without penalty;

c.     notwithstanding any notice of its election to opt out of the Third-Party Release under the Plan that Mudrick submitted in connection with solicitation of votes on the Plan, Mudrick shall be a "Releasing Party" and

a "Released Party" under the Plan, and shall both grant and receive the benefits of the Third-Party Release under the Plan, including with respect to any claims or causes of action arising out of, in connection with, or in any way related to the Secured Notes Documents;

d.  Mudrick shall not file any (a) supplemental objections to the Plan or Backstop Motion or (b) additional pleadings in the Chapter 11 Cases that would reasonably be expected to interfere with implementation or consummation of the Plan; and

e.  the Mudrick Objections shall be deemed withdrawn with prejudice upon entry of the Confirmation Order.

14.  The Mudrick Settlement is the result of hard-fought negotiations among Mudrick and the Debtors (in consultation with the Ad Hoc Noteholder Group), and is objectively fair and reasonable.  It resolves potentially difficult and diverse issues that would otherwise need to be litigated at Confirmation and on a post-emergence basis as they relate to the potential claims against the Ad Hoc Noteholder Group and/or the trustees under the Secured Notes Indentures.  In addition, the Mudrick Settlement avoids the significant cost and expense of litigation that would otherwise be borne by the Debtors' estates, either directly in connection with Confirmation or indirectly on account of certain indemnification obligations of the Debtors under the DIP Documents and proposed form of Backstop Agreement.  The Mudrick Settlement is a significant achievement that will facilitate a prompt, efficient conclusion of these Chapter 11 Cases and emergence from bankruptcy.

## The Plan Satisfies the Requirements of Confirmation

15.  I have been advised of the applicable standards under which a plan of reorganization may be confirmed under chapter 11 of the Bankruptcy Code.  For the reasons detailed below, and based on my understanding of the Bankruptcy Code, I believe the Plan satisfies all applicable requirements for confirmation.

**A.  The Plan Meets Each of the Applicable Requirements for Confirmation under Section 1129(a)(1) of the Bankruptcy Code**

16.     I understand that section 1129(a)(1) of the Bankruptcy Code requires the Plan to comply with the applicable provisions of the Bankruptcy Code.  As detailed below, I have been advised by the Debtors' legal counsel that the Plan satisfies this requirement.

**(i)     Proper Classification of Claims and Interests — Section 1122**

17.     It is my understanding that section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  Except for Administrative Claims, DIP Claims, and Priority Tax Claims, which I am advised need not be designated as Classes under the Plan, the Plan designates Claims against and Interests in the Debtors as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 3A | Prepetition ABL Revolver Claims | Impaired | Entitled to Vote |
| 3B | Prepetition ABL FILO Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote *(Presumed to Accept or Deemed to Reject)* |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote *(Presumed to Accept or Deemed to Reject)* |
| 8 | Interests in PCHI | Impaired | Not Entitled to Vote *(Deemed to Reject)* |

18.     Based on my familiarity with the Debtors' businesses and review of the Plan and related documents, each of the Claims and Interests assigned to each particular Class is substantially similar to the other Claims or Interests in such Class.  With respect to the voting Classes, the Debtors determined to classify (a) all Prepetition ABL Revolver Claims in Class 3A, given they arise under the revolving facility under the Prepetition ABL Credit Agreement, (b) all Prepetition ABL FILO Claims in Class 3B, given they arise under the first-in, last-out facility under the Prepetition ABL Credit Agreement, (c) all Secured Notes Claims (including the secured and unsecured portions thereof) in Class 4, given they arise from the Secured Notes Documents and are held by sophisticated institutional investors, and (d) General Unsecured Claims in Class 5, which is comprised of any unsecured prepetition Claim that is not otherwise accounted for under the Plan.  As a result, business, legal, and factual reasons justify the separate classification of the particular Claims and Interests into the Classes created under the Plan, and no unfair discrimination exists between or among holders of Claims and Interests.  Accordingly, I believe that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

**(ii)     The Plan's Mandatory Content Is Appropriate – Section 1123(a)**

19.     I have been advised that the Plan fully complies with each of the requirements of section 1123(a) of the Bankruptcy Code, based on the following:

- Section 1123(a)(1):  Article III of the Plan designates Classes of Claims and Interests.

