UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PARTY CITY HOLDCO INC., et al., | § | Case No. 23-90005 (DRJ) |
| | § | (Chapter 11) |
| Debtors, | § | (Jointly Administered) |
| _____ | § | |

**ORIGIN SETTLEMENT ADVISORS LLC'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO REJECTION, IT'S SUPPLEMENTAL OBJECTION, AND ITS REPLY TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RESPONSE TO ORIGIN'S OBJECTION TO DEBTOR'S PLAN OF REORGANIZATION AND TO CONFIRMATION OF PLAN**

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

ORIGIN SETTLEMENT ADVISORS LLC ("Origin"), as assignee and a party-in-interest, files (a) this memorandum in support of its objection to rejection of the Service Agreement between Origin and some of the Debtors, (b) this supplemental objection to rejection, and (c) this reply to the Official Committee of Unsecured Creditors' response (Dkt. No. 1251) to Origin's objection to rejection (Dkt. No. 1116) (the "Objection"), to the cure amount proposed by the Debtors (*see, e.g.*, Schedule 2 (p. 40) of the Debtors' Notice of Filing of Initial Plan Supplement for First Amended Joint Chapter 11 Plan of Reorganization of Party City Holdco Inc. and its Debtor Affiliates (Dkt. No. 947) (the "Plan Supplement Notice")). This Memorandum also responds to the Debtors' memorandum in support of confirmation filed August 31, 2023 at dkt. no. 1679.

1. The response filed by the Official Committee of Unsecured Creditors ("UCC") is found at dkt. No. 1251 (the "UCC's Response"). The UCC relies primarily on three unsubstantiated assertions, for which the UCC has provided no factual or legal support: (1) The UCC contends that the Service Agreement is *not* an assignment of the Debtors' claims in the Visa

Interchange Litigation; (2) The UCC contends that the Service Agreement is an executory contract because the Debtor has material unperformed future obligations; and (3) The UCC contends that, even if the Service Agreement has been fully performed by the Debtors, Origin would only have, at best, a prepetition general unsecured claim for Commissions due under the agreement. Each argument fails as a matter of law and fact.

### A. The Service Agreement is, under California law, an <u>Assignment</u> of the Debtors' Claims in the Visa Interchange Litigation.

2.  The UCC says that "[n]one of the narrow exclusions of property of the estate listed in section 541(b) or the enforcement of restrictions on transfers of interest in a beneficial trust under section 541(c)(2) is applicable [to the Service Agreement]." (UCC's Response at 3, 6.) The UCC overlooks the fact that Section 541 of the Bankruptcy Code provides a temporal limit on its inclusiveness: "property of the estate generally comprises that property held by a debtor *at the commencement of the bankruptcy case* and its proceeds." George R. Pitts, <u>Rights to Future Payment as Property of the Estate Under Section 541 of the Bankruptcy Code</u>, 64 AM. BANKR. L.J. 61, 62 (1990) (emphasis added). What's more, Party City cites *In re Morrison*[1] for the proposition that "[a] debtor's legal claims constitute property of the estate under § 541(a)(1)." While the foregoing quote may state the general rule, the UCC has failed to determine or analyze *exactly what* Party City's "legal claim" consists of as of the date of the filing of its petition for bankruptcy.

3.  A debtor's property rights are determined by state law, while federal bankruptcy law applies to establish the extent to which those rights are property of the estate. *Mitchell v. BankIllinois*, 316 B.R. 891, 896 (S.D.Tex.2004); see also *Butner v. United States*, 440 U.S. 48, 55,

---

[1] *In re Morrison*, 409 B.R. 384, 393 (S.D. Tex. 2009).

99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (holding that property interests are created and defined by state law).

4. It is well established that any causes of action belonging to the debtor as of the petition date are property of the debtor that become part of the estate once the bankruptcy petition is filed. *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir.2008) (per curiam) (Section 541 of the Bankruptcy Code provides that virtually all of a debtor's assets, including causes of action belonging to the debtor **at the commencement of the bankruptcy case**, vest in the bankruptcy estate upon the filing of a bankruptcy petition.). Therefore, we must look to California law to determine the extent of the Debtor's property rights in the Visa Interchange Claim (the "Claim") as of the Petition Date.