- Section 1123(a)(2):  Article III of the Plan specifies the treatment of Unimpaired Classes of Claims and Interests.

- Section 1123(a)(3):  Article III of the Plan specifies the treatment of Impaired Classes of Claims and Interests.

- Section 1123(a)(4):  Article III of the Plan provides the same treatment for each Claim or Interest of a particular Class, unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of such particular Claim or Interest. This applies to Holders within each Class.

- <u>Section 1123(a)(5)</u>:  Article IV, in conjunction with various other Plan provisions, provides adequate means for implementing the Plan.

- <u>Section 1123(a)(6)</u>:  Article IV.J of the Plan provides for the prohibition of non-voting equity securities, as implemented by the New Organizational Documents.

- <u>Section 1123(a)(7)</u>:  Article IV.K of the Plan provides that as of the Effective Date, the New Board will be appointed by the Required Consenting Noteholders. As discussed herein, the appointment of the New Board, as well as the election of the executive teams of the Reorganized Debtors, is consistent with the interests of creditors and equity security holders and complies with public policy with respect to the manner of selection of the Reorganized Debtors' officers and directors.

20.     Accordingly, I believe the requirements of section 1123(a) of the Bankruptcy Code have been satisfied.

**B.     The Plan's Discretionary Content Is Permitted – Section 1123(b)**

21.     I understand that section 1123(b) of the Bankruptcy Code allows a plan to include a variety of different permissive provisions.  I believe that each of the Plan's permissive provisions comport with section 1123(b):

- <u>Section 1123(b)(1)</u>:  Article III of the Plan classifies and describes the treatment for Claims and Interests under the Plan, and identifies which Claims and Interests are impaired or unimpaired.

- <u>Section 1123(b)(2)</u>:  Article VI of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases will be assumed as of the Effective Date in accordance with section 365 of the Bankruptcy Code, unless expressly otherwise provided pursuant to the Plan.  I understand that, in accordance with the Plan, the Debtors filed their Schedule of Rejected Executory Contracts and Unexpired Leases and Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement.

- <u>Section 1123(b)(3)</u>:  Article IX of the Plan provides for a release of certain of the Debtors' Claims and Causes of Action.  Moreover, Article IV.B of the Plan incorporates the settlement of a variety of issues, Claims, Interests, and controversies, and Article V governs the GUC Trust to be established pursuant to the Creditors' Committee Settlement.  In addition, Article IV.G provides that, except as otherwise provided in the Plan, all of the Debtors' Causes of Action will vest in the Reorganized Debtors and that the Reorganized Debtors will retain, and may compromise or settle all such Causes of Action.

- <u>Section 1123(b)(5)</u>:  Article III of the Plan modifies the rights of Holders of Claims as set forth therein.

22.     Accordingly, I believe that each of the foregoing permissive provisions is consistent with section 1123(b) of the Bankruptcy Code.

      **(i)**      **The Discretionary Contents of the Plan Are Permitted by Section 1123(b)(6) of the Bankruptcy Code**

23.     I have been advised that section 1123(b)(6) of the Bankruptcy Code also authorizes the inclusion of other appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code.  The Plan includes several such discretionary provisions, including (a) various terms discharging, releasing, and enjoining the pursuit of claims and (b) a consensual third-party release of certain potential claims.  The release and exculpation provisions result from extensive good faith and arm's'-length negotiations by and among the Debtors and certain of the Released Parties and the Exculpated Parties, respectively.  I have been advised that such provisions are consistent with applicable case law and precedent in this district and comply with the Bankruptcy Code in all respects, and I believe they are integral components of the Plan.

      **(ii)**      **The Debtor Release Is Appropriate**

24.     I understand that Article IX.C of the Plan provides for a release of certain Claims and Causes of Action of the Debtors and their Estates (the "<u>Debtor Release</u>").  I believe the Debtor Release is in the best interest of the Estates because: (a) the Debtors are not aware of the existence of any Claims or Causes of Action of material value being released by the Debtors, and are expressly preserving certain Claims and Causes of Action pursuant to the Schedule of Retained Causes of Action; (b) the Plan, including the Debtor Release, was negotiated in good faith and at arm's-length by sophisticated entities that were represented by able advisors and that each conditioned their support for and acceptance of the Plan, among other things, on the grant

of the Debtor Release; (c) no party has objected to the Debtor Release; and (d) most importantly, the Debtor Release has provided a material benefit to the Estates by securing the votes in favor of the Plan by voting Holders who executed the RSA, in return for the Third-Party Release discussed below.