5. When the Debtors, filed for bankruptcy protection on January 17, 2023, the Debtors had, relative to the Visa Interchange Litigation, a contractual right, *as between Party City and Origin*, to a portion (albeit the major portion) of the recovery in the Visa Interchange Litigation. As of the Petition Date, the Debtors no longer held a right—as debtors-in-possession or otherwise—to the Claim *itself* or to the entirety of the Claim recovery. As of the Petition Date, the Claim, or at least a portion thereof, belonged to Origin. In other words, the Debtors contractually gave (i.e., assigned) the Claim, or at least a portion thereof, to Origin via the Service Agreement. The right of the assignor (i.e., the Debtors) in the thing being assigned (i.e., the Claim) was extinguished, in whole or in part, and a right to the thing being assigned (i.e., the Claim) was created in the assignee (i.e., Origin). Thus, the Service Agreement extinguished the Debtors' rights to the Claim and created a new right, which is an unliquidated interest in a portion of the Claim in the Visa Interchange Litigation. While the rights to the Claim initially belonged to the Debtors, the Debtors transferred their rights to pursue the Claim and to the Claim recoveries by entering

into the Service Agreement with Origin, in which the Debtors irrevocably dedicated at least a portion of the Claim to Origin. In fact, the Debtors contracted to have no involvement in the Claim process itself (other than to provide data to Origin), to absolve themselves of the rights and responsibilities inherent in the Claim process, and to create a new class of rights in the Claim (and in the Claim recoveries) arising under the Service Agreement.

6. In fact, the UCC analyzes the terms of the Service Agreement only in the most superficial, conclusory fashion. If the Service Agreement is analyzed under California law, as required by the terms of the Service Agreement, it is clear that, in the Service Agreement, the Debtors' irrevocably assigned their claims in the Visa Interchange Litigation to Origin. In the Service Agreement, the Debtors validly and irrevocably assigned the Claims (or a portion thereof) to Origin on December 18, 2020, more than two years before the Debtors filed for bankruptcy protection. Thus, the Debtors' rights in the Visa Interchange Litigation were assigned to Origin as of 2020 and are not property of the Estate under § 541.

7. The Restatement, heavily utilized and relied on by California courts, lays out the basic requirements of an assignment:

> (1) An assignment of a right is a **manifestation of the assignor's intention** to transfer it by virtue of which the **assignor's right to performance** by the obligor is **extinguished in whole or in part** and the assignee **acquires a right to such performance**.

Restatement (Second) of Contracts § 317 (1981) ("Restatement") (emphasis added).

8. Accordingly, an assignment requires: (i) an assignable right; (ii) a manifestation of intent by the assignor to transfer that right and extinguish assignor's right therein (in whole or in part); and (iii) acquisition by the assignee of the right to performance. *See, id.*

9. The Restatement also lists characteristics of rights that may not be assigned:

A contractual right can be assigned <u>unless</u>

    a. the substitution of a right of the assignee for the right of the assignor would **materially change the duty of the obligor**, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or
    b. the assignment is **forbidden by statute** or is otherwise inoperative on grounds of **public policy**, or
    c. assignment is validly precluded by **contract**.

*Id.* (emphasis added).

10. Here, the Debtors' assignment of the Claim to Origin does not materially change the duty of the obligor (i.e., the Visa Interchange Litigation Claims Administrator), nor does it increase the burden or risk to the obligor, nor does it materially impair the obligor's chance of return performance, nor does it materially reduce the value of performance to the obligor. There is, in fact, no material change in the obligations of the obligor, the Visa Interchange Litigation Claims Administrator; the obligations of the Claims Administrator will be the same regardless of who holds the Claim. Moreover, there is no statutory, public policy[2], or contractual prohibition against the assignment of Party City's claim. As a result, the question is whether the assignment