**(iii)      The Third-Party Release Is Appropriate**

25.      Article IX.D of the Plan provides for a release of any and all claims and Causes of Action, including derivative claims, by certain non-Debtor Releasing Parties against the Released Parties in connection with, among other things and in whole or in part, the Debtors, the Plan, the Restructuring Transactions, or the Chapter 11 Cases (the "Third-Party Release").

26.      The Third-Party Release is fully consensual.  I have been advised that parties in interest were provided extensive notice of the Chapter 11 Cases, the Plan, and the Initial Objection Deadline and Supplemental Objection Deadline for Confirmation of the Plan. Moreover, I believe that parties in the Voting Classes were provided additional notice of the Plan modifications in connection with the Supplemental Solicitation Packages.   The Combined Hearing Notice, the Notice of Amended Plan and Combined Hearing, the Notice of Non-Voting Status, the Ballots, and the Vote Modification Forms expressly included the terms of the Third-Party Release, as set forth in Article IX.D of the Plan.  In addition, the Notice of Non-Voting Status, the Ballots, and the Vote Modification Forms set forth the procedures for assenting to or electing to opt out of such Third-Party Release and attached the appropriate release opt-out form in compliance with Paragraph 40 of the *Procedures for Complex Cases in the Southern District of Texas*.  The Combined Hearing Notice, the Notice of Amended Plan and Combined Hearing, the Notice of Non-Voting Status, the Ballots, and the Vote Modification Forms all advised careful review and consideration of the terms of the Third-Party Release, along with the other

release, exculpation, and injunction provisions included in the Plan.  The release, exculpation, and injunction provisions, including the Third-Party Release, were also emphasized with bold font in the Plan and the Disclosure Statement.  I have been advised that approximately 487 Holders of Claims and Interests completed and returned valid elections to opt out of the Third-Party Release.

27.    I believe the Third-Party Release is sufficiently specific to put the Releasing Parties on notice of the claims being released.  The Third-Party Release describes the nature and type of claims being released, including with respect to the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases and the Plan, and the negotiation thereof, the Chapter 11 Cases generally, the solicitation of votes with respect to the Plan, or any other act or omission relating to the foregoing taking place on or before the Effective Date.

28.    It is my understanding that the Third-Party Release is an integral part of the Plan and a condition of the settlement set forth therein.  The Third-Party Release facilitated participation by the Released Parties in both the Plan and the chapter 11 process and was critical in reaching consensus to support the Plan.  Indeed, the Debtors' key stakeholders insisted on the inclusion of the Third-Party Release as a condition to entering into the RSA, the DIP Documents, and the Backstop Agreement, and, ultimately, to support the Plan.  As such, the Third-Party Release was a core negotiation point and appropriately offers certain protections to parties that constructively participated in the restructuring.

29.    I have been advised that the Third-Party Release is given for consideration.  It is my understanding that the Released Parties have played an extensive and integral role in the Debtors' restructuring.   I believe all parties in interest benefit from the Restructuring

Transactions contemplated by the Plan and the significant contributions of the Released Parties in furtherance thereof, including the capital infusion through the Rights Offering, which is backstopped by the Commitment Parties, and the incurrence of the ABL Exit Facility. These contributions will allow for a holistic restructuring that will enable the Debtors to significantly reduce their funded debt and have sufficient liquidity to operate after the Effective Date.

30.     In addition to the above, the Debtors' current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, other professionals and each such Person's or Entity's current or former Affiliates (other than the Anagram Wholly-Owned Subsidiaries), predecessors, successors, direct or indirect equity holders, funds, portfolio companies, and management companies (collectively, the "Debtor Related Parties") are an integral component of the settlements and compromises embodied in the Plan. I believe that the Debtor Related Parties: (a) made substantial and valuable contributions to the Debtors' restructuring and the Estates, including through extensive negotiations with various stakeholders, and ensured the uninterrupted operation of the Debtors' business during the Chapter 11 Cases; (b) invested significant time and effort to make the Debtors' restructuring a success and preserve the value of the Debtors' Estates in a challenging operating environment; (c) attended and, in certain instances, participated in Court hearings; (d) attended numerous board meetings related to the restructuring and directed the restructuring negotiations that led to the Restructuring Support Agreement, the Backstop Agreement, and the Plan; (e) are entitled to indemnification from the Debtors under applicable law, organizational documents, and