---

[2] Regarding public policy, *please see Cohn v. Thompson*, 128 Cal. App. Supp. 783, 790, 16 P.2d 364, 366 (App. Dep't Super Ct. 1932):

> It is common knowledge that collection agencies pursue the policy of taking assignments of claims for the purpose of bringing action, and that the only interest the assignee has in the subject–matter is a percentage thereof as his compensation for doing those things ordinarily performed by an attorney at law." Chapter 485, p. 822, Statutes of 1927, declares the public policy as to such contracts by recognizing the right of collection agencies to do business, including "obtaining in any manner the payment of a claim." Section 2. This provision is broad enough to include bringing a suit. The right of a collection agent to take an assignment of a claim and bring suit thereon in his own name has been so long recognized in this state, both by statute and decisions, that we cannot declare an assignment of a claim for the purpose of bringing suit to be against public policy. We find no merit in the contention that assignment of a claim with the intent that the assignee shall bring suit thereon is illegal and void.

adheres to the general requirements espoused by California courts and elucidated within the Restatement.

11. The first requirement for an assignment is that the right must be assignable. *See* Restatement § 317. **A "chose in action",** i.e., "an interest in property not immediately reducible to possession . . . includ[ing] a financial interest such as a debt, a legal claim for money, or a contractual right", **is assignable**. *See Sprint Commc'ns. Co.*, 554 U.S. at 275, 278, 128 S.Ct. 2531 (emphasis added); *see also Cal. Ins. Guar. Ass'n v. Workers' Comp. Appeals Bd.*, 203 Cal. App. 4th 1328, 1335, 138 Cal.Rptr.3d 24 (2012) ("An assignment is a commonly used method of transferring a cause of action"); *see also Fink v. Shemtov*, 210 Cal. App. 4th 599, 610, 148 Cal.Rptr.3d 570 (2012) (quoting *Cal. Ins. Guar. Ass'n*, 203 Cal. App. 4th at 1335) ("A complete assignment *passes legal title* to the assignee who is the real party in interest and may sue in his or her real name."); *see id.* (emphasis omitted) (quoting *Nat'l Reserve Co. v. Metro. Trust Co.*, 17 Cal. 2d 827, 831, 112 P.2d 598 (1941)) ("[A]n assignment of a chose in action for collection vests the legal title in the assignee whether or not any consideration is paid therefor. In such case, the assignee may maintain a suit thereon in his own name, even though the assignor retains an equitable interest in the thing assigned.").

12. Here, there is an assignable right, i.e., the Claim, which is a chose in action. The assignment thereof is effectual even though Origin is proceeding under the name of the Debtors. *See* Walter Wheeler Cook, "The Alienability of Choses in Action," 29 Harv. L. Rev. 816, 831 (1916) ("If after the assignment the assignor becomes insolvent and bankruptcy proceedings are had, the assignee may still use the assignor's name in suing the debtor and the bankruptcy of the assignor is no defense to the action as it would be if the assignor still owned the claim").[3]

---

[3] Further citing *Matherson v. Wilkinson*, 79 Me. 159, 8 A. 684, 685 (1887) ("This debt is not now the property of the partnership, though sued in its name. **The partners do not own the claim after selling and assigning it**."); *Parsons*

13. A conditional right may be assigned:

> . . . the right may be conditional on a performance by another, or on some other event. Such a condition does not prevent assignment by a promisee or beneficiary of his conditional right. Whether or not the return performance is delegable, and whether or not the assignor is under a duty to render it, the assignee's right is subject to the same conditions as was the assignor's.

Restatement (Second) of Contracts § 320. Partial assignment is also permitted:

> It is well-settled that former section 385 applies to partial assignments too. This principle dates back more than a century. (*Cerf v. Ashley* (1886) 68 Cal. 420, 420, 9 P. 658 ["It would be too narrow a construction of this section to hold that it applies only where the transfer is of the entire interest"]; accord, *Crescent Canal Co. v. Montgomery, supra,* 124 Cal. at p. 145, 56 P. 797.)