agreements; (f) invested significant time and effort in the preparation of the Plan, the Disclosure Statement, the Disclosure Statement Supplement, all supporting analyses, and the numerous other pleadings filed in the Chapter 11 Cases, thereby ensuring the smooth administration of the Chapter 11 Cases; and/or (g) are entitled to all other benefits under any current employment contracts with the Debtors.

31.     Based on the foregoing, I believe the Third-Party Release is appropriate and justified under the circumstances and should therefore be approved.

**(iv)     The Plan's Exculpation Provisions Are Appropriate**

32.     Article IX.E of the Plan contains a customary exculpation benefitting the Exculpated Parties for claims arising out of or relating to the Chapter 11 Cases and the agreements made in connection therewith (the "Exculpation").  The Exculpation carves out acts or omissions that are determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct.

33.     I believe the Exculpation is appropriate as it provides protection to the estate fiduciaries and others that participated actively in the Debtors' restructuring.  It represents an integral component of the Plan, is the product of good faith, arm's-length negotiations among various parties (including the key constituents of the Chapter 11 Cases), is appropriately and narrowly tailored in time and scope, and have been advised that the Exculpation is authorized pursuant to the Court's authority under sections 105, 1123(b), 1125, and 1129(a)(1) of the Bankruptcy Code.  I believe the Exculpated Parties are similarly narrowly tailored to include the Debtors and the Creditors' Committee and its members.  As described below, each of these parties has made a significant contribution towards the consummation of the Debtors'

restructuring and acted in good faith throughout the process that has culminated in a fully consensual Plan.

34.    It is my understanding that all of the Debtors' key stakeholders support the Exculpation, including the Ad Hoc Noteholder Group and the Creditors' Committee.   The Debtors received no objections to the Exculpation from any economic stakeholder despite providing ample notice of its terms to all parties in interest, including by listing the entire Exculpation in the Ballots, the Combined Hearing Notice, the Notice of Non-Voting Status, and the Vote Modification Forms.  While the U.S. Trustee filed an objection to the scope of the Exculpation provisions, the Debtors and the U.S. Trustee have consensually resolved such objection through the inclusion of certain modifications to the Plan.

35.    Rather than including the Debtor Related Parties within the scope of the Exculpation provision, I understand that the Debtors, the U.S. Trustee, and other parties in interest are supportive of the Debtor Related Parties being deemed to have acted in good faith and having the Debtor Related Parties provided with the protections under section 1125(e) of the Bankruptcy Code, and for such treatment to be subject to a gatekeeping provision in the Confirmation Order.

36.    I understand that, for the Debtors, the Reorganized Debtors, the Released Parties (including the Debtor Related Parties), the Exculpated Parties, the GUC Trust, the GUC Trustee, or the GUC Trust Assets to have any liability for any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Supplement, the Backstop Agreement, the Rights Offering, the DIP Non-Cash Takeout Option, the ABL Exit Facility, the New Second

Lien Notes, this Plan, the Plan Supplement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, the Bankruptcy Court must (a) first determine, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (b) specifically authorize such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.[4]

### (v)   The Injunction Is Appropriate

37.    Article IX.F of the Plan contains an injunction provision that permanently enjoins all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to the Exculpation, from, among other things, commencing or continuing any action against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties on account of such Claims or Interests (the "Injunction").  I believe that the Injunction is necessary to implement, preserve, and enforce the Plan's release, discharge, exculpation, and gatekeeping provisions, which are integral to the

---

[4]    The foregoing description is a summary of the operative Plan provisions only.  To the extent there is any conflict between the foregoing summary and the Plan, the Plan shall control.

Plan. Furthermore, the Injunction is properly tailored to achieve its objective and only encompasses Claims or Causes of Action that have been voluntarily released. The Court should, therefore, approve the Injunction in connection with approving the discharge, release, and exculpation provisions included in the Plan.