*Hearn Pac. Corp. v. Second Generation Roofing Inc.*, 247 Cal.App.4th 117, 137 (Cal. Ct. App. 2016).

14. Moreover, courts have authorized assignments of choses in action *for collection*, wherein the assignor retains some equitable interest in the claim, such as when there is some agreement for contingent payment to the assignor. *See Fink*, 210 Cal. App. 4th at 148 ("[a]n assignment of a chose in action for collection **vests the legal title in the assignee** whether or not any consideration is paid therefor; in such case the assignee may maintain a suit thereon in his own name, *even though the assignor retains an equitable interest in the thing assigned.*" (Emphasis added.)); *see also Macri v. Carson Tahoe Hosp., Inc.*, 247 Cal. App. 2d 63, 66, 55 Cal. Rptr. 276, 278 (Ct. App. 1966) ("Provided the assignment is absolute, so as to vest the apparent legal title in the assignee, the latter is entitled to sue in his own name, **whatever collateral arrangements have been made between him and the assignor respecting the proceeds**"); *see also Fink*, supra, at 578-79:

> The legal effect of an assignment for collection is delineated in *Cohn v. Thompson* . . . as follows: The assignee merely contracts to file suit in his own name, if necessary to make the collection. But he does not agree to **furnish any**

---

*v. Woodward*, 22 N.J.L. 196, 200 (Sup. Ct. 1849) ("Any beneficial contract may be assigned, and the courts at law will protect the rights of the assignee suing in the name of the assignor.").

**legal services** whatever to the assignor. . . . [T]he only duty of the assignee is to **account to the assignor** after the collection has been made.[4]

*Id.*

15. The UCC says that "nothing in the Service Agreement provides or even references any assignment or transfer of any property. . . . Origin therefore has a contingent claim on account of (but no ownership in) any Commission owed." (UCC's Response, p. 4, para. 8.). It is, however, well established under California law[5] (and under Texas law[6]), that express reference to the word "assignment" is not required, and that "[i]t is the **substance** and not the form of a transaction which determines whether an assignment was intended." *McCown v. Spencer*, 8 Cal. App. 3d 216, 218, 87 Cal. Rptr. 213 (Ct. App. 1970) (emphasis added). Specifically, the court must look to whether "the assignor has, in some fashion, manifested an intention to make a present transfer of his rights to the assignee." *Fink,* supra, at 610; *see also Hearn Pac. Corp. v. Second Generation Roofing, Inc.*, 247 Cal. App. 4th 117, 201 Cal. Rptr. 3d 806 (2016) ("In absence of statute or a contract

---

[4] See also *Boisevert v. Lohan*'s characterization of the holding in *Fink*:

> The court of appeals held that the assignor transferred all rights to the debt it was owed to appellant; that in exchange for the assignment, appellant agreed to pay the assignor a certain amount; that although appellant agreed to file a lawsuit against the defendants and enforce any resulting judgment, he did not agree to represent the assignor or provide it with legal advice; that appellant filed the complaint in his own name and was the sole plaintiff; and that there was no evidence that the assignor retained any control over the litigation. Id. Therefore, the court concluded, appellant **had legal title to prosecute assigned collection claims** in his own name, and could do so in propria persona.

No. C -12-04263(EDL), 2012 WL 12920196, at *8 (N.D. Cal. Dec. 12, 2012), *aff'd,* 617 F. App'x 810 (9th Cir. 2015).

[5] A sampling of the wide array of California law on the topic follows: *Cal. Ins. Guar. Ass'n*, 203 Cal. App. 4th at 1335, 138 Cal.Rptr.3d 24 (quoting *Nat'l Reserve Co. v. Metro. Trust Co.*, 17 Cal. 2d 827, 832, 112 P.2d 598 (1941) ("[i]n determining whether an assignment has been made, 'the intention of the parties as manifested in the instrument is controlling.'"); *Amalgamated Transit Union, Local 1756*, 46 Cal. 4th 993, 1002, 95 Cal.Rptr.3d 605, 209 P.3d 937 (2009) ("[a]n assignment requires very little by way of formalities and is **essentially free from substantive restrictions**.") (Emphasis added); and see *Skanska USA Civ. W. California Dist. Inc. v. Nat'l Interstate Ins. Co.*, No. 20-CV-367-WQH-AHG, 2020 WL 5294713, at *4 (S.D. Cal. Sept. 3, 2020) ("To be effective, an assignment 'must include manifestation to another person by the owner of his intention to transfer the right, without further action, to such other person or to a third person . . ..'").