### (vi)   The Plan's Cure Process Is Appropriate under Section 1123(d)

38.    Article VI.C of the Plan provides for the satisfaction of the Cure Claims associated with each Executory Contract or Unexpired Lease to be assumed. Specifically, the Debtors or the Reorganized Debtors, as applicable, shall pay the Cure Claims, if any, as indicated on the cure notices distributed to the counterparties of assumed Executory Contracts and Unexpired Leases. Any disputed Cure Claim will be determined in accordance with the procedures set forth in Article VI.C of the Plan and applicable law.

39.    As such, I have been advised that the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts or Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code, and therefore complies with section 1123(d) of the Bankruptcy Code. Based upon the foregoing, I believe the Plan complies fully with sections 1122 and 1123, and therefore satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

## C.    The Debtors have Complied with Section 1129(a)(2) of the Bankruptcy Code

40.    To my understanding based on discussions with the Debtors' legal counsel and other advisors, section 1129(a)(2) of the Bankruptcy Code requires compliance with the disclosure, solicitation, and voting requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.

### (i)    Section 1125: Postpetition Disclosure Statement and Solicitation

41.     Following the Court's entry of the Initial Solicitation Procedures Order and Supplemental Solicitation Procedures Order, I believe that the Notice and Claims Agent solicited votes and/or modified votes, as applicable, on the Plan consistent with the Court-approved Solicitation Procedures and Supplemental Solicitation Procedures, as applicable.  I understand that the Debtors did not solicit acceptances of the Plan from any Holder of a Claim before entry of the Initial Solicitation Procedures Order and Supplemental Solicitation Procedures Order, as applicable.

**(ii)     Section 1126: Acceptance of the Plan**

42.     I understand that the Debtors solicited acceptances of the Plan only from the Holders of Claims in the Voting Classes, which are the only Classes that are Impaired and entitled to vote on the Plan.  In addition, it is my understanding that the Debtors did not solicit votes to accept or reject the Plan from the Holders of Claims and Interests in the Non-Voting Classes, as I have been advised by counsel that the non-Voting Classes are either (a) Unimpaired and, therefore, deemed to have accepted the Plan or (b) Impaired and presumed to have rejected the Plan.

43.     I have also been advised by the Debtors' legal counsel that holders of an impaired class of claims or interests must vote in favor of a plan by at least two-thirds in amount and more than one-half in number of the allowed claims, or interests, of such class to accept the plan.  Of those who timely voted, Holders of Claims in Class 3A (Prepetition ABL Revolver Claims), Class 3B (Prepetition ABL FILO Claims), and Class 4 (Secured Notes Claims) voted to accept the Plan, and Holders of Claims in Class 5 (General Unsecured Claims) voted to reject the Plan. Based on the foregoing, the requirements of sections 1125 and 1126 of the Bankruptcy Code

have been satisfied, and thus, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

**D.      Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Is Not by Any Means Forbidden by Law**

44.     I believe the Debtors have proposed the Plan in good faith and solely for the legitimate and beneficial purpose of restructuring the Debtors' balance sheet, maximizing recoveries for creditors, and positioning the Debtors' business for future success in a challenging retail environment.  The Plan represents the culmination of months of good faith, arm's-length negotiations among the Debtors and their key stakeholders.  The Debtors' management team and advisors acted in good faith and in the best interests of the Estates in evaluating and negotiating the Plan, the Restructuring Support Agreement, the Rights Offering, the ABL Exit Facility, the New Second Lien Notes, the Backstop Agreement, and the Restructuring Transactions contemplated in connection with the finalization and execution of the Definitive Documents for each of the foregoing.

45.     Based on my discussions with the Debtors' legal counsel, I understand that the Plan is "not by any means forbidden by law" and, indeed, is in full compliance with the Bankruptcy Code and applicable non-bankruptcy law.  Accordingly, I believe the Debtors have proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

**E.      Section 1129(a)(4): The Plan Provides That Professional Fees and Expenses Are Subject to Court Approval**

46.     I understand that Article II.D of the Plan provides that all Professional Fees must be approved by the Court as reasonable pursuant to final fee applications, and Article XII(b) of the Plan provides that the Bankruptcy Court retains jurisdiction to "decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the

Bankruptcy Code, the Confirmation Order, or this Plan." Based on the foregoing, I believe the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**F.    Section 1129(a)(5): The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

47.    As part of the Plan Supplement, the Debtors disclosed the identities and affiliations of Reorganized PCHI's initial officers and directors, as well as the process by which such officers and directors have been selected. Accordingly, I believe the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

**G.    Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes**

48.    It is my understanding that section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan." I believe section 1129(a)(6) is inapplicable to the Chapter 11 Cases, as the Plan does not provide for any rate changes.