[6] *See, e.g., Texas v. Am. Tobacco Co.*, 441 F. Supp. 3d 397 (E.D. Tex. 2020) ("An 'assignment,' under Texas law, is a manifestation by the owner of a right or property of its intention to transfer such right or property to another.").

provision to the contrary, there are **no prescribed formalities** that must be observed to make an effective assignment; it is sufficient if assignor has, in some fashion, **manifested intention to make a present transfer of his rights** to assignee.") (Emphasis added); *and see Sunburst Bank v. Exec. Life Ins. Co.*, 24 Cal. App. 4th 1156, 1164, 29 Cal. Rptr. 2d 734, 740 (1994) ("While no particular form of assignment is required, it is essential to the assignment of a right that the assignor **manifest an intention to transfer** the right.") (Emphasis added); Restatement § 324; *Cockerell v. Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 291, 267 P.2d 16.

16. The Debtors argue that, as a matter of law, express terms such as "assign" or "transfer" are <u>required</u> to effect an assignment or transfer, relying on a 2012 federal district court opinion, *Dameron Hospital Ass'n v. State Farm Mut. Auto Ins. Co.*, No. 2:10-cv-03396-GEB-JFM, 2012 WL 4038449, at*3-4 (E.D. Cal. 2012). The federal district court did not so hold. The Debtors are "stretching" the holding of *Dameron* to argue for a requirement that does not exist under California law. In *Dameron*, the court simply held that the word "authorizes", in the context presented, did not manifest an intention to assign or transfer to a liability insurer a hospital's right to receive and retain payment from the patient or the patient's health insurer. *Id.* Here, the Debtors clearly manifest an intention to transfer all or a portion of the Claim and the recoveries therefrom to Origin, as discussed in the following paragraphs.

17. Because use of the word "assign" or "assignment" is neither necessary nor determinative, the Court may examine the Service Agreement, and the context, in order to determine whether a valid assignment of the Claim occurred. Two important factors supporting Origin's position that the Claim was assigned to Origin on December 18, 2020 include: (1) the irrevocable nature of the Agreement, and (2) the divestiture of control by the Debtors and the transfer of control to Origin.

18. Assignments, by their nature, are irrevocable. *See Bryant v. Langford*, 80 Cal. 542, 22 Pac. 219 ("Such assignments pass the title to the assignee and the assignment becomes irrevocable"). Upon executing the Service Agreement with Origin, the Debtors relinquished all of their rights to the Claim, except for a contingent, future interest in a portion of the ultimate recovery: "Company agrees that **proceeds shall be paid directly to Origin** by the claims administrator. **Origin will deposit proceeds into Origin's bank account** and disburse **net amount** to Company no later than thirty (30) days after receipt of funds." (Service Agreement, p. 1, para. 2 (emphasis added).) Moreover, the Agreement states: "Should it be discovered that a duplicate claim was filed on behalf of Company by Company itself or by another third party in the Visa Interchange Litigation, the claim filed by Origin on behalf of Company **shall supersede** the other claim, and Commission will be due as described in Section 2." (Service Agreement, p. 1, para. 3 (emphasis added).)

19. Specifically, the Debtors agreed to several substantive provisions that unambiguously point to a full assignment. By way of example, the Debtors cannot void or terminate the Agreement—or even modify it—unless Origin agrees:

> This Agreement shall remain in effect until Company receives all claim benefits (whether check, vouchers or other) to which it is entitled pursuant to this Agreement, at which time Origin's authority to act as Company's agent shall terminate automatically. This Agreement and its terms shall remain in full effect and **may not be voided or its terms modified by the Company,** its successors-in-interest, creditors, or any court in the event of Company's bankruptcy, reorganization, or liquidation or sale of its assets.