**H.    Section 1129(a)(8): The Plan Has Been Accepted by an Impaired Voting Class**

49.    As has been explained to me by the Debtors' counsel and as set forth in the Voting Certifications, Class 3A, Class 3B, and Class 4 each voted to accept the Plan well in excess of two-thirds in amount and one-half in number of Holders entitled to vote in such Classes who voted on the Plan. Additionally, I understand that Class 5 (General Unsecured Claims) voted to reject the Plan. Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), and Class 8 (Interests in PCHI) are, or are potentially, deemed to reject the Plan under section 1126(g) of the Bankruptcy Code. However, as discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code, and thus will be able to "cram down" the remaining Impaired Classes under section 1129(b) of the Bankruptcy Code.

**I.    Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Priority Claims**

50.     It is my understanding that the Plan provides that Allowed Administrative Claims and Allowed Priority Tax Claims will be paid in full in Cash on or as soon as reasonably practicable after the Effective Date or, if not then due or Allowed, on or as soon as reasonably practicable after the date such Claim is due or becomes Allowed, or otherwise in the ordinary course of business or as agreed with the relevant Holder of such Claims, all consistent with sections 1129(a)(9)(A)-(C) of the Bankruptcy Code.

**J.      Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan**

51.     As stated above and in the Voting Certifications, I understand that each of Class 3A (Prepetition ABL Revolver Claims), Class 3B (Prepetition ABL FILO Claims), and Class 4 (Secured Notes Claims) is Impaired and voted to accept the Plan, without including the acceptance of the Plan by any insiders in such Classes.  Accordingly, I believe the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**K.      Section 1129(a)(11): The Plan Is Feasible**

52.     Based on my understanding of the Plan, the advice of the Debtors' advisors, and my experience with the Debtors' businesses and industry, I believe that the Plan is feasible.  For purposes of determining the feasibility of the Plan, the Debtors' management prepared financial projections, which were attached (together with certain related assumptions) to the Disclosure Statement as Exhibit F (the "Financial Projections").  The Financial Projections were integral to the development of the Reorganized Debtors' valuation analysis, which, as discussed in the Keil Confirmation Declaration, was performed by Moelis & Company LLC ("Moelis") and was attached to the Disclosure Statement as Exhibit D (the "Valuation Analysis").

53.     Since that time, a challenging economic environment and retail industry headwinds have impacted the Debtors' businesses.  The Debtors identified a decline in

performance through their ordinary course financial forecasting process and determined to update their Financial Projections and related Valuation Analysis prepared in connection with solicitation of the initial Plan.  This decision was also informed, in part, by the Debtors' ongoing efforts to raise the ABL Exit Facility and in light of the proposed rights offering under the initial Plan, through which holders of Secured Notes Claims would have received subscription rights to purchase New Common Stock of the Reorganized Debtors.

54.     The revised financial projections (the "Updated Financial Projections") resulting from that process, which are attached to the Disclosure Statement Supplement as Exhibit F, are based on (a) the Debtors' actual financial performance through the period ended March 31, 2023, and (b) adjustments to certain forward looking assumptions based on recent financial performance and a revised business outlook following changes in the macroeconomic environment.  Following development of the Updated Financial Projections, Moelis updated the Valuation Analysis (the "Updated Valuation Analysis" and, together with the Updated Financial Projections, the "Updated Financials"), which reflects a decrease in the Reorganized Debtors' total enterprise value from the estimated range set forth in the Valuation Analysis to a revised range of approximately $450 million to approximately $775 million, with a midpoint of approximately $612.5 million.  Accordingly, after adjusting for estimated net debt at emergence of $513 million, the implied equity value of the Reorganized Debtors has also decreased from the estimated range set forth in the Valuation Analysis to a revised range of approximately $0 to approximately $262 million.