(Service Agreement, p. 2, para. 8 (emphasis added)). The two clauses evidence a **permanent and irrevocable** assignment of the Debtors' rights to the Claim.

20. Additionally, the Debtors divested themselves of all **control** of the Claim—a crucial factor in determining whether a valid assignment has been achieved. *See Fink*, 210 Cal.

App. 4th at 612-13 (analyzing the effectiveness of an assignment in the context of determining whether the assignee had standing to sue, and finding insufficient evidence for the trial court to determine an assignee *lacked* standing where the "assignment was complete and absolute"; the assignee agreed to provide the assignor with 50% of the recovery, the assignee did not agree to represent the assignor or provide any legal advice, the assignee "filed the complaint against defendants in his own name and was the sole plaintiff," and "there was no evidence that [the assignor] retained any control over, or the right to control, the litigation of the assigned claims . . ..").  Here, under the Service Agreement, the Debtors have no power to direct, control, or even influence how Origin pursues the Claim.  (*See* Service Agreement.)

21.     Moreover, Origin makes no promise about the recovery that may be achieved, or how Origin will achieve it. (Service Agreement p. 2, para. 6 ("Origin does not guarantee any specific amount of monetary recovery for the Company ***or any recovery*** and ***shall not be liable if Company receives no recovery or a smaller recovery than Company anticipated***.").)  For the Debtors to agree to such terms clearly indicates a desire and intention to farm out the Claims and divest themselves of all responsibility.  If the Debtors had wanted to retain control of the Claim and pursue the Claim themselves, they could negotiated for control.  They did not do so.  Origin is working to maximize its own claim, and the Debtors benefit incidentally from Origin's success through a separate, distinct contractual arrangement as between only Origin and the Debtors. Origin earned this contract by its experience and track record of past successes (See Agreements: "Statement of Qualification"), and not because Origin promised to work for or be beholden to Party City.

22.     Here, the Debtors did not retain "full ownership" of the Claim.  First, the entirety of any claim proceeds will be deposited directly into Origin's bank account.  (Service Agreement,

p. 1, para. 2 ("Company agrees that proceeds shall be paid directly to Origin by the claims administrator")). Origin therefore has the first slice of the pie—only after Origin gets paid will it give the Debtors what's left over. Next, the contract between the Debtors and Origin terminates automatically when Origin receives its payments, and, importantly, the Debtors **may not** terminate or modify the Agreement. (Service Agreement, p. 2 ("This Agreement and its terms shall remain in full effect and **may not be voided or its terms modified by the Company,** its successors-in-interest, creditors, or any court in the event of Company's bankruptcy, reorganization, or liquidation or sale of its assets.") (emphasis added).) Finally, the Debtors have no right to approve or otherwise direct the claim—the *only* requirement of the Debtors under the Agreement is providing their records to Origin, as requested by Origin. (Service Agreement, p. 1, para. 4 ("Company understands that Origin *may* require Company's assistance to obtain records, collect data, and generate reports in order to maximize Company's recovery. Company will, to the extent it is reasonably able to do so, provide Origin with the information requested or authorizations to obtain such information from third parties.") (emphasis added).) However, in this case, the Debtors have fulfilled Origin's requests for records, and had done so by May 2022. Origin already has all the information from the Debtors that Origin needed to pursue the Claim. Origin has not requested any further information from the Debtors. The Debtors had fulfilled their responsibility to provide records to Origin by May 2022, and Origin had in hand all the information required from the Debtors by May 2022, about seven or eight months *before* the Petition Date. (*See*, Akel Affidavit, para. 11.)

23. Therefore, because the Debtors assigned the Claim to Origin before the Petition Date, the bankruptcy estate does not own or hold the Claim.