55.     Following development of the Updated Financials, I reviewed the Debtors' actual 2023 financial performance through June 2023.  Adjusted EDITDA during this period was approximately $1.5 million below the Updated Financial Projections.  Based on my review of the

Updated Financials, despite several changes to the Updated Financial Projections and resulting valuation range that the Reorganized are anticipated to have as of the Effective Date, I believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan and, therefore, that Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

56.     I also believe that the Reorganized Debtors will be able to repay or refinance the ABL Exit Facility, the New Second Lien Notes, and the Mudrick Promissory Note incurred or issued, as applicable, in connection with the Plan on commercially reasonable terms at or before the maturity of such indebtedness.   Additionally, it is my belief that the Reorganized Debtors will be able to satisfy all obligations owed under the ABL Exit Facility, the New Second Lien Notes Documents, and the Mudrick Promissory Note Documents and related to their post-emergence business operations in the ordinary course of business.   Furthermore, the Plan is the product of extensive negotiations and discussions among the Debtors and their key stakeholders. The Debtors' stakeholders extensively reviewed the Financial Projections, Updated Financial Projections, and their business plan, which ultimately resulted in the terms incorporated into the Plan.   Indeed, the Holders of Secured Notes Claims have agreed to equitize all of their Claims, thereby evidencing their conviction that the Plan is feasible.   Accordingly, I believe the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.     Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid under the Plan**

57.     I understand that the Plan provides that all statutory fees payable under section 1930 of title 28 of the United States Code, which are afforded priority as administrative expenses, due and payable before the Effective Date shall be paid by each of the Debtors or the Reorganized Debtors, as applicable, for each quarter, until the Chapter 11 Cases are converted,

dismissed, or closed, whichever occurs first.  I believe the Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.      Section 1129(a)(13): The Plan Does Not Modify Retiree Benefits**

58.      I have been advised by the Debtors' counsel that the Debtors do not provide any retiree benefits within the meaning of section 1114 of the Bankruptcy Code, but to the extent they do, the Plan does not modify any such retiree benefits.  Thus, I believe the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

**N.      Section 1129(b): The Plan Satisfies the "Cram Down" Requirements**

59.      As discussed above, Holders of Claims in Class 3A (Prepetition ABL Revolver Claims), Class 3B (Prepetition ABL FILO Claims), and Class 4 (Secured Notes Claims) (collectively, the "Accepting Classes") voted to accept the Plan.  Accordingly, cram down is only relevant to Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), and Class 8 (Interests in PCHI), which voted, have been deemed, or may be deemed to reject the Plan under certain circumstances.  The Plan may be confirmed as to both of these Classes pursuant to the cram down provisions of section 1129(b) of the Bankruptcy Code.

**(i)      The Plan Does Not Discriminate Unfairly**

60.      As it has been explained to me, the Plan does not discriminate unfairly with respect to any Class.  There is no unfair discrimination among the Accepting Classes and the Classes of Claims that voted or are deemed to reject the Plan:

- Class 3A (Prepetition ABL Revolver Claims) and Class 3B (Prepetition ABL FILO Claims) are separately classified on account of distinct revolving and first-in, last-out loan facilities under the Prepetition ABL Credit Agreement.

- Class 4 (Secured Notes Claims) consists of all Claims arising under the Secured Notes Indentures, which provide the Holders thereunder with specific rights and

obligations against the Debtors with respect to their investments in the Secured Notes Claims.

- Class 5 (General Unsecured Claims) consists of a broad array of General Unsecured Claims held by, among others, trade creditors, suppliers, servicers, vendors, litigation claimants, and contract counterparties, who each generally have different rights and obligations governing their Claims but whose Claims share a common general unsecured priority.

- Class 6 Intercompany Claims are legally distinct from both of these Classes, and consist of insider Claims by Debtors and Non-Debtor Affiliates against other Debtors.

61.     I have been advised by the Debtors' counsel that it is not unfair discrimination to classify such Claims within a separate and distinct Class and, much like the Intercompany Interests described below, it is reasonable for a business to maintain or cancel such Intercompany Claims in the ordinary course.  Accordingly, I believe that there is no unfair discrimination among the Accepting Classes, Class 5 (General Unsecured Claims), and Class 6 (Intercompany Claims), and there is a reasonable basis for the disparate treatment among those Classes.