> **B. The Debtors have no further material unperformed future obligations pursuant to the Service Agreement and, therefore, the Service Agreement is not an executory contract subject to rejection.**

24. In support of the argument that the Service Agreement is an executory contract subject to assumption or rejection, the UCC makes the conclusory and unsupported statement that there are a "litany of performance obligations on both sides of the Service Agreement that still remain unperformed." (UCC Response, p. 5, para. 11.) The UCC does not identify the Debtors' performance obligations. The UCC then claims that whatever performance requirements remain are "material obligations under the Service Agreement" but fails to identify those obligations other than "the lengthy process to reconcile the claims." (*Id.*) What the UCC fails to mention is that the reconciliation process is all work to be done by Origin, not the Debtors. The reconciliation process occurs between Origin and the Claims Administrator. If the Debtors could have had any role in the claim submission or reconciliation process, it would only have been to provide information to Origin, if not already provided. But Origin already has in hand all the information Origin requires from the Debtor necessary to pursue – and maximize – the Claim. (Akel Affidavit, para. 11.) No further information from the Debtors is required. (*Id.*) Additionally, the UCC fails to identify any remaining obligations of the Debtors and certainly fails to identify any remaining obligations that would or could give rise to a liability of the Debtors. *See Matter of Falcon V, L.L.C.*, 44 F.4th 348, 352–53 (5th Cir. 2022) ("***Only*** where a contract has at least one material unperformed obligation on each side—that is, where there can be uncertainty if the contract is a net asset or [a net] liability for the debtor—do we invite the debtor's business judgment on whether the contract should be assumed or rejected." (Emphasis added.))

25. The UCC also erroneously asserts that the Service Agreement can be terminated at any time. (UCC Response, p. 5-6, para. 11.) Only the Letter of Agency can be terminated by the

Debtors (upon written notice to Origin). (Letter of Agency, para. 5.) In stark contrast to the UCC's representations to the Court, *the Service Agreement* explicitly states that it cannot be voided or modified by the Debtors:

> 8. This Agreement shall remain in effect until Company receives all claim benefits (whether check, vouchers or other) to which it is entitled pursuant to this Agreement, at which time Origin's authority to act as Company's agent shall terminate automatically. This Agreement and its terms shall remain in full effect and may not be voided or its terms modified by the Company, its successors-in-interest, creditors, or any court in the event of Company's bankruptcy, reorganization, or liquidation or sale of its assets.

(Service Agreement, p. 2, para. 8.)

26.  There are no material, unperformed obligations of the Debtors. There were no material, unperformed obligations of the Debtors on the Petition Date. The Service Agreement simply is not an executory contract subject to rejection. (The UCC and the Debtors cannot create a material, unperformed obligation on the Debtors side simply by wishing it so or by creating fanciful hypotheticals.)

27.  Furthermore, the Service Agreement encompasses the Visa Interchange Litigation claims and claim recoveries of nine (9) Party City affiliates or subsidiaries that have not filed for bankruptcy protection are not numbered among the Debtors in these jointly administered cases, namely Anagram International, Anagram Holdings, Party City Franchise Group, Gags and Games, Party Galaxy, iParty, Factory Card & Party Outlet, Party America, and Amscan NM Land LLC. (Service Agreement, p. 3.) Neither the UCC nor the Debtors have considered whether the Service Agreement may be rejected by the Debtors on behalf of the non-debtor Party City affiliates and subsidiaries. Certainly, the Bankrupcy Code does not permit the Debtors to reject the Service Agreement for the non-debtor entities.

### C. Origin does not have an unsecured claim against the Debtors because Origin owns the Debtors' Claim in the Visa Interchange Litigation and because the Service Agreement is, under the holding of *Matter of Falcon V*, an asset of the bankruptcy estate, not a liability.

28. The UCC and the Debtors contend that Origin would only have an unsecured claim[7] based on Service Agreement or rejection thereof. The UCC and the Debtors simply misapprehend the Debtors' current relationship to the Claim under the terms of the Service Agreement, and the UCC and the Debtors misunderstand Origin's rights in and ownership of the Claim.