62.     In addition, it is my understanding that Class 8 (Interests in PCHI) is legally distinct in nature from all other Classes, including Class 7 (Intercompany Interests).  Class 8 represents all Interests in PCHI, the "top" of the Debtors' corporate structure, which such Interests are publicly held by a broad array of Holders.  Class 7 (Intercompany Interests) represents Interests held by Debtors and Non-Debtor Affiliates in Debtors other than PCHI.  I understand that all Interests in PCHI are classified together and afforded the same treatment under the Plan.  Similarly, all Intercompany Interests are classified together and afforded the same treatment under the Plan.  These Classes represent legally distinct Interests.  Accordingly, in my view, there is no unfair discrimination among the Holders of Interests in Class 7 and Class 8.  Thus, I believe that the Plan does not "discriminate unfairly" with respect to any impaired Classes of Claims or Interests.

(ii)     **The Plan Is Fair and Equitable**

63.     I have been advised by the Debtors' counsel that the Plan is fair and equitable with respect to each Impaired Class as distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the rule of absolute priority. I understand that the Holders of Claims in Class 3A (Prepetition Revolver Claims), Class 3B (Prepetition ABL FILO Claims), and Class 4 (Secured Notes Claims) have consented to the recoveries the Plan provides to the Holders of Claims and Interests junior to them through their Class vote to accept the Plan.  There is no Class junior to Class 8 (Interests in PCHI).

64.     I believe the "fair and equitable" rule is satisfied as to the other Classes that are deemed to reject or have voted to reject the Plan (i.e., Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), and Class 7 (Intercompany Interests)), as no Claims and Interests junior to each such Class, as applicable, will receive or retain any property under the Plan on account of such junior Claims or Interests.  The Plan provides that on the Effective Date, all Intercompany Claims shall be Reinstated, or cancelled, released, and extinguished without any distribution, and all Intercompany Interests shall be Reinstated, or cancelled, released, and extinguished without any distribution.  To the extent Reinstated, Intercompany Interests and Intercompany Claims are Unimpaired solely to preserve the Debtors' corporate structure and internal business operations, and Holders of such Intercompany Interests shall not otherwise receive or retain any property on account of such Intercompany Interests.  The option to reinstate these Intercompany Interests and Intercompany Claims is designed to allow the Debtors to preserve their holding company structure and business operations instead of having to reconstitute a new one or recreate their internal business operations and relationships.

65.     Because the Plan does not discriminate unfairly and is fair and equitable, I believe the Plan satisfies the "cram down" requirements of section 1129(b) of the Bankruptcy code and may be confirmed.

**O.     Section 1129(c): The Plan Is the Only Plan Currently on File**

66.     I understand that the Plan is the only plan filed in these Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

**P.     Section 1129(d): The Purpose of the Plan Is Not Tax or Securities Law Avoidance**

67.     I believe that the principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no governmental unit has objected to Confirmation of the Plan on such grounds.

**Q.     Section 1129(e): Inapplicable Provision**

68.     I understand that the Chapter 11 Cases are not "small business cases" as that term is defined in the Bankruptcy Code.

**R.     Good Cause Exists to Waive the Stay of the Confirmation Order**

69.     Under the circumstances, I believe that it is appropriate for the Bankruptcy Court to permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order.  Moreover, I believe the restructuring contemplated by the Plan was vigorously negotiated among sophisticated parties and is premised on preserving value of the Debtors as a going concern.  That restructuring contemplates a series of complicated and time-consuming corporate reorganizational steps that must be taken in advance of the Effective Date, which must occur no later than September 21, 2023, per the milestone requirements of the Restructuring Support Agreement and the DIP Credit Agreement.  Given that

time is of the essence, immediate effectiveness of the Confirmation Order would facilitate the Debtors' efforts to take the steps necessary to consummate the Plan by the Effective Date.

70.     Finally, as set forth above, given the Debtors' extensive efforts to provide each of the voting parties, as well as their other stakeholders, a full measure of adequate notice, I believe that staying the Confirmation Order will not serve any due process-related ends.  Accordingly, I believe the Debtors should be granted their request of a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

August 31, 2023

*/s/ David Orlofsky*

David Orlofsky
Chief Restructuring Officer
Party City Holdco Inc.