29. As stated above, the Debtors do not have an executory contract with Origin – instead, the Debtors have a contingent asset, namely, a percentage of whatever recovery Origin is able to obtain in the Visa Interchange Litigation. *Thus, the Debtors have a contingent claim against Origin pursuant to the Service Agreement, not vice-versa.* The Debtors do not hold any rights or claims in the Visa Interchange Litigation itself (or at least not to Origin's portion). Nor do the Debtors have any ownership rights to the Claim itself; the Debtors assigned the right to recover any claim to Origin.

30. Even if this Court holds that the Service Agreement does not effect an assignment to Origin, the Service Agreement provides for a percentage of any Claim recoveries to go to the Debtors *after* Origin retains its share. [A] contract where the debtor fully-performed all material obligations, but the nonbankrupt counterparty has not [fully performed], cannot be executory, that contract can be viewed as just an asset of the estate with no liability." *Matter of Falcon V, L.L.C.,*

---

[7] The UCC also claims that Origin has not filed a proof of claim and that, if Origin filed a claim, it would be untimely. Please note that when the Debtors filed this Chapter 11 proceeding on or about January 17, 2023, Origin was not listed as a creditor. Origin is not identified on the creditor matrix. Origin did not receive notice of petition filing. Moreover, Origin was not notified of the claims bar date. In fact, Origin did even receive Notice of the Debtors' Plan Supplement or Rejection Notice until May 8, 2023, about 10 days after the Debtors filed the Plan Supplement and the Rejection Notice. Clearly, the Debtors did not think that Origin held a claim against the Debtors for which a proof of claim was required. The Debtors only in belated hindsight decided the Origin holds a claim, espousing that position only *after* the UCC persuaded the Debtors to reject the Service Agreement and *after* Origin objected to rejection.

44 F.4th 348, 352-53 (5th Cir. 2022). The Service Agreement does not give rise to an unsecured claim in favor of Origin.

31. Thus, Origin does not hold a claim in the Debtors' bankruptcy case(s); the Debtors are not liable to Origin now and were not liable to Debtors on the Petition Date. Instead, the Service Agreement is an asset of the bankruptcy estate to the extent of any recoveries payable to the Debtors.

## Conclusion

32. All of the UCC's and the Debtors' contentions and arguments fail as a matter of law and fact. The Bankruptcy Code does not provide an avenue for the Debtors or the UCC to avoid the pre-petition assignment that occurred by virtue of the Service Agreement nor does the Bankruptcy Code permit rejection of the Service Agreement, nor does the Bankruptcy Code permit the Debtors or the UCC to steal from Origin the recovery for which Origin has already performed much of the work. Origin respectfully submits that its objection to the Debtors' Notice of Rejection must be sustained and the attempt to reject the Service Agreement must be denied.

## Reservation of Rights

33. Origin reserves the right to amend and/or supplement this Memorandum, Supplement, and Reply prior to any hearing.

**For these reasons,** ORIGIN SETTLEMENT ADVISORS LLC respectfully objects to the Debtors' attempt to reject the Service Agreement and to all of the Plan provisions related thereto (especially those that would potentially effect a *sub rosa* rejection by discharging the Debtors from the Service Agreement or releasing the Debtors therefrom), and urges the Court to sustain Origin's objection and to deny the Debtors' attempt to reject the Service Agreement. Origin also prays for such other and further relief to which it may show itself justly entitled.

Filed: September 4, 2023.

> Respectfully submitted,
>
> **SCOTTHULSE** <sup>PC</sup>
> 201 E. Main, 11th Floor
> P.O. Box 99123
> El Paso, Texas 79999-9123
> (915) 533-2493
> (915) 546-8333 Telecopier
>
> By:  */s/ Robert R. Feuille*
> **ROBERT R. FEUILLE**
> State Bar No. 06949100
> Counsel for Origin Settlement Advisors LLC

### CERTIFICATE OF SERVICE

I hereby certify that on this 4rd day of September, 2023, a true and correct copy of the foregoing instrument was served upon those parties receiving electronic notice through the CM/ECF system.

> */s/ Robert R. Feuille*
> **ROBERT R. FEUILLE**